## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sam Wolk, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>The City of Brooklyn Center; Brooklyn Center Police Chief Tim Gannon, *in his individual capacity*; Brooklyn Center Police Commander Tony Gruenig, *in his individual capacity*; Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual capacity,* Minnesota Department of Public Safety; Department of Public Safety Commissioner John Harrington, *in his individual capacity,* Chief of Minnesota State Patrol Colonel Matt Langer, *in his individual capacity,* Minnesota Department of Natural Resources; Minnesota Department of Natural Resources Director of Enforcement Colonel Rodman Smith*, in his individual capacity,* Minnesota Department of Natural Resources Incident Commander Captain Aaron Kahre*, in his individual capacity*; and John Does 1-100, *in their individual capacities*,<br><br>               Defendants. | Case No. 22-cv-1666 (WMW/DTS)<br><br><br>**<u>AMENDED COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.    This is an action for damages, injunctive, and declaratory relief to declare as unlawful, and put an end to, the systematic use of excessive force by the Brooklyn Center Police Department ("BCPD"), Hennepin County Sheriff's Office ("HCSO"), the

Minnesota State Patrol ("MSP"), and the Minnesota Department of Natural Resources ("DNR") against peaceful protestors exercising their first amendment rights.

2.      On April 11, 2021, twenty-year-old Daunte Wright was killed by Brooklyn Center Police Department officer Kim Potter. Fewer than ten miles away, former Minneapolis Police Officer Derek Chauvin was sitting on trial for the murder of George Floyd on May 25, 2020. On the same day of Wright's killing, many people in Brooklyn Center and various other locations around Minneapolis began protesting against racialized police violence and systemic racism in law enforcement.

3.      However, as was so brutally demonstrated during the George Floyd protests in May 2020, these peaceful demonstrations were met with overwhelming and unreasonable shows of force from law enforcement, including the Defendants. Law enforcement gave orders to disperse well before curfew and the protesters who stood in solidarity against police brutality were indiscriminately shot at with "less lethal" weapons including rubber bullets, pepper spray, and tear gas. Defendants, utilized these weapons without restraint or justification, and with wanton disregard for the safety or the rights of the protesters.

4.      The HCSO avows their mission as "Serving and Protecting all in our Community by furthering Equal Justice, Safety and Wellness." HCSO Policy Manual – Our Mission.  All Defendants take an oath to uphold the federal and state constitutions and to enforce federal, state, and local laws.

5.      Defendants' conduct repeatedly demonstrated their failure to take seriously this duty. As the events following Daunte Wright's killing show, these defendants acted as the oppressors of those they have sworn an oath to protect.

6.      One trenchant example of the defendants' blatant disregard for the rights and safety of the community they serve came in the early hours of April 12th—the first night of protests—as a crowd of approximately 500 protesters approached the Brooklyn Center police station at 6645 N. Humboldt Avenue. The police formed a barricade around the police station and began launching two-minute barrages of chemical and less-lethal munitions indiscriminately into the gathered crowd. Across Humboldt Avenue is a complex of residential apartments that quickly became awash in the gaseous chemical agents, affecting untold innocent residents including children.[1]

7.      More disturbing, however, are the actions of those parties—HCSO, DPS—who were intimately involved in the brutalizing of protesters during the George Floyd protests and who, despite a maelstrom of complaints and lawsuits, failed to change

---

[1] Mara Klecker, *'It's absolutely terrorizing': Residents near Brooklyn Center unrest rattled by clashes, tear gas*, Star Tribune (April 14, 2021, 9:25 PM), https://www.startribune.com/it-s-absolutely-terrorizing-residents-near-brooklyn-center-unrest-rattled-by-clashes-tear-gas/600046078/. Researchers believe that, beyond the immediate, incapacitating effects of tear gas, the chemicals may cause long-term health damage. Susan Du, *Operation Safety Net's crowd-control chemical weapons pose a mystery for medical researchers,* Star Tribune (May 3, 2021, 5:22 AM), https://www.startribune.com/operation-safety-net-s-crowd-control-chemical-weapons-pose-a-mystery-for-medical-researchers/600052860/.

department policies and employed the same unconstitutional tactics against those protesting the killing of Daunte Wright.[2]

8.      Plaintiff brings this action alleging that Defendants' conduct violated their[3] First Amendment rights to freedom of speech and assembly, their Fourth Amendment rights to be free from excessive force, and their Fourteenth Amendment right to due process.

## PARTIES

9.      Plaintiff Sam Wolk lives in Minnesota. Wolk engaged in peaceful protest each day of April 13 through April 16, 2021, near the Brooklyn Center Police headquarters in Brooklyn Center, Minnesota. On April 13, Wolk was, without warning, unreasonably indirectly exposed to tear gas by John Doe Officers without justification. On April 14, Wolk was, without warning, unreasonably subjected to tear gas and pepper spray, and shot with a rubber bullet by John Doe officers without justification. The unlawful use of chemical agents and shooting by John Doe officers caused Wolk pain and suffering, and mental anguish.  Wolk wishes to continue to lawfully exercise their First Amendment rights but has been become hesitant to do so due to the danger that they could suffer similar unlawful abuse by the government.

10.      Defendant City of Brooklyn Center is a municipality in Hennepin County in the State of Minnesota with its principal place of business located at 6301 Shingle Creek

---

[2] *See, e.g., Goyette, et al. v. City of Minneapolis, et al.*, File No. 20-cv-01302 (D. Minn.); *see also Samaha, et al. v. City of Minneapolis, et al.,* File No. 20-cv-01715 (D. Minn.); *see also Armstrong, et al. v. City of Minneapolis, et al.,* File No. 20-cv-01645 (D. Minn.).
[3] Plaintiff Wolk uses they/their/them pronouns.

Parkway, Brooklyn Center, MN 55430. At all times relevant, this Defendant was authorized to and did operate and maintain the Brooklyn Center Police Department, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendants Gannon and Gruenig, who were acting within the course and scope of their employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the City Brooklyn Center.

11.     Defendant Tim Gannon is a resident of Minnesota. Gruenig served as a Chief of the Brooklyn Center Police Department, and on information and belief, was one of the chief policymakers of the Brooklyn Center Police Department for all times relevant. Prior to his resignation on April 13, 2021, Gannon ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. Gannon was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Brooklyn Center Police Department. Gannon is sued in his individual capacity.

12.     Defendant Tony Gruenig is a resident of Minnesota. Gruenig serves as a Police Commander for the Brooklyn Center Police Department, and on information and belief, was one of the chief policymakers of the Brooklyn Center Police Department for all times relevant. Gruenig ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. Gruenig was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Brooklyn Center Police Department. Gruenig is sued in his individual capacity.

