## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Sam Wolk,                                    Case No.: 0:22-cv-01666 (WMW-DTS)

                    Plaintiff,

    v.

City of Brooklyn Center, et al.,

                    Defendants.

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TIM GANNON'S MOTION TO DISMISS

---

### INTRODUCTION

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013) (citing *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). Plaintiff was the victim of excessive force and retaliation at the hands of John Doe Defendants because of the policies, practices, and customs of the City of Brooklyn Center and the supervisory actions of former Chief Gannon.

Plaintiff, and countless others, was horrified by the killing of twenty-year-old Daunte Wright by Brooklyn Center Police Department ("BCPD") officer Kim Potter less than a year after the murder of George Floyd by Derek Chauvin. Plaintiff protested not only this act of police brutality against Daunte Wright, but the longstanding and

pervasive system of racial oppression that resulted in Wright's death. While engaging in peaceful protest of Wright's killing from April 13 to April 16, 2021, Wolk was exposed to tear gas, pepper spray, and shot with a rubber bullet without justification by Defendant John Does, some or all of whom were likely BCPD officers supervised and acting under the policies and customs established by Gannon.

Defendant Gannon's Motion to Dismiss should be denied because, by incorporating the arguments of the Motion to Dismiss filed by Defendants Brooklyn Center and Commander Gruenig, it largely misapprehends the facts pleaded in Plaintiff's Amended Complaint. Plaintiff has alleged that BCPD officers, following the policies and customs established by former Chief Gannon, employed excessive force in violation of Plaintiff's fundamental rights. The court must at this stage accept all of Plaintiff's factual allegations as true and draw all reasonable inferences in their favor; because Plaintiff has adequately pled a claim against Defendant Gannon in his individual capacity, the Court should deny the motion to dismiss. However, if the Court dismisses any of Plaintiff's claims, such dismissal should be without prejudice and Plaintiff should be given leave to file an amended complaint.

Defendant Gannon incorporates by reference all the arguments made by Defendants City of Brooklyn Center and Commander Gruenig in their motion to dismiss and does not develop any additional arguments. *See* Memorandum of Law in Support of Defendant Tim Gannon's Motion to Dismiss at 1-2, ECF No. 30 ("Gannon Br."). Plaintiff herein incorporates the arguments contained in Plaintiff's opposition to the motion to dismiss filed by Defendants City of Brooklyn Center and Commander Gruenig

2

("BC Br."), but also submits this brief to expand upon those arguments specifically concerning Defendant Gannon.

## STATEMENT OF FACTS

On April 11, 2021, twenty -year-old Daunte Wright was killed in Brooklyn Center by BCPD officer Kim Potter. Amended Complaint ¶ 2, ECF No. 18. Immediately following the killing, protesters gathered in Brooklyn Center to protest the killing, specifically, and racialized injustice more broadly. *Id.* ¶ 29. By the evening of April 11, more than one hundred protesters were present at the site of Wright's killing. *Id.* Brooklyn Center Mayor Mike Elliot issued a curfew from 1:00 a.m. until 6:00 a.m. for all city residents. *Id.* ¶ 30.

The number of protesters continued to grow as the crowd erected a makeshift memorial for Wright outside the BCPD headquarters. *Id.* ¶ 32. BCPD officers—joined by Hennepin County Sheriff's Office officers ("HCSO") and Minnesota State Patrol ("State Patrol") officers—guarded the headquarters, which was reinforced by a fenced-in perimeter. *Id.* ¶ 33. At approximately 9:30 p.m., then-Brooklyn Center Police Commander Gruenig declared the protests unlawful and gave dispersal orders. *Id.* Shortly thereafter, law enforcement officers—including the BCPD officers supervised by Commander Gruenig, then operating under the customs and policies established by former Chief Gannon—began firing flash-bang grenades, pepper spray, tear gas projectiles, and other less-lethal munitions indiscriminately into groups of protesters, several of whom were struck directly by the tear gas projectiles. *Id.* ¶¶ 34-35. Law enforcement also targeted

members of the press, who were clearly identified by press credentials. *Id.* ¶ 36. Dozens of protesters were injured, and several were detained by police. *Id.* ¶ 38.

