UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Sam Wolk, | Case No. 22-cv-1666 (WMW/DTS) |
| Plaintiff, | |
| v. | **ORDER** |
| The City of Brooklyn Center, Tim Gannon, Tony Gruenig, David Hutchinson, Hennepin County, Minnesota Department of Natural Resources, Rodman Smith, Aaron Kahre, John Does, | |
| Defendants. | |

This case arises from a lawsuit filed by Plaintiff Sam Wolk against multiple defendants, involving a range of constitutional claims that occurred while Wolk was protesting the fatal shooting of Daunte Wright. Wolk alleges violations of their[1] rights under the First, Fourth, and Fourteenth Amendments during the course of their protests, while also asserting claims of civil conspiracy and failure to intervene against Defendants.

Defendants separately move to dismiss Wolk's complaint. Defendants City of Brooklyn Center and Brooklyn Center Police Commander Tony Gruenig ("Commander Gruenig"), (collectively, "City Defendants") have filed a motion to dismiss. Defendants Minnesota Department of Natural Resources ("DNR"), DNR Colonel Rodman Smith ("Colonel Smith"), and DNR Captain Aaron Kahre ("Captain Kahre"), (collectively, "DNR Defendants"), filed a motion to dismiss. Defendant Former Brooklyn Center Police

---

[1] Wolk uses the pronouns they/them.

Chief Tim Gannon ("Chief Gannon") filed a motion to dismiss.  Defendants Hennepin County, and Hennepin County Sheriff David Hutchinson ("Sheriff Hutchinson"), (collectively, "Hennepin County Defendants") filed a motion to dismiss.

For the reasons addressed below, the Court grants in part and denies in part Defendants' motions to dismiss.

## BACKGROUND

When deciding whether to grant a motion to dismiss, the Court takes all facts alleged in the Amended Complaint as true. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555-56 (2007); *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).  Accordingly, the following allegations are taken from the Amended Complaint.

Daunte Wright was fatally shot by Brooklyn Center Police Department ("BCPD") officer Kim Potter on April 11, 2021.  After the shooting, Brooklyn Center Mayor Mike Elliot implemented a curfew for all Brooklyn Center residents from 1:00 a.m. to 6:00 a.m. Protesters assembled in Brooklyn Center and several locations throughout Minneapolis to demonstrate against the fatal shooting by a law enforcement officer and racial injustice. By the evening of April 11, more than one hundred protesters were present at the location where Wright was killed.  Plaintiff Sam Wolk was one of the protesters.

As the crowd outside the BCPD headquarters erected a makeshift memorial for Wright, the number of protesters continued to grow.  To protect the BCPD headquarters, officers from the Hennepin County Sheriff's Office ("HCSO") and Minnesota State Patrol (the "State Patrol") joined BCPD officers, and a fenced-in perimeter was erected around the headquarters.  Wolk alleges that, shortly after the HCSO and the State Patrol officers

arrived, several law enforcement officers, including the BCPD officers under Commander Gruenig's supervision, fired at groups of protesters using flash-bang grenades, pepper spray, tear gas projectiles, and other less-lethal munitions.[2]  The tear gas projectiles struck several protesters directly.  Wolk alleges that law enforcement also targeted members of the press, who were clearly identified by their press credentials.  Dozens of protesters were injured during the protest, and several were detained by the police.

On April 12, 2021, Operation Safety Net forces, a multi-agency police force comprising officers from the State Patrol, Minnesota Department of Natural Resources, and several local police departments were deployed in Brooklyn Center.  In light of the actions of law enforcement officers the previous night, Mayor Elliot convened a special session of the Brooklyn Center City Council to introduce and debate Resolution No. 2021-58, which governed police crowd-control tactics during the protests ("the Resolution"). The Resolution was unanimously adopted.   Resolution No. 2021-58 prohibits BCPD officers from using certain crowd-control tactics, including: (1) gas and other chemicals; (2) violent crowd-control and dispersion techniques, such as the use of rubber bullets against demonstrators; (3) confinement of groups of demonstrators or protesters in a small area, as a method of crowd control, referred to as "kettling," (4) violent tactics such as

---

[2] A less-lethal weapon, also known as a non-lethal weapon or less-than-lethal weapon, is a type of weapon designed to incapacitate or subdue targets without causing fatal injuries. These weapons are commonly used by law enforcement, military personnel, and security forces as a means to control and neutralize threats while minimizing the risk of lethal outcomes.  Neil Davison, NON-LETHAL WEAPONS (Springer 2009).

chokeholds; (5) preventing protesters from videotaping law enforcement personnel; and (6) concealing law enforcement badge numbers.