13.    Defendant Hennepin County is a county in the State of Minnesota with its seat in Minneapolis, MN. At all times relevant, this Defendant was authorized to and did operate and maintain the Hennepin County Sheriff's Office, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendant Hutchinson, who were acting within the course and scope of their employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the Hennepin County. Defendant Hennepin County is also referred to herein as "Hennepin County Sheriff's Office" and "HCSO".

14.    Defendant David Hutchinson is a resident of Minnesota. Hutchinson serves as the Hennepin County Sheriff for the Hennepin County Sheriff's Office, and on information and belief, at all times relevant, was one of the chief policymakers of Defendant Hennepin County Sheriff's Office. At all times relevant, Hutchinson ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Hutchinson was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Hennepin County Sheriff's Office. Hutchinson is sued in his individual capacity.

15.    Defendant Minnesota Department of Public Safety ("DPS") has its principal office located at 445 Minnesota Street, Saint Paul, MN 55155. At all times relevant, DPS was authorized to and did operate and maintain the Minnesota State Patrol, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendants Harrington and Langer, who were acting within the course and scope of their employment,

under the color of state and federal law and in accordance with the customs, policies, and practices of the DPS.

16.     Defendant John Harrington is a resident of Minnesota. Harrington serves as the Commissioner for the Minnesota Department of Public Safety, and on information and belief, at all times relevant, was one of the chief policymakers of Defendant Minnesota Department of Public Safety. At all times relevant, Harrington ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Harrington was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Minnesota Department of Public Safety. Harrington is sued in his individual capacity.

17.     Defendant Colonel Matthew Langer is a resident of Minnesota. Col. Langer serves as the Chief of the Minnesota State Patrol for the Minnesota Department of Public Safety, and on information and belief, at all times relevant, was one of the chief policymakers of Defendant Minnesota Department of Public Safety. At all times relevant, Col. Langer ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Col. Langer was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Minnesota Department of Public Safety. Col. Langer is sued in his individual capacity.

18.     Defendant Minnesota Department of Natural Resources ("DNR") has its principal place of business located at 500 Lafayette Road, Saint Paul, MN 55155. At all

times relevant, DNR was authorized to and did operate and maintain an enforcement division, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendants Smith and Kahre, who were acting within the course and scope of their employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the DNR.

19.     Defendant Colonel Rodman Smith is a resident of Minnesota. Col. Smith serves as Director of Enforcement for the Minnesota Department of Natural Resources, and on information and belief, at all times relevant, was one of the chief policymakers of the Department of Natural Resource's enforcement division, operational response teams, mobile field forces, mobile response teams, and any other such enforcement units. At all times relevant, Col. Smith ordered, authorized, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Col. Smith was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Minnesota Department of Natural Resources. Col. Smith is sued in his individual capacity.

20.     Defendant Captain Aaron Kahre is a resident of Minnesota. Captain Kahre serves as a conservation officer for the Minnesota Department of Natural Resources, and on information and belief, at all times relevant, was the incident commander on the scene and responsible for minute-to-minute actions of the operational response teams, mobile field forces, mobile response teams, and any other such enforcement units. At all times relevant, Captain Kahre ordered, authorized, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Captain Kahre was acting under

color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Minnesota Department of Natural Resources. Captain Kahre is sued in his individual capacity.

21.     Defendants John Does 1-100 are unidentified individuals who committed the various acts set forth below, or ordered other John Doe Defendants to commit excessive force, including as agents of Defendants, and are reserved for others who worked together with Defendants to effectuate the harm complained of herein. At all times relevant, John Does were acting under color of state and federal law, within the course and scope of their official duties and in accordance with the customs, policies, and practices of the City of Brooklyn Center, the Hennepin County Sheriff's Office, the Minnesota Department of Public Safety, or the Minnesota State Patrol. Defendants solely possess the discovery necessary to identify the John Doe Defendants. John Does are sued in their individual capacities.

22.     Defendants Tim Gannon, Tony Gruenig, David Hutchinson, John Harrington, Matt Langer, Rodman Smith, Aaron Kahre, and John Does 1-100 are referred to collectively herein as "The Individual Defendants."

23.     Defendants City of Brooklyn Center, Hennepin County, Minnesota State Patrol, Minnesota Department of Public Safety, and Minnesota Department of Natural Resources are referred to collectively herein as the "State, County, and Municipal Defendants."

## JURISDICTION AND VENUE

24.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this matter, which arises in part under the laws of the United States including 42 U.S.C. § 1983.

25.     Venue is proper in this district under 28 U.S.C. § 1391, as Defendants reside in this district, and the events or omissions giving rise to the claims set forth herein occurred in this district.

## FACTUAL ALLEGATIONS

**A.     The Aggressive Police Response to Demonstrations Over the Killing of Daunte Wright**

**1.     Sunday, April 11, 2021, approximately 2:00 P.M.**

26.     On April 11, 2021, twenty-year-old Daunte Wright was driving with his girlfriend in Brooklyn Center to the house of his older brother. Two police officers, including former BCPD officer Kim Potter, pulled over Wright's vehicle for an expired license plate tag. When the officers ran Wright's license number, they discovered that he had an outstanding warrant for a gross misdemeanor.

27.     Potter's bodycam footage showed the officers approach Wright, who stood outside his vehicle with his hands behind his back as an officer tried to handcuff him. Wright broke away from the officer's grip and moved back into the driver's seat. Potter shouted "Taser! Taser! Taser!" before drawing her Glock 9mm handgun shooting Wright in his left side. Wright's car sped away for a short distance before crashing into another vehicle and stopping. Potter can be heard on bodycam screaming "Holy [expletive]! I just shot him." An ambulance was called and Wright was pronounced dead at the scene.

28.     Immediately following the killing, public comment on the incident was scattered and inconsistent. Then-chief of Brooklyn Center Police Department Tim Gannon did not comment on the killing, did not release the bodycam footage, and did not disclose the name of Wright or Potter. The Minnesota Bureau of Criminal Apprehension released a report in the early afternoon of April 11th that named Wright as the victim and described the incident as a fatal shooting during a traffic stop where Wright tried to flee arrest for an outstanding warrant.[4]

**2.     Sunday, April 11, 2021 evening – Monday, April 12, 2021 morning**

29.     In the hours after the shooting, protesters gathered at the scene, waving Black Lives Matter flags and yelling "Justice for Daunte." Some protesters came directly from an earlier rally in St. Paul organized by families with relatives who had been killed by police.[5] The number of protesters at and around the site of Wright's killing eventually grew to more than one hundred.

30.     Brooklyn Center Mayor Mike Elliot issued a curfew from 1:00 a.m. until 6:00 a.m. Monday morning for anyone in the city except for those traveling to work or emergency situations.[6]

---

[4] Kyle Brown, *BCA investigating after Brooklyn Center officer shoots, kills driver during traffic stop,* KSTP (April 11, 2021, 4:46 PM), https://kstp.com/kstp-news/top-news/bca-investigating-after-brooklyn-center-officer-shoots-kills-driver-during-traffic-stop/.