On April 12, 2021, Operation Safety Net forces—a multi-agency police force consisting of officers from the State Patrol, Department of Natural Resources, and several local police forces—were deployed in Brooklyn Center. *Id.* ¶ 44. Following the actions of law enforcement officers the previous night, Mayor Elliot convened the Brooklyn Center City Council for an extraordinary session to introduce and debate Resolution No. 2021-58: A Resolution Limiting Police Crowd Control Tactics During Protests ("Resolution"). After fewer than 30 minutes of discussion, the Resolution passed 4-0, banning BCPD police officers from using the following crowd control tactics:

a. Gas and other chemicals;

b. Violent crowd control and dispersion techniques such as the use of rubber bullets as a tool against protesters;

c. Kettling, the corralling of demonstrators into a confined space so they cannot leave and are then arrested slowly;

d. Violent tactics such as chokeholds;

e. Preventing protesters from taping law enforcement personnel; and

f. Law enforcement officers covering up their badge numbers.

*Id.* ¶ 41.

Despite these changes, the night of April 12 again saw officers from multiple law enforcement agencies—including the BCPD—fire tear gas, flash bangs, and pepper spray indiscriminately into the crowd of peaceful protestors, pursuant to the authorization of

supervising officers, including Defendant Gannon. *Id.* ¶¶ 45-46. Around 40 protesters were eventually arrested. *Id.* ¶ 53.

On April 13, 2021, Mayor Elliot announced that Defendant Gannon had resigned as BCPD police chief. *Id.* ¶ 55. Mayor Elliott also announced a curfew from 10:00 p.m. to 6:00 a.m. the following day. *Id.* ¶ 56. Around 8:30, protesters including Plaintiff Wolk again gathered at the BCPD headquarters. *Id.* ¶57-58. Between 8:30 and 9:00 p.m.—prior to curfew and without warning or justification—law enforcement officers, including BCBP officers, fired tear gas, flash bang grenades, and rubber projectiles at those standing near the perimeter fence. *Id.* ¶ 58. Law enforcement advanced on the gathered protesters and eventually charged, grabbing people and throwing them to the ground. *Id.* ¶ 62.

On the next day, April 14, 2021, Mayor Elliot again announced a curfew from 10:00 p.m. to 6:00 a.m. *Id.* ¶ 65. Protesters gathered outside of the BCPD headquarters where the police presence was greater than the previous nights. *Id.* ¶ 66. Plaintiff Wolk was present and peacefully demonstrating outside the headquarters and was near the perimeter fence. At approximately 8:30 p.m.—again before curfew and without warning—John Doe Police officers began spraying pepper spray at the protesters through the chain link fence. *Id.* ¶ 68. The officers ordered the protesters to back up, but Wolk and the others gathered did not have time to comply. *Id.* Plaintiff Wolk was then shot in the knee by John Doe 1, who fired a rubber bullet at Wolk from close range while they attempted to move away from the perimeter fence. *Id.* ¶ 69. The John Doe Defendants were acting upon orders and training provided by supervisory officers, including Defendant Commander Gruenig. *Id.* ¶ 70. The John Doe Defendants were also acting upon the training, customs, and policies

established by Defendant Gannon prior to his resignation. *Id.* Wolk's injury made it so they were unable to stand for extended periods of time, and has resulted in chronic pain for which they have been referred to a specialist for long-term care. *Id.* ¶ 71.

## ARGUMENT

## I.   LEGAL STANDARD

On a motion to dismiss, courts must accept all of the plaintiff's factual allegations as true and draw all reasonable inferences in their favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In short, a complaint must contain sufficient facts, accepted as true, "to state a claim for relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). The plausibility standard does "not require heightened fact pleading of specifics." *Twombly*, 550 U.S. at 570; *see also In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017) (en banc) ("Plaintiffs 'need not provide specific facts in support of their allegations.").