Officers from multiple law enforcement agencies, including the BCPD, Hennepin County, and DPS, again fired tear gas, flash-bangs, and pepper spray into the crowd of peaceful protesters on the night of April 12.  This action allegedly was authorized by supervising officers, including Commander Gruenig, Chief Gannon, Sheriff Hutchinson and Commissioner Harrington.  At the Operation Safety Net press conference on April 13, 2021, Operation Safety Net reported that approximately 40 protesters were arrested the previous night.

At 8:30 p.m. on April 13, Wolk and other protesters gathered at the BCPD headquarters.  Before the curfew and allegedly without warning or justification, law enforcement officers, including BCPD officers, fired tear gas, flash-bang grenades, and rubber projectiles at protesters standing near the perimeter fence between 8:30 p.m. and 9:00 p.m.  Law enforcement officers then allegedly advanced on the protesters, eventually, "throwing them to the ground."

On April 14, 2021, Mayor Elliot again declared a curfew from 10:00 p.m. to 6:00 a.m.  Protesters assembled outside the BCPD headquarters where, a greater number of police officers were present than in the previous evenings.  Wolk, who was among those assembled outside the BCPD headquarters, alleges that they were peacefully protesting near the perimeter fence.  At approximately 8:30 p.m., again before the curfew and allegedly with no warning, unidentified police officers (collectively, "John Doe Defendants"), began spraying pepper spray through the chain-link fence at the protesters.

The officers directed the protesters to retreat, but Wolk alleges that the protesters and the other assembled individuals did not have adequate time to comply. John Doe 1 allegedly shot Wolk in the knee with a rubber bullet from close range while Wolk attempted to move away from the perimeter fence. Wolk alleges that the John Doe Defendants were "instructed to deploy pepper spray and rubber bullets" by supervisory officers, "and/or did so due to a policy or practice, or the training they received (or failed to receive) from the State, County and Municipal Defendants." Wolk's injury allegedly impaired Wolk's ability to stand for extended periods and resulted in chronic pain, for which Wolk has been referred to a specialist for ongoing care.

On June 27, 2022, Wolk filed this lawsuit against the City Defendants, DNR Defendants, Hennepin County Defendants, and Chief Gannon. Wolk filed the operative pleading, the Amended Complaint, on July 14, 2022. Count I alleges violations of the First Amendment. Count II alleges the use of excessive force in violation of the Fourth Amendment. Count III alleges retaliation against constitutionally protected activity. Count IV alleges that Defendants violated Wolk's due process rights under the Fourteenth Amendment. Count V alleges civil conspiracy, 42 U.S.C. § 1983, and Count VI alleges a failure to intervene, 42 U.S.C. § 1983. Wolk seeks a permanent injunction, damages, and attorneys' fees.

Defendants move to dismiss this lawsuit on several grounds. DNR Defendants argue that Wolk lacks standing. Fed. R. Civ. P. 12(b)(1). Commander Gruenig, Colonel Smith, Captain Kahre, Chief Gannon, and Sheriff Hutchinson, (collectively, "Supervisory Defendants"), contend that Wolk's claims are barred by qualified immunity. Defendants

also maintain that Wolk fails to state a claim for which relief can be granted, Fed. R. Civ. P. 12(b)(6).  After the motions were filed, Wolk voluntarily dismissed the claims against Defendants Minnesota Department of Public Safety ("DPS"), Commissioner John Harrington ("Commissioner Harrington"), and Colonel Matthew Langer ("Colonel Langer").