[5] Jared Goyette & Andrea Salcedo, *Police fatally shoot man, 20, in suburban Minneapolis, sparking protests*, The Washington Post (April 12, 2021, 3:42 AM), https://www.washingtonpost.com/nation/2021/04/11/daunte-wright-brooklyn-center-minnesota/.

[6] Kyle Brown, *Brooklyn Center curfew implemented following protests over fatal police shooting,* KSTP (April 11, 2021, 10:23 PM), https://kstp.com/kstp-news/top-

31.     As the number of protesters grew, police reinforcements in tactical gear arrived in the residential area.[7] At approximately 7:15 p.m., police in riot gear formed a line in front of the protesters but backed away and exited the area.

32.     Around nightfall, protesters regrouped near the Brooklyn Center Police Department Headquarters where they had erected a makeshift memorial for Wright.

33.     At approximately 9:00 p.m., the crowd of protesters continued their demonstration near the Police Department Headquarters, where law enforcement had created a perimeter. The law enforcement presence was comprised of, among others, officers from the Brooklyn Center Police Department, Hennepin County Sheriff's Office, and the Minnesota State Patrol. Just after 9:30 p.m., Brooklyn Center Police Commander Tony Gruenig (later to be named interim Brooklyn Center Police Chief) declared the demonstration outside the police station an unlawful assembly and gave protesters an order to disperse within 10 minutes.

34.     Just before 10:00 p.m., officers began firing "less-lethal rounds and flash-bang grenades" to disperse protesters remaining in the area.[8] Images and video from social media show clouds of chemicals engulfing groups of protesters and drifting across the street towards residential buildings.

---

news/brooklyn-center-curfew-implemented-following-protests-over-fatal-police-shooting/.

[7] *Id.*

[8] *Id.*

35.     Officers shot gas canisters indiscriminately into groups of protesters, and some protestors were struck directly by the projectiles. Officers appeared to target individuals who approached spent gas canisters to identify their make and model.

36.     At several points, officers shot less-lethal munitions and gas canisters at individuals with clearly identified press credentials. Several members of the press who were gathered on the property directly North of the police department with "press" prominently displayed on their clothing were fired at several times. There were no protesters in their vicinity.

37.     Commander Gruenig, acting on behalf of the Brooklyn Center Police Department, continued declaring the gathering to be an unlawful assembly and ordering the crowd to disperse. Several times he included "this includes the media."

38.     Dozens of protesters suffered injuries from munitions fired by the police, and several demonstrators were detained by police.

**3.     Monday, April 12, 2021**

39.      On the Morning of April 12, 2021, then-chief Tim Gannon released Potter's bodycam footage and identified her as the officer who killed Wright. Gannon commented that Potter had mistaken the taser on the left side of her duty belt with the handgun holstered on the right side and had intended to tase Wright to subdue him. Kim Potter was a 26-year police veteran. In 2019, Potter became a local police union president, and was an instructor with the Brooklyn Center Police Department. She was training two junior officers when she stopped and killed Daunte Wright.

40.     Minnesota Department of Public Safety Commissioner John Harrington justified the April 11, 2021, use of force due to reports of break-ins at least 20 businesses at a "nearby" mall.[9] However, the mall in question, the Shingle Creek Mall, is over five miles away from the BCPD headquarters and on the other side of a six-lane freeway. Officers did not act to protect those businesses, but instead employed violent and excessive force on the protestors in front of the Brooklyn Center Police Station. Harrington added that more troops from the National Guard were going to be deployed in the Brooklyn Center area.[10]

41.     Following the actions of law enforcement officers the previous night, Mayor Elliot convened the Brooklyn Center City Council for an extraordinary session to introduce and debate Resolution No. 2021-58: A Resolution Limiting Police Crowd Control Tactics During Protests. After less than 30 minutes of discussion, the Resolution passed 4-0, banning from use by the BCPD the following crowd control tactics:[11]

    a.   The use of gas and other chemicals;

---

[9] Griff Witte & Mark Berman, *Minnesota killing adds to the anger, and the stakes, as Chauvin trial nears its end,* The Washington Post (April 12, 2021, 7:21 PM), https://www.washingtonpost.com/national/daunte-wright-minneapolis-protests/2021/04/12/d6a9150c-9bd0-11eb-b7a8-014b14aeb9e4_story.html.

[10] Goyette & Salcedo, *supra* note 5.

[11] Cheryl Teh, *Brooklyn Center, Minnesota, city council prohibited the use of tear gas. The police broke the rule almost immediately.,* Insider (April 12, 2021, 9:51 PM), https://www.insider.com/brooklyn-center-police-prohibited-tear-gas-then-broke-own-rules-2021-4; *see also* Brooklyn Center City Council Resolution No. 2021-58, available at http://bc-img.ci.brooklyn-center.mn.us/WebLink/DocView.aspx?id=978650&dbid=0&repo=BrooklynCenter.

    b.  Violent crowd control and dispersion techniques such as the use of rubber bullets as a tool against protesters;

    c.  Kettling, the corralling of demonstrators into a confined space so they cannot leave and are then arrested slowly;

    d.  Violent tactics such as chokeholds;

    e.  Preventing protesters from taping law enforcement personnel; and

    f.  Law enforcement covering up badge numbers.

42.    The Brooklyn Center City Council also recommended then-chief Gannon and former Officer Potter both resign.

43.    Governor Tim Walz announced a 7:00 p.m. curfew for that evening for Hennepin, Ramsey, Anoka, and Dakota counties along with increased deployment of police and National Guard.

44.    By the evening of April 12, members of the Minnesota National Guard arrived in Brooklyn Center to join forces with "Operation Safety Net"—a multi-agency police force established in the wake of the George Floyd protests which was deployed in and around Minneapolis during the Derek Chauvin trial. Operation Safety Net contains officers from the Minnesota State Patrol, Anoka County Sheriff's Office, Eden Prairie Police Department, University of Minnesota Police Department, and Conservation Officers from the Department of Natural Resources.[12]

---

[12] This list is non-exhaustive but is taken from the Operation Safety Net website. While that website is no longer directly available, it is archived at: https://web.archive.org/web/20210413044756/https://safetynet.mn.gov/Pages/default.asp

45.     Upon information and belief, it was Defendants Gannon, Gruenig, Hutchinson, and Harrington who were in charge of the tactical operations during all relevant periods of time, including the decisions on use of force against protesters.

46.     By curfew, a large group of protesters had gathered at the Brooklyn Center Police Department Headquarters and were again fired upon indiscriminately by law enforcement with tear gas, flashbang grenades, and pepper spray.