Importantly, at this pleading stage, courts cannot weigh "competing inferences" or "credit a defendant's counterallegations." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013). The complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Smith v. Questar Capital Corp.*, No. 12-CV-2669 SRN/TNL, 2013 WL 3990319, at *2. Courts undertake the "context-specific task" of determining whether a plaintiff's

6

allegations "nudge" its claims against a defendant "across the line from conceivable to plausible." *See Iqbal*, 556 U.S. at 679-80. "A motion to dismiss a complaint should not be granted unless it appears beyond doubt that a plaintiff can prove *no set of facts* that would entitle him to relief." *Smith v. Questar Capital Corp.*, No. 12-CV-2669 SRN/TNL, 2013 WL 3990319, at *2 (D. Minn. Aug. 2, 2013) (emphasis added).

## II.    PLAINTIFF ADEQUATELY PLED A CLAIM AGAINST DEFENDANT GANNON IN HIS INDIVIDUAL CAPACITY

Defendant Gannon notes by incorporation that Section 1983 "requires a causal link to, and direct responsibility for, the deprivation of rights" and that "Wolk 'must allege specific facts' regarding [former Chief Gannon's] 'personal involvement in, or direct responsibility for' the deprivation of their rights." BC Br. at 8 (citing *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990); *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)). Plaintiff pleads sufficient facts to for their claims against Defendant Gannon in his individual capacity to be not only conceivable, but plausible. Plaintiff alleges that high-ranking officers from the BCPD and the Operations Safety Net law enforcement agencies were making tactical decisions on the ground. For the first two nights of protests, this contingency would have included Defendant Gannon, while he was Chief. Plaintiff further alleges that Defendant Gannon, in his role as Chief, had responsibility for authorizing the uses of force. Am. Compl., ¶¶ 45, 101. Plaintiff does *not* allege that Defendant Gannon took steps to correct the policies and customs in the Brooklyn Center Police Department after the Department's conduct on April 11 and 12. Plaintiff *does* allege that Defendant Gannon "ordered, authorized, condoned, approved, assisted, and/or acquiesced" the

7

conduct that eventually resulted in Plaintiff's injury. *Id.* ¶ 11. Even if he was not one of the officers personally doing the spraying or shooting that deprived Plaintiff of their constitutional rights, Plaintiff alleges, as there has been no discovery conducted to date, that Defendant Gannon was, in the very least, overseeing and ordering his officers' use of force and setting the policies and customs that guided that use of force. This is not a conclusory allegation, as Defendants argue; it is a factual statement, easily inferred from Gannon's authority as Chief of the Brooklyn Center Police Department.

Defendant Gannon also argues by incorporation that his role as Chief is an insufficient basis to sustain individual liability under Section 1983. There is no question that individuals may be liable under Section 1983 for their supervisory failures. *See Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) ("[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity."). Supervisory liability under § 1983 is shown where a supervisor "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Goyette v. City of Minneapolis*, No. 20-CV-1302 (WMW/DTS), 2021 WL 3222495, at *7 (D. Minn. July 29, 2021). To demonstrate deliberate indifference at the motion-to-dismiss stage, a plaintiff must plausibly allege that each defendant had notice that "the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Id.* However, a supervisor need not have "personally participated in any constitutional deprivation committed by his officers, or [ ] have known about any violation at the time it occurred" to be liable. *Wever v. Lincoln Cty., Nebraska*, 388 F.3d 601, 606 (8th Cir. 2004) (citing *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir.1989)

8

("Proof of actual knowledge of constitutional violations is not, however, an absolute prerequisite for imposing supervisory liability.")). Although "[a] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability," *Howard v. Adkinson*, 887 F.2d 134, 138 (8th Cir. 1989), no more than two prior incidents are needed to find a supervisor liable, *see Andrews*, 98 F.3d at 1078 (two complaints not enough to impose *Monell* liability on city, but *are enough* for supervisory liability).