## ANALYSIS

To survive a motion to dismiss for failure to state a claim for which relief can be granted, the complaint must allege sufficient facts such that, when accepted as true, a facially plausible claim to relief is stated.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When determining whether the complaint states such a claim, a district court accepts as true all of the factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  The factual allegations need not be detailed, but they must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

Before the Court are: (1) City Defendants' Motion to Dismiss, (2) DNR Defendants' Motion to Dismiss, (3) Chief Gannon's Motion to Dismiss, and (4) Hennepin County Defendants' Motions to Dismiss.

### I.      Subject-Matter Jurisdiction

DNR Defendants contend that dismissal is warranted because Wolk lacks standing to pursue the relief that Wolk requested for the Section 1983 claims, and therefore this Court does not have subject-matter jurisdiction over those claims.  Fed. R. Civ. P. 12(b)(1).

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction requires the Court to "distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).  DNR Defendants assert a facial challenge to Wolk's standing. A facial attack challenges the sufficiency of a plaintiff's pleadings, which requires the district court to determine whether the pleadings allege sufficient facts to support subject-matter jurisdiction. *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015).  In doing so, the court considers the pleadings only, and the nonmoving party receives the same protections that the party would receive when defending a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Osborn*, 918 F.2d at 729 n.6.

DNR Defendants argue that Wolk does not have standing for declaratory or injunctive relief because the threat of future harm is merely speculative.  In this facial attack, the Court considers only the pleadings and draws all reasonable inferences in favor of Wolk. *Osborn*, 918 F.2d at 729 n.6.

Wolk must allege three elements to establish Article III standing for declaratory and injunctive relief: (1) injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Here, only the "injury in fact" element is disputed.  To meet the "injury in fact" element, abstract injury is not enough. *Id*.  Wolk must demonstrate that they are in danger of a "real and immediate" harm. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983).  Alleging that future injury

is merely possible is not enough to warrant injunctive relief, future injury must be "certainly impending." *Clapper v. Amnesty Intern'l USA*, 568 U.S. 398, 409 (2013).

In general, a single incident of police brutality will not establish a risk of future harm sufficient to support standing. *Lyons*, 461 U.S. at 101-03. And previous injustices alone do not constitute the real and immediate threat of harm required to establish a case or controversy. *Id*. A distinction can be drawn between *Lyons* and the present case, however. At issue in *Lyons* was the likelihood of experiencing future harm due to engaging in unlawful conduct, specifically the fear of being subjected to a chokehold for committing subsequent traffic violations. *Id*. at 105. The Court deemed that argument speculative as it presumed the plaintiff, Lyons, would abide by the law in the future. *Id*. at 102-03.

Unlike the facts in *Lyons*, Wolk asserts their intent to participate in lawful First Amendment activity, namely protesting. And, as the Court clarified in *Lyons*, to establish an actual controversy, the plaintiff must claim either (1) the involvement of all officers in the unlawful conduct, or (2) the City's endorsement or authorization of such actions by police officers. *Id*. at 105-06. These are precisely the allegations that Wolk presents in this case where there were several incidents of harm to protesters occurring over a four-day period. *Edwards v. City of Florissant*, 58 F.4th 372, 378. Wolk contends that the officers who were present outside the BCPD headquarters over the four-day period engaged in authorized illegal activity. Wolk asserts that the officers did so intentionally or in retaliation by discharging tear gas canisters, rubber bullets, flash-bang grenades and pepper spray at protesters. Wolk also alleges that the officers issued unlawful assembly and dispersal orders throughout the night, aimed a grenade launcher at a driver in a vehicle

to force him out of the vehicle and effect an arrest, charged at protesters, threw them to the ground, and sprayed pepper spray directly in their faces or shot rubber bullets through the fence links.

DNR Defendants contend that Wolk lacks standing for declaratory or injunctive relief, arguing that the potential harm in the future is too speculative.  As to this facial attack, the Court examines the pleadings and draws all inferences in favor of Wolk.  To establish standing, Wolk must demonstrate three elements: (1) injury in fact, (2) causation, and (3) redressability.  Here the parties dispute the "injury in fact" element, which requires the demonstration of a "real and immediate" danger of harm.  Prior incidents of police brutality, without more, typically do not establish a sufficient risk of future harm to establish standing.  However, a distinction can be drawn between the present case and *Lyons*, as Wolk intends to participate in future lawful First Amendment activities, namely protests.  Moreover, the court clarified in *Lyons* that an actual controversy can be established if all officers are involved in the unlawful conduct or if the City endorses or authorizes such behavior by police officers.  Wolk alleges both of these circumstances, citing numerous incidents of harm to protesters over a four-day period.  These alleged incidents involve officers engaging in authorized illegal activity, including discharging tear gas, rubber bullets, flashbang grenades, and pepper spray, issuing unlawful orders, aiming a grenade launcher at a driver, charging at protesters, throwing protesters to the ground, and using pepper spray and rubber bullets against protesters.  These allegations support Wolk's claim of standing and distinguish the present case from *Lyons*.