47.     Among those involved were law enforcement officers from the HCSO, BCPD, MSP, DNR, and the National Guard. Again, Defendant Gruenig from the BCPD gave the unlawful assembly and dispersal orders throughout the night.

48.     Approximately one hour after curfew, law enforcement deployed a large military-style Humvee in front of the police department. As the vehicle approached the perimeter, a protester who stood alone near the fence was shot from approximately six feet by an officer inside the perimeter.

---

x. Since the protests surrounding the construction of the Enbridge Line 3 Pipeline, the DNR has become increasingly militarized. Emails and public records demonstrate that Conservation Officers have received riot control training from the MSP as well as a stockpile of crowd-control weapons and vehicles from various other agencies and the Minnesota National Guard. DNR's budget for its Enforcement Division has increased by nearly 30% from fiscal year 2020, in addition to a $6.3 million appropriation to be split between DNR and MSP. *See* Andrew Neef, *Multi-Agency Task Force Prepares "Rules of Engagement" for Line 3 Protests*, Unicorn Riot (February 11, 2019) (https://unicornriot.ninja/2019/multi_agency_task_force_prepares_rules_of_engagement_for_line_3_protests/); Tommy Wiita, *House passes, Senate amends $7.8M in funding for police response to civil unrest*, KSTP (April 27, 2021) (https://kstp.com/minnesota-news/house-passes-senate-amend-funding-for-police-response-to-civil-unrest-/6088453/).

49.     When a protester affixed a small flag bearing the letters BLM ("Black Lives Matter") to the perimeter fence, law enforcement officers fired several shots at the flag—apparently using the symbol of a movement against police brutality as target practice.

50.     Law enforcement again fired gas canisters indiscriminately at the assembled crowds and towards the surrounding buildings. One gas canister was fired into the front yard of the residential property adjacent to the police department where no protesters were gathered. That house, along with the apartment buildings across Humboldt Avenue from the police station, became engulfed in noxious smoke.

51.     A large contingent of officers from the MSP and DNR formed a line across Humboldt. Avenue and advanced on protesters, driving them north towards a strip mall and gas station. Several protesters were pepper-sprayed, shot with rubber bullets, and/or thrown to the ground for arrest.

52.     As police advanced down Humboldt Avenue, officers surrounded several vehicles and ordered all occupants out of the car and onto the ground at gunpoint. At one point, a group of State Patrol and DNR officers surrounded a parked vehicle and aimed a grenade launcher at the driver through the driver-side window. When the man got out of the vehicle he was thrown to the ground and arrested.

53.     That night, a total of around 40 protesters were arrested according to an Operation Safety Net press conference.[13]

---

[13] MN Operation Safety Net, *News Conference: April 13, 2021 – Briefing Update #1 (12:30 a.m.,* YouTube (April 113, 2021), https://www.youtube.com/watch?v=JpP0cYouWJ0

4.      **Tuesday, April 13, 2021**

54.      Potter submitted her resignation, although Mayor Mike Elliot did not accept the resignation that day, insisting on an internal process to ensure accountability.

55.      Elliot announced that Tim Gannon had resigned as BCPD police chief and Brooklyn Center City Manager Curt Boganey was fired. Tony Gruenig was named interim BCPD police chief.

56.      Brooklyn Park Mayor Mike Elliot announced a curfew beginning April 13 at 10:00 p.m. to 6:00 a.m. the following morning.

57.      Around 8:30 p.m., crowds began to gather at the Brooklyn Center Police Department headquarters, many holding umbrellas to shield them from exposure to the toxic tear gas.

58.      Plaintiff Wolk was present outside the Brooklyn Center Police headquarters starting at approximately 8:30 p.m. Between 8:30 and 9:00 p.m., they were subjected to tear gas, flashbang grenades, and other such crowd-control munitions fired at and around them.

59.      Just after 9:00 p.m., almost an hour before the curfew set by Governor Walz, law enforcement began commanding media and press to leave the area immediately. After several such dispersal warnings, officers marched on the protesters, again discharging canisters of tear gas into the crowd. The law enforcement contingency was again made up of, among others, the BCPD, HCSO, MSP, and DNR.

60.     Officers in riot gear marched towards members of the press who were clearly identified and taking video of the incident. One officer raised his firearm and deliberately shot one such journalist, striking him in the leg with a rubber bullet.

61.     As law enforcement marched on the gathered crowd, they shot gas canisters, rubber bullets, and flash-bang grenades indiscriminately into the crowd. Again, the gas from these canisters drifted towards the apartment buildings on the east side of Humboldt Avenue. Several residents of that apartment complex came outside and pleaded with law enforcement to stop firing because there were children in the apartments.

62.     Following a fourth dispersal order, the advancing police broke into a run, charging at protesters and throwing them to the ground. A large force of unmarked police cars then approached the scene, to prevent cars from leaving and to transport arrested protesters.

**5.     Wednesday, April 14, 2021**

63.     Kim Potter was charged on April 14, 2021, with second-degree manslaughter. She was brought into custody that morning, posted bail, and was released.

64.     At a press conference following Potter's arrest, Brooklyn Center Mayor Wright distanced himself from the law enforcement decisions made regarding protesters, indicating that Hennepin County Sheriff David Hutchinson oversaw the Operation Safety Net agents and their tactics.

65.     The City of Brooklyn Center announced a curfew beginning at 10:00 p.m. on April 14, 2021.

66.     For the fourth night in a row, protesters expressed their outrage at the killing of Daunte Wright by protesting outside the Brooklyn Center Police Department headquarters. The number of law enforcement officers was greater than any of the previous days. Many officers were located inside the reinforced fence that surrounded the Police headquarters, and when protesters approached the fence—many with signs saying "Justice for Daunte"—were sprayed in the face with pepper spray or shot through the fence links with rubber bullets.

67.     Plaintiff Wolk was also present outside the Brooklyn Center Police headquarters.

68.     At approximately 8:30 p.m.—prior to curfew and without warning—a presently unknown number of John Doe officers within the barricade began spraying pepper spray at the gathered protesters through the chain link fence.  These officers also ordered the protesters to back up but did not provide any time for the protesters to comply before deploying pepper spray.

69.     Wolk was then shot in the knee with a rubber bullet by John Doe 1, who fired on Wolk through the chain link fence at a distance of less than ten feet while Wolk was attempting to move away from the fence.

70.     John Doe 1 and other John Doe Defendants were instructed to deploy pepper spray and rubber bullets by other named and John Doe Defendants and/or did so due to a policy or practice, or the training they received (or failed to receive) from the State, County, and Municipal Defendants.

20

71.     As a result their injuries, Wolk had difficulty walking without assistance for weeks. Wolk was later instructed by their doctor not to stand for more than twenty minutes for several weeks. Wolk subsequently began participating in physical therapy and experiences consistent pain in their knee. To-date, Wolk has continued to suffer chronic knee pain and has been referred to a chronic pain specialist for long-term care.