Plaintiff has alleged that Gannon was, at the least, responsible for supervising the BCPD officers that repeatedly fired tear gas and other less-lethals on peaceful protestors. The use of force was so flagrant that the Brooklyn Center City Council held a well-publicized extraordinary session to introduce and pass a Resolution banning "the use of gas and other chemicals," and "[v]iolent crowd control and dispersion techniques such as the use of rubber bullets as a tool against protesters." Am. Compl. ¶ 41. Despite this policy change on April 12, 2021, BCPD officers continued to use force against peaceful protestors that night, while Gannon was still Chief, and many nights afterward. The Amended Complaint plausibly alleges that Defendant Gannon directed, coordinated, and was aware of his officers' use of less-lethals (a policy and custom that continued until they were used against Plaintiff), both before and after the BCPD's April 12 purported policy change. Gannon was undoubtedly aware of the Resolution passed by the City Council, and yet

demonstrated a failure to supervise and train these officers, as the conduct of BCPD officers largely did not change despite the ostensible change in policy.[1]

Plaintiff has therefore satisfied the pleading requirements for supervisory liability because their factual allegations demonstrate that Defendant Gannon's failure to supervise or train officers rose to a level of deliberate indifference towards Plaintiff's constitutional rights, and that this failure was the proximate cause of Plaintiff's injury. At this point in the pleadings, when the Court accepts the facts alleged in the complaint as true and views those allegations in the light most favorable to the plaintiff (*Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014)), the allegations in the Amended Complaint establish a sufficient "causal link" between Defendants' actions and Plaintiffs injury. *Clemmons,* 477 F.3d at 868; *see also Martin v. Sargeant,* 780 F.2d 1334, 1338 (8th Cir. 1985) ("In order to survive a motion to dismiss, a prisoner need not plead more than the warden was directly involved in the decision.").

Defendant Gannon contends by incorporation he is entitled to qualified immunity. Under the judicially-created doctrine of qualified immunity, a government official is entitled to immunity unless his "conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *McNeally v. HomeTown Bank,* No. 21-CV-2614 (ECT/DTS), 2022 WL 2220922, at *8 (D. Minn. June 21, 2022) (internal quotations omitted) (quoting *Moore-Jones v. Quick,* 909 F.3d 983, 985 (8th Cir. 2018) (citation omitted)). To overcome qualified immunity, the plaintiff "must plead facts

---

[1] *See* Teh, *supra* note 1.

showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *LeMay v. Mays,* 18 F.4th 283, 287 (8th Cir. 2021). To succeed on a motion to dismiss a § 1983 claim on qualified immunity grounds, the defendant must show that he is "entitled to qualified immunity 'on the face of the complaint.'" *Stanley v. Finnegan,* 899 F.3d 623, 627 (8th Cir. 2018) (quoting *Bradford v. Huckabee*, 394 F3.d 1012, 1015 (8th Cir. 2005)).

Determining whether a constitutional right was "clearly established," does not require that the "very action in question has been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Accordingly, courts do not need to have addressed the exact constitutional right at issue or even the same factual pattern for a right to be clearly established. *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a cases directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (stating that officials "can still be on notice that their conduct violates established law even in novel factual circumstances."). Further, courts have found that where a plaintiff alleges that a supervisor "orders allowing the use of force against [a] crowd, which was not violent, largely compliant, and unable to flee", the allegations are sufficient to survive at the motion to dismiss stage. *Baude v. City of St. Louis*, No. 4:18-CV-1564-RWS, 2020 WL 4470846, at *8, n.6 (E.D. Mo. Aug. 4, 2020) (citing *Tatum v. Robinson*, 858 F.3d 544, 548-550 (8th Cir. 2017), and noting that after *Tatum*, a "reasonable officer would know that pepper spraying a non-fleeing, non-resisting

individual suspected or held for non-violent misdemeanors is unreasonable."); *see also Don't Shoot Portland v. City of Portland,* 465 F. Supp. 3d 1150, 1155-56 (D. Or. 2020 (denying motion to dismiss on retaliation claim where "officers indiscriminately used force against peaceful protesters on multiple occasions," including "continu[ing] to fire tear gas canisters as people attempted to leave the protest area," finding that based on those allegations "preventing criminal activity . . . was not the sole purpose of [officers'] use of force.").