Based on the incidents Wolk alleges, including the prior examples of Defendants harassing protesters that demonstrate a pattern of harassment, the involvement of all officers present in the allegedly illegal activity, and the gravity of constitutional harm, the Court concludes that there is a real and immediate threat of injury to Wolk if Wolk protests in the future.  Wolk, therefore, has standing.

## II.    Qualified Immunity of Supervisory Defendants

Defendants Commander Gruenig, Colonel Smith, Captain Kahre, Chief Gannon, and Sheriff Hutchinson, argue that qualified immunity bars Wolk's Section 1983 claims against them in their individual capacities.  A plaintiff in a Section 1983 action "must plead that each Government-official defendant, through [the defendant's] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.  Vicarious liability does not exist for Section 1983 claims.  *Id*.  For this case to proceed against the Supervisory Defendants in their individual capacities, the Amended Complaint must allege that each Government-official Defendant is liable through their direct failure as a supervisor.

The analysis for supervisory liability's qualified immunity standard is consistent with the merits examination of Wolk's claim for supervisory liability.  *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).  When, as here, there is no allegation that any of the individual Supervisory Defendants directly participated in the alleged constitutional violations, those Defendants will have qualified immunity for the supervisory-liability claims unless Wolk can show that a supervisor "(1) received notice of a pattern of unconstitutional acts committed by a subordinate and (2) was deliberately indifferent to or authorized those acts." *Id*.  Allegations of generalized notice are insufficient. *Id*.  The

prior events giving notice must be "a pattern of conduct by the subordinate that violated a clearly established constitutional right," *id.*, and must be "very similar to the conduct giving rise to liability." *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012). To demonstrate deliberate indifference at the motion-to-dismiss stage, a plaintiff must plausibly allege that each defendant had notice that "the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id*. at 355-56 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)). To be liable, however, a supervisor need not have personally participated in any constitutional deprivation that the supervisor's officers committed and the supervisor need not have known about any violation when it occurred. *Wever v. Lincoln Cnty., Neb.*, 388 F.3d 601, 606 (8th Cir. 2004) (citing *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989) ("Proof of actual knowledge of constitutional violations is not, however, an absolute prerequisite for imposing supervisory liability."). But a supervisor is entitled to qualified immunity unless the supervisor "*personally knew* of the constitutional risk posed by [the supervisor's] inadequate training and supervision." *Walton v. Dawson*, 752 F.3d 1109, 1118 (8th Cir. 2014).

The doctrine of "capable of repetition, yet evading review," may apply in a case involving qualified immunity of supervisory defendants when the alleged unconstitutional acts, including inadequate supervision, have a duration that is too short to permit comprehensive litigation before the acts cease or expire, and the plaintiff has demonstrated a probability of being subjected to similar actions again. *See Camreta v. Greene*, 563 U.S. 692, 709-10 (2011). Wolk must show that there is a reasonable expectation of recurrence, not just a physical or theoretical possibility. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982);

*Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).  The doctrine does not apply if the issue might recur in another case but not in the plaintiff's case.  *Heles v. South Dakota*, 682 F.2d 201, 202 (8th Cir. 1982).

Wolk's allegations satisfy the "capable of repetition, yet evading review" criteria. Wolk alleges that the Supervisory Defendants have implemented a specific policy or practice that results in constitutional violations, such as a brief but recurring pattern of the excessive use of force during protests, and the alleged conduct and circumstances are of such a temporal nature that they evade complete judicial scrutiny before they cease. Because Wolk could face the same unconstitutional actions again in the future, the "capable of repetition, yet evading review" doctrine is applicable to the Supervisory Defendants' liability.