72.     Around 9:00, law enforcement announced that the protesters were an unlawful assembly and gave dispersal orders. Large, military-style armored vehicles arrived on the scene and flanked the protesters on either side of the road. Law enforcement continued to spray protesters with pepper spray through the fence and fire nonlethal ammunition at protesters in a constant volley.

73.     Minnesota DNR Conservation and Minnesota State Patrol officers approached the group from Humboldt Avenue. Several officers rushed forward to make sudden arrests of individuals that were standing idly by the road. Officers walked around the residential buildings located on Humboldt Avenue. shining strobing flashlights into the windows of homes and confronting random bystanders. About ten officers surrounded a vehicle with weapons drawn, pulled out a lone occupant, and arrested him. A total of 24 protesters were arrested.[14]

74.     Officers then approached various members of the press—clearly identified by their press credentials and the professional recording equipment they carried—and broke their equipment, detained them, forced them to be photographed, and then released

---

[14] Minnesota Operation Safety Net (@MinnesotaOSN), Twitter (April 15, 2021, 12:19 AM), https://twitter.com/MinnesotaOSN/status/1382564319502725121.

them. The clear intention of these actions was to harass, intimidate, and punish the members of the press who were documenting the rampant abuses committed by law enforcement.

### 6. Thursday, April 15, 2021

75. Brooklyn Center Mayor Mike Wright wrote a letter to HCSO Sheriff David Hutchinson indicating that Brooklyn Center "remains in need of mutual aid from its partner agencies," and that Wright believed the HCSO had taken command of the situation.[15] Further, Wright responded to "concerns from law enforcement" regarding Brooklyn Center's April 12, 2021 resolution banning the use of tear gas and other dangerous crowd control devices, stating "my view is that as long as protesters are peaceful and not directly interacting with law enforcement, law enforcement should not engage with them."[16]

76. Minnesota State Patrol Col. Matt Langer held a press conference where he was asked about journalists being detained, photographed, and having their equipment broken. Langer dismissed the concerns as "semantics" and insisted that the behavior of the State Patrol towards journalists was their "refined way to process them."[17]

---

[15] Letter from Mike Elliot to David Hutchinson (April 15, 2021), *available at* https://www.documentcloud.org/documents/20691731-mike-elliot-letter.

[16] *More than 100 people arrested on sixth night of Brooklyn Center protests; journalists detained,* MPR News (April 17, 2021, 10:55 AM), https://www.mprnews.org/story/2021/04/17/law-enforcement-response-swift-on-sixth-night-of-protests.

[17] *4th night of protests, arrests following shooting of Daunte Wright,* KARE 11 (April 14, 2021 7:34 AM), https://www.kare11.com/article/news/local/daunte-wright/daunte-wright-shooting-kim-potter-arrest-manslaughter-charge/89-c1bc8647-f019-4d27-b3f2-2c2f76a9d013.

77.     Protesters again gathered at the Brooklyn Center Police Department headquarters. As the 10:00 p.m. curfew approached, most of those gathered left the area and no official dispersal orders were given.[18]

**7.     Friday, April 16, 2021**

78.     On the morning of April 16, 2021, District of Minnesota Judge Wilhelmina Wright issued a temporary restraining order ("TRO") barring state law enforcement from using force against journalists or ordering them to disperse while covering protests. The case, *Goyette v. City of Minneapolis*, originally involved similar brutal treatment of the press during the George Floyd protests in May 2020. The complaint was filed on June 2, 2020, but the TRO was denied at that time because by that date, the protests had abated and the court found that a restraining order would not redress the alleged injury. When the Daunte Wright protests began and law enforcement—many of the same agencies and, likely, individual officers—continued to harass and assault members of the press, Goyette again petitioned the court for a TRO.

79.     The 22-page order contained findings of fact reciting a litany of egregious violations of reporters' rights by law enforcement, including that "members of the press have sustained severe injuries at the hands of law enforcement in recent days. These severe injuries include bruising and at least one injury requiring surgery." *Goyette*, 338 F.R.D. 109, 117 (D. Minn. 2021). Additionally, the court concluded that plaintiffs had a fair

---

[18] *No dispersal orders given on 5th night of protests in Brooklyn Center,* KSTP (April 15, 2021, 11:41 PM), https://kstp.com/news/protesters-gather-for-5th-night-in-brooklyn-center-to-call-for-justice-in-daunte-wright-shooting/6076737/?cat=1.

chance on prevailing on the merits of their First Amendment retaliation claim that law enforcement officers were motivated by plaintiffs' exercise of their First Amendment rights. The court found

> Plaintiffs' declarations reflect that a Star Tribune photojournalist, who had a camera and press credentials in clear view, was pepper sprayed in the eye while photographing a scene. According to another journalist, '[o]ne officer just shot our ground reporter in the leg with some kind of impact round – it appeared to be deliberate and not accidental.' These facts suggest that the State Defendants' actions were motivated at least in part by the press's engagement in constitutionally protected activity.

*Id.* at 118 (alterations in original) (internal citations omitted).

80.     The district court granted plaintiffs' motion for a temporary restraining order and enjoined DPS Commissioner John Harrington, MSP Colonel Matthew Langer, and their agents from

> g. arresting, threatening to arrest, or using physical force – including through use of flash bang grenades, non-lethal projectiles, riot batons, or any other means – directed against any person whom they know or reasonably should know is a Journalist . . . *unless* the State Defendants have probable cause to believe that such individual has committed a crime;

> h. using chemical agents directed against any person whom they know or reasonably should know is a Journalist, including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas . . . and other similar substances unless such Journalist presents an imminent threat of violence or bodily harm to persons or damage to property; and

> i. seizing any photographic equipment, audio- or videorecording equipment, or press passes from any person whom the State Defendants know or reasonably should know is a Journalist, or ordering such person to stop photographing, recording, or observing a protest, unless the State Defendants are lawfully seizing that person consistent with this Order.

*Id* at 121-22.[19]

81.   The Minnesota State Patrol has since settled the *Goyette* lawsuit by agreeing to a permanent injunction that prohibits the Minnesota State Patrol from arresting or attacking journalists.[20]

82.   Demonstrating local governance discomfort with the tactics being employed by law enforcement, the Minneapolis City Council passed a resolution opposing the use of tear gas and other less-lethal munitions on protesters.[21]

83.   Friday night saw a large gathering of protesters outside the Brooklyn Center Police headquarters on Humboldt Avenue. After dispersal orders were given to the crowd, police busses arrived on the scene and law enforcement conducted a kettle and mass arrest of 134 protesters.[22]

84.   Dozens of members of the press who had their press credentials clearly visible were ordered at gunpoint to lay on the ground and were held in that position while

---

[19] Major Kurtz of the HCSO clarified to HCSO agents in an internal memorandum that "[t]his TRO, while not issued directly against HCSO, is a declaration of Minnesota law, so HCSO and our Operation Safety Net partners *must* comply with it." However, this memorandum was not circulated until April 20, 2021, well after the protests had essentially ended.