Defendant Gannon is not entitled to qualified immunity on Plaintiffs' supervisory liability claims. Qualified immunity precludes a supervisory liability claim unless a plaintiff shows that a supervisor received notice of a pattern of unconstitutional acts committed by a subordinate, and was deliberately indifferent to or authorized those acts." *Goyette*, 2021 WL 3222495, at *7. This standard mirrors the merits analysis of Plaintiff's claim for supervisory liability. For the reasons discussed *infra*, Plaintiff has demonstrated that Defendant Gannon had notice that BCPD officers had violated and continued to violate protestors' First and Fourth Amendment rights, both before and after the April 12 Resolution was passed. Defendant Gannon's failure to train or supervise rose to the level of deliberate indifference to or tacit authorization of these unconstitutional acts and led to Plaintiff's injuries suffered on April 13 and 14, 2021. Therefore, the Defendant Gannon is not entitled to qualified immunity.

Even if the Court determines that qualified immunity would apply to the claims against Gannon, the Court should nonetheless decline to apply it. "The modern doctrine of qualified immunity is inconsistent with conventional principles of law applicable to

federal statutes" and "the [Supreme] Court's justifications are unpersuasive." William

Baude, *Is Qualified Immunity Unlawful?¸* 106 Calif. L. Rev. 45, 47, 88 (2018), available

at https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=13555&context=

journal_articles. As Baude notes, these justifications are: (1) "qualified immunity derives

from a putative common-law rule that existed when Section 1983 was adopted;" (2)

while qualified immunity is wrong, it is a necessary wrong given the current scope with

which Section 1983 is applied; and (3) "qualified immunity derives from principles of

fair notice analogous to the criminal law rule of lenity." Baude at 51, 62. "Upon close

examination, none of these rationales can sustain the modern doctrine of qualified

immunity." *Id.* at 51.

The "common law" justification is essentially that certain "good-faith" defenses

existed for public officials prior to the enactment of Section 1983, and those defenses

form the basis for qualified immunity. *Id.* at 51-55. However, "there was no well-

established good-faith defense in suits about constitutional violations when Section 1983

was enacted, nor in Section 1983 suits early after its enactment." *Id.* at 55-58. While

some common law (rather than constitutional) causes of action did have good-faith

defenses, those "generally do not describe a freestanding common-law defense, like

sovereign immunity. Instead, those cases mostly describe the individual elements of

particular common-law torts." *Id.* at 58-60. The final problem with the historical good-

faith defense justification for qualified immunity is that modern qualified immunity has

been applied much more broadly than any potential historical predecessors, been

transformed from a "subjective inquiry into intent or motive" to "an objective standard

based on case law," and become so protective that it "outstrip[s] other comparable defenses." *Id.* at 60-61.

Under the "two-wrongs-make-a-right" justification, "qualified immunity might be wrong, [but] it was a wrong justified by an earlier wrong in interpreting the statute." *Id.* at 62. Essentially, "qualified immunity jurisprudence is inconsistent with the intended meaning of the statute," but the Supreme Court has so mistakenly misinterpreted the scope of Section 1983 "that qualified immunity is a fair enough response." *Id.* This rationale is articulated in Justice Scalia's dissent in *Crawford-El v. Britton*, 523 U.S. 574, 611-12 (1998) (Scalia, J., dissenting), where he faults the Court's previous decision in *Monroe v. Pape*, 365, U.S. 167 (1961) as erroneous. Baude at 62-63. However, the foundational premise that *Monroe* was wrongly decided "appears to be wrong." *Id.* at 63-66. But even if that flawed premise is accepted as true, the logical scope of immunity would be for wrongs where states have provided remedies, thus obviating the need for a federal remedy. *Id.*at 66-67. But where a state provides no remedy, Section 1983 should. *Id.* at 66-69.