Taking the allegations in the Amended Complaint as true and interpreting them in the light most favorable to Wolk, the Amended Complaint asserts multiple incidents that would have alerted Brooklyn Center Police Commander Gruenig and Chief Gannon to a pattern of unconstitutional conduct.   First, according to the Complaint, Commander Gruenig and Chief Gannon were aware that BCPD officers had been violating protesters' First Amendment and Fourth Amendment rights both before and after the enactment of the April 12 Resolution.   Second, given the extensive media coverage of both the protests following the killing of Daunte Wright and the Brooklyn Center City Council's widely publicized passage of the Resolution, the allegations in the Amended Complaint are sufficient to reasonably infer that Commander Gruenig and Chief Gannon had actual knowledge and constructive knowledge that their policies and procedures were insufficient

and were likely to result in a violation of constitutional rights. As alleged, these occurrences are sufficient to state a claim that Commander Gruenig and Chief Gannon had notice of a pattern of unconstitutional acts committed by a subordinate.

The Amended Complaint also alleges that, both before and after the Resolution policy change, Commander Gruenig and Chief Gannon directed, coordinated, and were aware of their officers' use of less-lethal munitions against Wolk and other protesters. Wolk alleges that Commander Gruenig and Chief Gannon were aware of the Resolution the City Council passed, and both of them demonstrated a failure to supervise and train these officers, as the conduct of BCPD officers persisted despite the change in policy.

At this stage in the proceedings, accepting the facts alleged in the complaint as true and viewing those allegations in the light most favorable to Wolk, *Blankenship*, 601 F.3d at 853, the allegations in the Amended Complaint establish a sufficient "causal link" between these Defendants' actions and Wolk's injury to establish these Defendants' personal supervisory liability for Wolk's injury. *Clemmons*, 477 F.3d at 868.

Because Wolk pled that Commander Gruenig and Chief Gannon had supervisory control over the City of Brooklyn Center's protest response, were aware of a pattern of unconstitutional acts, and displayed deliberate indifference to these alleged acts, the Court denies Commander Gruenig's and Chief Gannon's motions to dismiss on the basis of qualified immunity.

Similarly, taking the allegations in the Amended Complaint as true and interpreting them in the light most favorable to Wolk, the Amended Complaint sets forth multiple incidents that would have alerted Colonel Smith and Captain Kahre to a pattern of

unconstitutional behavior.  First, the Amended Complaint alleges that, after the first night of protests during which Defendants BCPD, Hennepin County Sheriff's Office, and Minnesota State Patrol indiscriminately shot tear gas canisters into a group of protesters, causing tear gas to engulf a nearby residential building, the Brooklyn Center City Council held a widely publicized extraordinary session to introduce and pass the Resolution banning the use of tear gas and other chemicals and banning violent crowd-control and dispersion techniques, such as the use of rubber bullets.  Second, on April 14, 2021, following another night of police violence against protesters, this time with officers from the DNR joining and using the same tactics that led to the passage of the Resolution, Mayor Elliot held a press conference and addressed the allegedly unconstitutional tactics.  These facts are sufficient to plausibly allege that Colonel Smith and Captain Kahre had notice of a pattern of unconstitutional acts committed by their subordinates.

Taking the allegations in Wolk's Amended Complaint as true, the supervisory failures exhibited a deliberate indifference because the supervisory officials should have known that further unconstitutional conduct would occur or that the subordinates' training and supervision were inadequate to prevent such conduct.  As addressed above, the Amended Complaint, when taken as true and interpreted in the light most favorable to Wolk, presents multiple incidents that would have alerted Colonel Smith and Captain Kahre to a pattern of unconstitutional behavior.  The City Council's public actions to attempt to stop the protests are one example.