[20] Alex Chhith, *Settlement prohibits Minnesota State Patrol from attacking or arresting journalists*, Star Tribune (Feb. 8, 2022, 8:40 PM), https://www.startribune.com/settlement-prohibits-minnesota-state-patrol-from-attacking-or-arresting-journalists/600144577/.

[21] Tommy Wiita, *In 11-1 vote, Minneapolis City Council opposes use of tear gas on protesters,* KSTP (April 16, 2021, 3:31 PM), https://kstp.com/minnesota-news/in-11-1-vote-minneapolis-city-council-opposes-use-of-tear-gas-on-protesters/6077655/?cat=1.

[22] Niko Georgiades, *Police Break Equipment, Shoot, Beat, and Detain Press,* Unicorn Riot (April 20, 2021), https://unicornriot.ninja/2021/police-break-equipment-shoot-beat-and-detain-press/.

their credentials were checked and their badges and faces pictured by the police.[23] One photojournalist stated that during the police rush and mass arrests, an officer punched him in the face, threw his press badge, and slammed the journalist's head on the ground before ordering him at gunpoint to lay on the ground.[24]

85.     One photo shows a law enforcement officer standing in front of a group of reporters—all of whom are clearly identified, holding or standing near large telecommunications gear, and located at least ten yards from the rest of the crowd—and spraying a heavy stream of pepper spray onto their faces from a distance of approximately 4 feet away.[25]

**8.     Saturday, April 17, 2021**

86.     Brooklyn Center Mayor Wright issued a curfew for 11:00 p.m.

87.     The protests were largely quiet, as national civil rights figures Jesse Jackson and Rep. Maxine Waters appeared in Brooklyn Center and spoke to the crowd.

88.     There were no dispersal orders given following curfew. There were no further arrests.

89.     From the period of April 11 to April 20, 2021, HCSO used hundreds of less-lethal munitions against unarmed protesters, including foam rounds (288), 40mm 50 Meter Arial Warning Signal (24), 40mm 100 Meter Arial Warning Signal (1), OC Blast Ball (37),

---

[23] *Id.*

[24] *See* Declaration of Timothy Evans, *Goyette v. City of Minneapolis*, No. 0:20-cv-01302 (D. Minn.), available at https://www.documentcloud.org/documents/20618242-declaration-of-timothy-evans.

[25] Alex Kent (@AlexKentTN), Twitter (April 17, 2021, 12:25 AM), https://twitter.com/AlexKentTN/status/1383290508181590018.

and various other munitions which deploy chemical agents such as tear gas. During the same period, DNR deployed chemical munitions and direct impact munitions, as well as generalized use of force. DNR would not identify the type or quantity of munitions they deployed against the protesters.

## B.   HCSO's Policies Regarding Use of Force

90.   HCSO Policy Manual ("HCSO Policy") defines "Force" as: "The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained." [26]

91.   According to the same HCSO Policy, "When de-escalation techniques are not effective or appropriate, a deputy may consider the use of other than deadly force to control a non-compliant or actively resistant individual. A deputy is authorized to use agency-approved other than deadly force techniques and issued equipment in the following circumstances (Minn. Stat. § 609.066 and Minn. Stat. § 609.33): (a) [i]n effectuating a lawful arrest; or (b) [i]n the execution of a legal process; or (c) [i]n enforcing an order of the court; or (d) [i]n executing any other duty imposed by law; or (e) [i]n defense of self or another." HCSO Policy § 300.3.5 Use of Other Than Deadly Force.

92.   Kinetic energy projectiles, including rubber bullets and 40-mm "less lethal" foam rounds, are "not to be used to psychologically torment, elicit statements or punish

---

[26]   Hennepin County Sheriff's Office, *Policy Manual* § 300.1.1 Definitions (the version of these policies was provided to Plaintiff through a Data Records Request and is in the possession of Plaintiff's counsel).

any individual," but rather "can be used in an attempt to de-escalate a potentially *deadly* situation." HCSO Policy § 308.9.3 Kinetic Energy Projectile and Marking Rounds Guidelines, Special Deployment Considerations (emphasis added).

93.     HCSO Policy states that "[t]he need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death." *Id.* § 308.9.2 Kinetic Energy Projectile and Marking Rounds Guidelines, Deployment Considerations. The policy explicitly advises against targeting a person's head and neck unless "the suspect poses an imminent threat of serious bodily injury or death to the deputy or others." *Id.*

94.     Importantly, the HCSO Policy also mandates that a verbal warning be considered "unless it would otherwise endanger the safety of deputies or when it is not practicable due to the circumstances:" "The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other deputies and individuals that the device is being employed." *Id.*.

95.     The HCSO Policy also encourages the use of de-escalation tactics "whenever possible and appropriate before resorting to force and to reduce the need for force." *Id.* § 300.3.4 Use of Force Procedure, De-Escalation. De-escalation tactics listed in the policy include "command presence, advisements, warnings, verbal persuasion, and tactical repositioning." *Id.* § 300.1.1. Use of Force, Purpose and Scope, Definitions.

96.     Finally, HCSO Policy mandates that, "as soon as practical, a deputy shall provide appropriate medical care consistent with his or her training to any individual who has visible injuries, complains of being injured, or requests medical attention." *Id.* § 300.3.1. Use of Force Procedure; General Provisions.

97.     As stated above, often times, HCSO officers frequently ignored cries of help from protestors for medical assistance after having force used on them.

98.     Defendants' repeated decisions to ignore their own policies constitutes a custom and practice of failing to, and refusing to, follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other members of the public.

99.     HCSO policy permits chemical munitions be used for "crowd control, crowd dispersal or against barricaded suspects based on the circumstances" and states only the "Watch Commander, Incident Commander or Emergency Services Unit Commander may authorize the delivery and use of chemical munitions, and only after evaluating all conditions known at the time and determining that such force reasonably appears justified and necessary." *Id.* § 308.6. Control Devices, Chemical Munition Guidelines.

100.    On information and belief, the authorization for use of force was given as a blanket authorization by the on-scene incident commander(s) and was not given on an incident-by-incident basis.

101.    The identities of those in command and those authorizing the uses of force are mostly unknown but are believed to include Defendants Gannon, Gruenig, Hutchinson, Harrington, Langer, Smith, and Kahre. This information is uniquely in the hands of Defendants and discovery will bring to light their identities.