The third justification, the lenity theory, "derives from cases that read a related enforcement provision in light of the need for fair warning, and later extended similar principles to Section 1983." *Id.* at 69. In addition to Section 1983, Congress passed additional statutes in the Reconstruction era that enforce constitutional rights against state officials, including a criminal statute. *Id.* Under this theory, it would be unfair to impose criminal consequences for actions that the accused does not have fair warning such actions violate the Constitution. *Id.* at 70-72. However, the text of Section 1983 differs

14

from the criminal statute in important ways, and the "fair-warning" concerns of criminal statutes do not apply to civil statutes. *Id.* at 73-74. But even if Section 1983 should be subject to the concerns of lenity and fair notice, qualified immunity "has come to bear little practical resemblance to the rules applicable to criminal defendants." *Id.* at 74. In the criminal law context, circuit splits do not favor the defendant; but "a circuit split is considered a strong point in favor of" a Section 1983 defendants. *Id.* at 74-77.

Qualified immunity's detractors are not limited to scholars. Indeed, a number of advocacy organizations with differing ideological views have also reached the conclusion that it is time to reconsider the doctrine of qualified immunity. *See* Ending Qualified Immunity Once and For All is the Next Step in Holding Police Accountable, ACLU (Mar. 23, 2021), https://www.aclu.org/news/criminal-law-reform/ending-qualified-immunity-once-and-for-all-is-the-next-step-in-holding-police-accountable (last visited Oct. 5, 2022) ("For decades, the doctrine has shielded police officers and other government employees from being held responsible for all sorts of malfeasance."); Qualified Immunity: A Legal, Practical, and Moral Failure, CATO Inst. (Sept. 14, 2020), https://www.cato.org/policy-analysis/qualified-immunity-legal-practical-moral-failure (last visited Oct. 5, 2022) ("Qualified immunity is a judicial doctrine that protects public officials from liability, even when they break the law."); Why EFF Supports Repeal of Qualified Immunity, Elec. Frontier Found. (Apr. 12, 2021), https://www.eff.org/deeplinks/2021/04/why-eff-supports-repeal-qualified-immunity (last visited Oct. 5, 2022).

Given the increasing recognition that qualified immunity has a questionable legal foundation and leads to outcomes where plaintiffs are denied a remedy when their constitutional rights have nonetheless been violated, Plaintiff requests that the Court decline to apply the doctrine.

## III.   PLAINTIFF ADEQUATELY PLEADS THAT DEFENDANT GANNON FAILED TO INTERVENE TO PREVENT MISCONDUCT

A law enforcement officer who fails to intervene to prevent excessive force by another officer may be held individually liable for violating the Fourth Amendment. *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015). To make out a claim, a plaintiff must show that the individual "observed or had reason to know that excessive force would be or was being used." *Id*.

Defendant Gannon claims by incorporation that Plaintiff "has not alleged any facts indicating [Defendant Gannon] had an opportunity to prevent or interrupt any alleged act of excessive force". BC Br. at 19. This is inaccurate. Plaintiff has alleged that Defendant Gannon was acting in a supervisory position both before and after Brooklyn Center City Council passed a Resolution restricting the use of chemical agents on protestors. These allegations tend to show that Defendant Gannon was, at least in part, responsible for directing and overseeing BCPD officers. *Id.* ¶¶ 11, 33-38, 45-53. Plaintiff's allegations also show that Gannon did not take steps to ensure that excessive force would not be used following the first two nights of the protests. *Id.* ¶¶ 59-62, 66-70, 111-17, 128-30, 146-48, 157-60. Defendant Gannon's motion to dismiss Plaintiff's claim for failure to intervene should therefore be denied.

16

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety. If the Court does grant Defendants' motion, Plaintiff asks that such dismissal be without prejudice and that Plaintiff be granted leave to file an amended complaint to cure any pleading defects.

Dated:  October 11, 2022

*/s/Daniel J. Nordin*
Daniel E. Gustafson (#202241)
Daniel J. Nordin (#392393)
Anthony Stauber (#401093)
Frances Mahoney-Mosedale (#402741)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com
fmahoneymosedale@gustafsongluek.com

*Attorneys for Plaintiff*