Wolk's allegations plausibly plead that Colonel Smith and Captain Kahre, as supervisory officials, had notice of a pattern of unconstitutional acts committed by their

subordinates. Colonel Smith and Captain Kahre were allegedly aware of multiple incidents, including the use of tear gas and violent crowd-control techniques against protesters and nearby residential areas, which led to significant public attention and the passage of a Resolution explicitly banning such tactics. These incidents collectively indicate a pattern of unconstitutional behavior that should have alerted Colonel Smith and Captain Kahre to the potential for further unconstitutional conduct. Additionally, the Amended Complaint alleges that they failed to train and supervise their officers adequately on the proper and constitutional response to constitutionally protected activity, and that the agencies under their command had customs, policies, and an unofficial culture contributing to a pattern and practice of excessive force. Wolk's allegations suggest that Colonel Smith and Captain Kahre should have known that the training and supervision provided were insufficient to prevent recurring violations, making these Defendants potentially liable for the consequences of their purported deliberate indifference.

Based on the governing legal standard, which requires assessing the plausibility of the allegations and viewing them in the light most favorable to the plaintiff, Wolk, dismissal of the claims alleging supervisory failures against Colonel Smith and Captain Kahre is unwarranted at this stage. The allegations made in the Amended Complaint, including incidents of unconstitutional conduct and failure to train and supervise officers properly, plausibly support the claim of deliberate indifference in their supervisory roles. Therefore, at this stage of the proceedings, dismissal of the claims related to supervisory failures against Colonel Smith and Captain Kahre is not warranted.

Wolk also has sufficiently pled that Sheriff Hutchinson knew or should have known of his subordinates' pattern of unconstitutional behavior.  The Amended Complaint alleges that Sheriff Hutchinson was responsible for supervising the HCSO officers who "repeatedly fired tear gas and other less-lethal munitions from April 11, 2021, to April 20, 2021, on peaceful protesters."  The use of force was "so flagrant," the Amended Complaint alleges, that Mayor Elliot expressed concern directly to Sheriff Hutchinson about the further use of less-lethal force on protesters.  *Id*.  And the Amended Complaint alleges that Sheriff Hutchinson directed, coordinated, and was aware of his officers' use of less-lethal munitions against protesters, including Wolk.  This awareness, Wolk alleges, demonstrates a failure to supervise and train these officers, and this failure, according to Wolk, led to the injuries Wolk suffered.

The Amended Complaint alleges that Sheriff Hutchinson was aware of HCSO officers violating protesters' First and Fourth Amendment rights and that his failure to train or supervise constitutes either deliberate indifference or tacit authorization of these unconstitutional acts, which resulted in Wolk's injuries.

The Amended Complaint alleges several incidents that should have alerted Sheriff Hutchinson to a pattern of unconstitutional conduct.  First, there were instances of excessive force that received widespread media coverage.  Second, on April 15, 2021, Brooklyn Center Mayor Elliott sent a letter to Sheriff Hutchinson, advising that Brooklyn Center needed assistance from partner agencies and that Mayor Elliott believed the HCSO had taken command of the situation.  The letter, referring to the Resolution, cautioned law enforcement not to engage with peaceful protesters who were not interacting with law

enforcement directly. Mayor Elliott's letter also referred to Brooklyn Center's April 12, 2021 Resolution, which prohibited the use of tear gas and other dangerous crowd control devices. The letter suggests that excessive force was occurring under Sheriff Hutchinson's command, and he either directly authorized it or allowed it to happen, making him aware of a pattern of unconstitutional behavior by his subordinates. These incidents conveyed to Sheriff Hutchinson, when accepted as true, are sufficient to plausibly allege that Sheriff Hutchinson had knowledge of a pattern of unconstitutional acts committed by a subordinate, such that he is not entitled to qualified immunity.

Sheriff Hutchinson is not entitled to qualified immunity because the Amended Complaint presents plausible allegations both that he had knowledge of a pattern of unconstitutional acts committed by his subordinates and that he allegedly failed to adequately supervise or train his subordinates to prevent these violations. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). Accepting these allegations as true, Wolk has sufficiently pled that the Sheriff was deliberately indifferent to his subordinates' violation of protesters' constitutional rights.

### III.    Failure to State a Claim

Defendants also move to dismiss arguing that Wolk has failed to state a claim (1) for failure to train, supervise, or intervene; (2) for a violation of their substantive due process rights; and (3) for conspiracy. Fed. R. Civ. P. 12(b)(6). The Court addresses these arguments in turn below.