## C.     Defendants Have a Pattern and Practice of Using Excessive Force

102.    Defendants did not follow their own official policies regarding the use of less-lethal force in the days following Mr. Wright's death, resulting in such uses of force

being excessive. Worse yet, Defendants have shown a pattern and practice of using excessive force when engaging with the public.

103.    These shocking stories from peaceful protestors over the course of multiple days exemplifies Defendants' pattern and practice of using excessive and unreasonable force on people they are meant to serve and protect.

104.    According to Police Scorecard[27], a data project that publishes a public evaluation of policing the United States, in 2016-2018 and 2020[28], there were 106 civilian complaints filed against HCSO, 39 of which were sustained. During this same period, 15 use of force complaints were filed against HCSO, 2 of which were sustained.[29]

105.    HCSO, DPS, and DNR's unofficial customs and culture, and their deliberately indifferent failure to train, supervise, and discipline have all led to a pattern and practice of excessive force.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### First Amendment—Free Speech, Free Assembly

106.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

---

[27]    Police Scorecard, https://policescorecard.org/mn/sheriff/hennepin-county (last visited May 24, 2022).
[28]    HCSO has not provided 2019 data despite numerous requests for its release.
[29]    Police Scorecard, https://policescorecard.org/mn/sheriff/hennepin-county (last visited May 24, 2022) (data compiled from Minnesota Board of Peace Officer Standards and Training (POST) https://docs.google.com/spreadsheets/d/1AJFk9ILwxg2oJEDP4xj0C9Qi9lZLJNnxKG5NNPO__GA/edit#gid=0).

107.   Plaintiff engaged in constitutionally protected acts engaging in public demonstrations. Plaintiff will continue to do so in the future.

108.   Defendants, acting under color of law, used excessive force to curb Plaintiff's exercise of their First Amendment rights.

109.   Plaintiff reasonably fears the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

110.   These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff from continuing to engage in public demonstration.

111.   It was the State, County, and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused Defendants to violate Plaintiff's First Amendment rights.

112.   The State, County, and Municipal Defendants' failure to supervise and train their employees and agents with respect to Plaintiff's First Amendment rights, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to Plaintiff's rights.

113.   The pattern of similar constitutional violations against Plaintiff and others that occurred during the protests of April 11 to April 17, 2021, demonstrates the reckless

and deliberate indifference of the State, County, and Municipal Defendants to Plaintiff's rights.

114. Given the multiple constitutional violations documented above, the State, County, and Municipal Defendants' lengthy pattern and practice of such violations, and the multiple past federal lawsuits arising out of such violations, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County, and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

115. Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiff, and continued violation of constitutional rights, was willful and recklessly indifferent to Plaintiff's rights.

116. Plaintiff Wolk's First Amendment rights were violated when they were deliberately targeted and shot with a less-lethal projective while engaging in lawful protest activity.

117. Plaintiff Wolk suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights and the Individual Defendants, Hennepin County, and the City of Brooklyn Center are jointly and severally liable to Plaintiff for damages.

118.    Plaintiff reasonably fears further violation of their First Amendment rights if they continue to engage in lawful protest activity and is entitled to injunctive relief against Defendants.

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Fourth Amendment—Unlawful Seizure and Excessive Force

119.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

120.    Defendants, acting under the color of state law, violated Plaintiff's constitutional right to remain free from excessive use of force under the Fourth Amendment to the United States Constitution when Defendants used force greater than was necessary, without justification, on peaceful protestors exercising their First Amendment right of protesting the government.

121.    Plaintiff was seized by Defendants when Defendants' officers intentionally, through use of force and threat of arrest, chemical agents, and nonlethal projectiles, terminated their freedom of movement. Defendants were acting under color of law when they violated Plaintiff's Fourth Amendment rights.

122.    Plaintiff's Fourth Amendment rights were violated when they were deliberately targeted and shot with a less-lethal projective while engaging in lawful protest activity.

123.    The amount of force used against the Plaintiff was objectively unreasonable under the circumstances.

124.   In particular, the use of pepper spray and rubber bullets was objectively unreasonable and constituted excessive force.

125.   Defendants committed these acts without forewarning and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

126.   The officers on the scene had no reason to fear for their lives, no other lives were in danger, and no felonies were being committed. Plaintiff was not posing an immediate threat to the safety of the officers or anyone else by exercising their First Amendment rights to protest the actions and inactions of the government. Plaintiff was not actively resisting arrest or attempting to evade arrest by flight when less- lethal force was used against them.

127.   Plaintiff did not commit a crime, because they were entitled to exercise their First Amendment rights prior to the declared curfew.

128.   It was the State, County, and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

129.   The State, County, and municipal Defendants' failure to supervise and train their employees and agents with respect to Plaintiff's Fourth Amendment rights amounts to reckless and deliberate indifference to Plaintiff's rights.

130.   The Pattern of similar constitutional violations against Plaintiff and others that occurred during the protests of April 11 to April 17, 2021, demonstrates the reckless

and deliberate indifference of the State, County, and Municipal Defendants to Plaintiff's rights.

131.   Given the multiple constitutional violations documented above, the State, County, and Municipal Defendants' lengthy past pattern and practice of such violations, and the multiple past federal lawsuits arising out of such violations, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County, and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

132.   Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiff and others, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to Plaintiff's rights.

133.   As a direct and proximate result of Defendants' violations of Plaintiff's constitutional rights, Plaintiff suffered physical injury and is entitled to compensation for damages from the Individual Defendants, Hennepin County, and the City of Brooklyn Center.

134.   Plaintiff reasonably fears further violation of their Fourth Amendment rights if they continue to exercise their First Amendment rights and is entitled to injunctive relief against Defendants.

## THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Retaliation

135.   Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

136.   Plaintiff has a fundamental right to assemble and express their views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

137.   From April 11 to April 17, 2021, Plaintiff and others were lawfully exercising their First Amendment rights to free speech and the right to peacefully assemble.

138.   Plaintiff was not exhibiting violence and was not a threat to officers. Plaintiff attempted to follow orders from law enforcement when such orders were given.

139.   Plaintiff was not under arrest or displaying probable cause sufficient for an arrest when they were subjected to excessive force in retaliation for exercising their First Amendment rights.

140.   Defendants used less-lethal force against Plaintiff in retaliation for the exercise of Plaintiff's constitutional rights. The repeated use of less- lethal force against Plaintiff and others violated their right to engage in constitutionally protected activities.

141.   Plaintiff and others, while peacefully protesting or trying to leave the protest after disbursement orders had been given or trying to leave once officers began deploying force when no disbursement order was given, were repeatedly the victims of excessive force.

142.    At all times, Defendants acted under color of law.

143.    Defendants' unlawful use of excessive force was willfully, knowingly, and recklessly indifferent to Plaintiff's constitutional rights as evidenced by the repeated violations of Plaintiff's constitutional rights.