A.      **Failure to Train, Supervise, or Intervene**

The analysis for supervisory liability's qualified immunity standard is coextensive

with the merits examination of Wolk's claim for supervisory liability.  *Krigbaum*, 808 F.3d

at 340.  Therefore, for the same reasons that Supervisory Defendants are not entitled to

qualified immunity, *See* Section II of this Order, Wolk has plausibly alleged that the

Supervisory Defendants bear supervisory liability for claims related to supervision,

including Failure to Train, Failure to Supervise, and Failure to Intervene.

B.      **Substantive Due Process**

DNR Defendants contend that Wolk's Fourteenth Amendment substantive due

process violation allegation against the DNR Defendants fails because Wolk's claims are

duplicative of the allegations in Wolk's First and Fourth Amendment claims.  (Dkt. 37 at

17-18.)   When "a particular Amendment provides an explicit textual source of

constitutional protection against a particular sort of government behavior, that Amendment,

not the more generalized notion of substantive due process, must be the guide for analyzing

these claims."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998); *see also Graham

v. Connor*, 490 U.S. 386, 393-95 (1989).

An excessive-force claim is governed by the Fourth Amendment, not by the

Fourteenth Amendment substantive due process analysis.  *Graham,* 490 U.S. at 395

("Today we . . .  hold that all claims that law enforcement officers have used excessive

force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a

free citizen should be analyzed under the Fourth Amendment and its 'reasonableness'

standard, rather than under a 'substantive due process' approach."). For this reason, the Court grants the motion to dismiss as to Count IV, Wolk's Fourteenth Amendment claim.

### B. Conspiracy

Defendants also argue that Wolk has failed to plead a Section 1983 civil conspiracy claim. To plead such a claim, a plaintiff must allege that the defendant conspired with others to deprive the plaintiff of a constitutional right, at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy, and the overt act injured the plaintiff. *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). Allegations of conspiracy must be pled with sufficient specificity and factual support to demonstrate a meeting of the minds. *Manis v. Sterling*¸862 F.2d 679, 681 (8th Cir. 1988). The pleading need not establish that each participant knew the precise parameters of the illegal plan, but the pleading must show sufficient evidence to support the conclusion that there was a meeting of the minds to deprive the plaintiff of their constitutional rights. *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996).

Here, Wolk plausibly alleged that the defendants conspired to violate Wolk's First Amendment rights to free speech and assembly. Specifically, Wolk plausibly alleged that the BCPD, HCSO, DNR, DPS, State Patrol, and National Guard, along with members of Operation Safety Net, coordinated and agreed on their response to protests occurring from April 11 to April 16. This alleged coordination implies a "meeting of the minds" between Defendants. Wolk further claimed Defendants' coordinated response to the protests involved excessive use of force or other unconstitutional acts that caused Wolk's injuries. These allegations are sufficient to plead the requisite conspiracy. *Manis v. Sterling*, 862

F.2d 679, 681 (8th Cir. 1988).   Because Wolk sufficiently alleged that Defendants conspired to violate their First Amendment rights through coordinated acts causing Wolk harm, the Court concludes that Wolk has plausibly alleged a conspiracy against Defendants.

Wolk has likewise met the pleading standard for Defendants' personal involvement in the conspiracy by plausibly alleging that each individual Supervisory Defendant possessed statutory supervisory authority or had the ability to prevent the harm during the civil unrest and at the time of Wolk's alleged injury.

With respect to Commander Gruenig, the Amended Complaint alleges that he was personally involved in the activity at BCPD headquarters where Wolk was injured.   The Amended Complaint also alleges that Commander Gruenig allegedly made tactical decisions, including the decision to use force on protesters, thereby exercising control over all of the law enforcement officials who responded to the protest.   This degree of involvement alleged supports the conclusion that Commander Gruenig was among those responsible, in part, for directing and overseeing BCPD officers.   The Amended Complaint plausibly alleges that Commander Gruenig was personally involved as a leader who could have directed the law enforcement officers not to harm the protesters.   Because Wolk has adequately pled that Commander Gruenig showed deliberate indifference, despite having the ability to prevent harm, the Court denies the City Defendants' motion to dismiss the conspiracy claim against Commander Gruenig.