144.    Plaintiff suffered physical injury as a direct and proximate result of Defendants' violations of their First Amendment rights.

145.    Defendants' unlawful and repeated use of excessive force on Plaintiff caused an injury to them that would chill a person of ordinary firmness from continuing to exercise their constitutional right to peacefully protest.

146.    It was the State, County, and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

147.    The State, County, and Municipal Defendants' failure to supervise and train their employees and agents with respect to Plaintiff's First Amendment rights, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to Plaintiff's rights.

148.    The pattern of similar constitutional violations against Plaintiff and others that occurred during the protests of April 11 to April 17, 2021, demonstrates the reckless and deliberate indifference of the State, County, and Municipal Defendants to Plaintiff's rights.

149.    Given the multiple constitutional violations documented above, the State, County, and Municipal Defendants' lengthy past pattern and practice of such violations,

and the multiple past federal lawsuits arising out of such violations, the need for more supervision nor training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County, and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

150.   Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force to retaliate against Plaintiff, and continued retaliatory violation of constitutional rights, was willful and recklessly indifferent to Plaintiff's rights.

151.   Plaintiff Wolk's First Amendment rights were violated when they were deliberately targeted and shot with a less-lethal projectile while engaged in lawful protest activity.

152.   Plaintiff suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights.

153.   Plaintiff reasonably fears further retaliation in the future if they continue to engage in constitutionally protected lawful protest activity.

154.   The fear of future retaliation establishes an ongoing and continuous injury by chilling Plaintiff's exercise of their First Amendment rights, which will not be remedied by any alleged policy changes voluntarily undertaken by the State, County, and Municipal Defendants and Plaintiff is therefore entitled to injunctive relief against Defendants.

155.    As a direct and proximate result of Defendants' retaliation, Plaintiff suffered physical injury and is entitled to compensation for damages from the Individual Defendants, Hennepin County, and the City of Brooklyn Center.

**FOURTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Due Process**

156.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

157.    The Due Process rights of Plaintiff were violated when the State, County, and Municipal Defendants, through their officers and agents, and deployed chemical agents and less-lethal projectiles without providing a warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

158.    It was the State, County, and Municipal Defendants' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused the due process violations.

159.    The State, County, and Municipal Defendants' failure to supervise and train their employees and agents with respect to Plaintiff's Due Process rights, including a failure to investigate and discipline officers for Due Process violations, amounts to reckless and deliberate indifference to Plaintiff's rights.

160.    The pattern of similar constitutional violations against Plaintiff and others that occurred in prior protests and during the protest of April 11 to April 17, 2021, demonstrates the reckless and deliberate indifference of the State, County, and Municipal Defendants to Plaintiff's rights.

161.   Given the multiple constitutional violations documented above, the State, County, and Municipal Defendants' lengthy past pattern and practice of such violations, and the multiple past federal lawsuits arising out of such violations, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the State, County, and Municipal Defendants demonstrated their reckless and deliberate indifference to the need for such training and supervision.

162.   Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants, that Defendants' continued use of excessive force against Plaintiff and others, and continued violation of constitutional rights, and failure to supervise, discipline, or correct these violations was willful and recklessly indifferent to Plaintiff's rights.

163.   Plaintiff's Fourteenth Amendment rights were violated when they were deliberately targeted and shot with a rubber bullet while engaged in lawful protest activity.

164.   Plaintiff reasonably fears further violation of the right to due process in the future if they participate in constitutionally protected protest activity and Plaintiff is therefore entitled to injunctive relief against Defendants.

165.   As a direct and proximate result of Defendants' violations of Plaintiff's constitutional rights, Plaintiff suffered physical injury and is entitled to compensation for damages from the Individual Defendants, Hennepin County, and the City of Brooklyn Center.

## FIFTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Civil Conspiracy

166.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

167.    Defendants conspired, under color of law, to deprive Plaintiff of their constitutional rights.

168.    Defendants acted in concert and committed overt acts in furtherance of the conspiracy. Defendants used unlawful, excessive force to interfere with and retaliate against Plaintiff's exercise of their constitutional rights.

169.    Defendants coordinated with one another prior to and during the protests of April 11 to April 17, 2021, regarding their response to the protests.

170.    As described above, Defendants engaged in overt acts in furtherance of their conspiracy to violate Plaintiff's constitutional rights, and these overt acts injured Plaintiff.

171.    Defendants acted with reckless and deliberate indifference to Plaintiff's constitutional rights.

172.    Plaintiff reasonably fears Defendants will continue to conspire to violate Plaintiff's constitutional rights and Plaintiff is therefore entitled to injunctive relief against Defendants.

173.    As a direct and proximate result of Defendants' conspiracy to violate constitutional rights, Plaintiff suffered physical injury and is entitled to compensation for damages from the Individual Defendants, Hennepin County, and the City of Brooklyn Center.

## SIXTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Failure to Intervene

174.   Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

175.   During the constitutional violations described in this Complaint, Defendants, including but not limited to John Doe supervisors and commanders in the MPD and Minnesota State Patrol, Defendant Hutchinson, Defendant Kahre, Defendant Langer, Defendant Smith, and Defendant Harrington, stood by without intervening to prevent the misconduct.

176.   Defendants had a duty to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

177.   Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

178.   Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

179.   Defendants acted with reckless and deliberate indifference to Plaintiff's constitutional rights when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

180.   The misconduct described herein was undertaken under color of state law, and Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

181.   As a direct and proximate result of Defendants' failure to intervene in the violations of Plaintiff's constitutional rights, Plaintiff suffered physical injury and is entitled to compensation for damages from the Individual Defendants, Hennepin County, and the City of Brooklyn Center.

182.   Plaintiff reasonably fears further failure to intervene by Defendants if they continue to exercise their First Amendment rights and is entitled to injunctive relief against Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

A.   Enter judgment in favor of Plaintiff and against the Defendants;

B.   Declare that Defendants have infringed on the First Amendment rights of Plaintiff;

C.   Declare that Defendants have retaliated against Plaintiff for exercising their First Amendment rights;

D.   Declare that Defendants used excessive force on Plaintiff;

E.   Declare that Defendants have a pattern and practice of using excessive force against protesters such as Plaintiff;

F.   Enjoin and prohibit Defendants from continuing their use of excessive force;

G.   Award Plaintiff monetary damages in an amount that is fair and reasonable to compensate them for the damages they have suffered;

H.   Award Plaintiff punitive damages assessed against the Individual Defendants, Hennepin County, and the City of Brooklyn Center;

I.     Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

J.     Allow such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial as to all issues triable by a jury.

Dated:  July 14, 2022          Respectfully submitted,

                                     */s/Daniel J. Nordin*

Daniel E. Gustafson (#202241)
Daniel J. Nordin (#392393)
Anthony Stauber (#401093)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

*Attorneys for Plaintiff*