Wolk alleges that, despite their acknowledgment of acting in concert with Co-Defendants, Colonel Smith and Captain Kahre attempted to reframe their concerted crowd-control actions that violated Wolk's constitutional rights as "coordination in the context of

an emergency." Wolk's allegations are sufficient to support a claim of conspiracy in that Wolk alleges both a pattern of constitutional violations against protesters and that Colonel Smith and Captain Kahre were aware of that pattern of violations by the time Wolk was injured. And, Wolk alleges, these Defendants nevertheless persisted in using tactics that violated protesters' rights thereafter. The Amended Complaint plausibly alleges Colonel Smith's and Captain Kahre's personal involvement as leaders who could have directed law enforcement officers not to harm the protesters. The Amended Complaint plausibly alleges that Colonel Smith and Captain Kahre showed deliberate indifference, despite having the power to prevent the harm, and the Court denies the DNR Defendants' motion to dismiss the conspiracy claim against them.

As to Chief Gannon, the Amended Complaint alleges that, as the chief of the Brooklyn Center Police Department at the time of Daunte Wright's fatal shooting and the subsequent protests, Chief Gannon was personally involved in and authorized crowd-control decisions both before and after the Brooklyn Center City Council passed the Resolution restricting the use of tear gas, chemical agents, kettling, violent tactics and other dangerous crowd control devices on protesters. At this stage of the proceedings, these allegations are sufficient as to Chief Gannon's responsibility in directing and overseeing BCPD officers. Wolk also alleges that Chief Gannon did not take actions to prevent the use of excessive force after the first two nights of the protests. The Amended Complaint, therefore, plausibly alleges Chief Gannon's personal involvement as a leader who could have directed the law enforcement officers not to harm the protesters. Accordingly, Chief Gannon's motion to dismiss the conspiracy claim is denied.

Finally, the Amended Complaint alleges that Sheriff Hutchinson was one of the chief policymakers of the HCSO and, in that capacity, allegedly made tactical decisions, including the decision to use force on the protesters. Wolk alleges that Sheriff Hutchinson and the HCSO worked in coordination with members of Operation Safety Net, including the BCPD, DNR, DPS, and State Patrol, throughout the HCSO response to the protests from April 11 to April 16. These allegations pertaining to Sheriff Hutchinson's leadership and authority suggest that Sheriff Hutchinson shared responsibility for directing and overseeing the HCSO officers. The Amended Complaint plausibly alleges Sheriff Hutchinson's personal involvement as a leader who could have directed the law enforcement officers not to harm the protesters. In light of the plausible allegation that Sheriff Hutchinson showed deliberate indifference, despite having the power to prevent the harm, the Court denies the Hennepin County Defendants' motion to dismiss the conspiracy claim against him.

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.  City Defendants' motion to dismiss, (Dkt. 28), is **GRANTED IN PART AND DENIED IN PART**, as follows:

    a.  City Defendants' motion to dismiss is **GRANTED** as to the Count IV of the Amended Complaint; and

    b.  City Defendants' motion to dismiss is **DENIED** as to the remaining claims.

2.  DNR Defendants' motion to dismiss, (Dkt. 34), is **GRANTED IN PART AND DENIED IN PART**, as follows:

    a.  DNR Defendants' motion to dismiss is **GRANTED** as to Count IV of the Amended Complaint; and

    b.  DNR Defendants' motion to dismiss is **DENIED** as to the remaining claims.

3.  Defendant Chief Gannon's motion to dismiss, (Dkt. 36), is **GRANTED IN PART AND DENIED IN PART**, as follows:

    a.  Defendant Chief Gannon's motion to dismiss is **GRANTED** as to Count IV of the Amended Complaint; and

    b.  Defendant Chief Gannon's motion to dismiss is **DENIED** as to the remaining claims.

4.      Hennepin County Defendants' motion to dismiss, (Dkt. 45), is **GRANTED IN PART AND DENIED IN PART**, as follows:

    a.   Hennepin County Defendants' motion to dismiss is **GRANTED** as to Count IV of the Amended Complaint; and

    b.   Hennepin County Defendants' motion to dismiss is **DENIED** as to the remaining claims.

Dated: August 15, 2023

s/ Wilhelmina M. Wright
Wilhelmina M. Wright
United States District Judge