## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sam Wolk,<br><br>             Plaintiff,<br><br>     v.<br><br>The City of Brooklyn Center; Brooklyn Center Police Commander Tony Gruenig, *in his individual capacity*; Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual capacity,* The City of Hopkins; Captain Erik Husevold, *in his individual capacity*; Officer Michael Miller, *in his individual capacity*; Officer Christopher Harriman, *in his individual capacity*; Officer James Niemackl, *in his individual capacity*; and Officer Andrew Leyrer, *in his individual capacity*; and John Does 1-100, *in their individual capacities*,<br><br>             Defendants. | Case No. 22-cv-1666 (JWB/DTS)<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     This is an action for damages, injunctive, and declaratory relief to declare as unlawful, and put an end to, the systematic use of excessive force by the Brooklyn Center Police Department ("BCPD"), Hennepin County Sheriff's Office ("HCSO"), the Hopkins Police Department ("HPD") and their respective officers, against peaceful protestors exercising their first amendment rights.

2.     On April 11, 2021, twenty-year-old Daunte Wright was killed by Brooklyn Center Police Department officer Kim Potter. Fewer than ten miles away, former

Minneapolis Police Officer Derek Chauvin was sitting on trial for the murder of George Floyd on May 25, 2020. On the same day of Wright's killing, many people in Brooklyn Center and various other locations around Minneapolis began protesting against racialized police violence and systemic racism in law enforcement.

3.      However, as was so brutally demonstrated during the George Floyd protests in May 2020, these peaceful demonstrations were met with overwhelming and unreasonable shows of force from law enforcement, including the Defendants. Law enforcement gave orders to disperse well before curfew and the protesters who stood in solidarity against police brutality were indiscriminately shot at with less-lethal weapons including rubber bullets, pepper spray, and tear gas. Defendants utilized these weapons without restraint or justification, and with wanton disregard for the safety or the rights of the protesters.

4.      The HCSO, for example, avows their mission as "Serving and Protecting all in our Community by furthering Equal Justice, Safety and Wellness." HCSO Policy Manual – Our Mission.  All Defendants take an oath to uphold the federal and state constitutions and to enforce federal, state, and local laws.

5.      Defendants' conduct repeatedly demonstrated their failure to take seriously this duty. As the events following Daunte Wright's killing show, these defendants acted as the oppressors of those they have sworn an oath to protect.

6.      One trenchant example of the defendants' blatant disregard for the rights and safety of the community they serve came in the early hours of April 12th—the first night of protests—as a crowd of approximately 500 protesters approached the Brooklyn Center

2

police station at 6645 N. Humboldt Avenue. The police formed a barricade around the police station and began launching two-minute barrages of chemical and less-lethal munitions indiscriminately into the gathered crowd. Across Humboldt Avenue is a complex of residential apartments that quickly became awash in the gaseous chemical agents, affecting untold innocent residents including children.[1]

7.    More disturbing, however, are the actions of those parties that were intimately involved in the brutalizing of protesters during the George Floyd protests and who, despite a maelstrom of complaints and lawsuits, failed to change department policies and employed the same unconstitutional tactics against those protesting the killing of Daunte Wright.[2]

8.    Plaintiff brings this action alleging that Defendants' conduct violated their[3] First Amendment rights to freedom of speech and assembly.

---

[1] Mara Klecker, *'It's absolutely terrorizing': Residents near Brooklyn Center unrest rattled by clashes, tear gas*, Star Tribune (April 14, 2021, 9:25 PM), https://www.startribune.com/it-s-absolutely-terrorizing-residents-near-brooklyn-center-unrest-rattled-by-clashes-tear-gas/600046078/. Researchers believe that, beyond the immediate, incapacitating effects of tear gas, the chemicals may cause long-term health damage. Susan Du, *Operation Safety Net's crowd-control chemical weapons pose a mystery for medical researchers,* Star Tribune (May 3, 2021, 5:22 AM), https://www.startribune.com/operation-safety-net-s-crowd-control-chemical-weapons-pose-a-mystery-for-medical-researchers/600052860/.

[2] *See, e.g., Goyette, et al. v. City of Minneapolis, et al.*, File No. 20-cv-01302 (D. Minn.); *see also Samaha, et al. v. City of Minneapolis, et al.,* File No. 20-cv-01715 (D. Minn.); *see also Armstrong, et al. v. City of Minneapolis, et al.,* File No. 20-cv-01645 (D. Minn.).

[3] Plaintiff Wolk uses they/their/them pronouns.

3

**PARTIES**

9.      Plaintiff Sam Wolk currently lives Arizona but resided in Minnesota in 2021. Wolk engaged in peaceful protests each day of April 13 through April 16, 2021, near the Brooklyn Center Police headquarters in Brooklyn Center, Minnesota. On April 13, Wolk was, without warning, unreasonably indirectly exposed to tear gas by law enforcement officers without justification. On April 14, Wolk was, without warning, unreasonably subjected to tear gas and pepper spray, and shot with a rubber bullet by law enforcement officers without justification. The unlawful use of chemical agents and shooting by law enforcement officers caused Wolk pain and suffering, and mental anguish. Wolk wishes to continue to lawfully exercise their First Amendment rights but has been become hesitant to do so due to the danger that they could suffer similar unlawful abuse by the government. Although currently residing in Arizona, Plaintiff Wolk has friends and family in Minnesota and it is foreseeable that Wolk will wish to engage in protest here in the future without fear of reprisal by government agents.

10.      Defendant City of Brooklyn Center is a municipality in Hennepin County in the State of Minnesota with its principal place of business located at 6301 Shingle Creek Parkway, Brooklyn Center, MN 55430. At all times relevant, this Defendant was authorized to and did operate and maintain the Brooklyn Center Police Department, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendant Gruenig, who was acting within the course and scope of his employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the City of Brooklyn Center.

4

11.     Defendant Tony Gruenig is a resident of Minnesota. Gruenig serves as a Police Commander for the Brooklyn Center Police Department, and on information and belief, was one of the chief policymakers of the Brooklyn Center Police Department for all times relevant. Gruenig ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. Gruenig was acting under color of state and federal law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Brooklyn Center Police Department. Gruenig is sued in his individual capacity.

12.     Defendant Hennepin County is a county in the State of Minnesota with its seat in Minneapolis, MN. At all times relevant, this Defendant was authorized to and did operate and maintain the Hennepin County Sheriff's Office, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendant Hutchinson, who were acting within the course and scope of their employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the Hennepin County. Defendant Hennepin County is also referred to herein as "Hennepin County Sheriff's Office" and "HCSO".

13.     Defendant David Hutchinson is a resident of Minnesota. Hutchinson serves as the Hennepin County Sheriff for the Hennepin County Sheriff's Office, and on information and belief, at all times relevant was one of the chief policymakers of Defendant Hennepin County Sheriff's Office. At all times relevant, Hutchinson ordered, authorized, condoned, approved, assisted, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Hutchinson was acting under color of state and federal

5

law, within the course and scope of his official duties and in accordance with the customs, policies, and practices of the Hennepin County Sheriff's Office. Hutchinson is sued in his individual capacity.

14.     Defendant City of Hopkins is a municipality in Hennepin County in the State of Minnesota with its city hall located at 1010 1st Street South, Hopkins, MN 55343. At all times relevant, this Defendant was authorized to and did operate and maintain the Hopkins Police Department, and acted by and through its duly authorized agents, employees, and/or assigns, including Defendants Husevold, Miller, Harriman Niemackl, and Leyrer, who were acting within the course and scope of their employment, under the color of state and federal law and in accordance with the customs, policies, and practices of the City of Hopkins.

15.     Defendant Erik Husevold serves as Captain of the Hopkins Police Department. At all times relevant, Husevold was a field commander with the West Command Mobile Field Force ("WCMFF") and directly ordered, authorized, directed, and/or commanded the actions of the HPD Officers which violated Plaintiff's rights as alleged herein. At all times relevant, Husevold was acting under the color of state and federal law and within the scope of his official duties. Husevold is sued in his individual capacity.

16.     Defendant Michael Miller is a resident of Minnesota. At all times relevant, Miller was an officer in the Hopkins Police Department and was deployed during the protests and demonstrations taking place in Brooklyn Center on April 14, 2021. At all times relevant, Miller's actions violated Plaintiff's rights as alleged herein. At all times relevant,

Miller was acting under the color of state and federal law and within the course and scope of his official duties. Miller is sued in his individual capacity.

17.    Defendant Christopher Harriman is a resident of Minnesota. At all times relevant, Harriman was an officer in the Hopkins Police Department and was deployed during the protests and demonstrations taking place in Brooklyn Center on April 14, 2021. At all times relevant, Harriman's actions violated Plaintiff's rights as alleged herein. At all times relevant, Harriman was acting under the color of state and federal law and within the course and scope of his official duties. Harriman is sued in his individual capacity.

18.    Defendant James Niemackl is a resident of Minnesota. At all times relevant, Niemackl was an officer in the Hopkins Police Department and was deployed during the protests and demonstrations taking place in Brooklyn Center on April 14, 2021. At all times relevant, Niemackl's actions violated Plaintiff's rights as alleged herein. At all times relevant, Niemackl was acting under the color of state and federal law and within the course and scope of his official duties. Niemackl is sued in his individual capacity.

19.    Defendant Andrew Leyrer is a resident of Minnesota. At all times relevant, Leyrer was an officer in the Hopkins Police Department and was deployed during the protests and demonstrations taking place in Brooklyn Center on April 14, 2021. At all times relevant, Leyrer's actions violated Plaintiff's rights as alleged herein. At all times relevant, Leyrer was acting under the color of state and federal law and within the course and scope of his official duties. Leyrer is sued in his individual capacity.

20.    Defendants John Does 1-100 are unidentified individuals who committed the various acts set forth below, or ordered other John Doe Defendants to commit excessive

force and retaliation, including as agents of Defendants, and are reserved for others who worked together with Defendants to effectuate the harm complained of herein. At all times relevant, John Does were acting under color of state and federal law, within the course and scope of their official duties and, to the extent applicable, in accordance with the customs, policies, and practices of the City of Brooklyn Center, the Hennepin County Sheriff's Office, or the City of Hopkins. Defendants solely possess the discovery necessary to identify the John Doe Defendants. John Does are sued in their individual capacities.

## JURISDICTION AND VENUE

21.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this matter, which arises in part under the laws of the United States including 42 U.S.C. § 1983.

22.     Venue is proper in this district under 28 U.S.C. § 1391, as Defendants reside in this district, and the events or omissions giving rise to the claims set forth herein occurred in this district.

## FACTUAL ALLEGATIONS

**A.      The Aggressive Police Response to Demonstrations Over the Killing of Daunte Wright**

**1.      Sunday, April 11, 2021, approximately 2:00 P.M.**

23.     On April 11, 2021, twenty-year-old Daunte Wright was driving with his girlfriend in Brooklyn Center to the house of his older brother. Two police officers, including former BCPD officer Kim Potter, pulled over Wright's vehicle for an expired license plate tag. When the officers ran Wright's license number, they discovered that he had an outstanding warrant for a gross misdemeanor.

24.     Potter's bodycam footage showed the officers approach Wright, who stood outside his vehicle with his hands behind his back as an officer tried to handcuff him. Wright broke away from the officer's grip and moved back into the driver's seat. Potter shouted "Taser! Taser! Taser!" before drawing her Glock 9mm handgun shooting Wright in his left side. Wright's car sped away for a short distance before crashing into another vehicle and stopping. Potter can be heard on bodycam screaming "Holy [expletive]! I just shot him." An ambulance was called and Wright was pronounced dead at the scene.

25.     Immediately following the killing, public comment on the incident was scattered and inconsistent. Then-chief of Brooklyn Center Police Department Tim Gannon did not comment on the killing, did not release the bodycam footage, and did not disclose the name of Wright or Potter. The Minnesota Bureau of Criminal Apprehension released a report in the early afternoon of April 11th that named Wright as the victim and described the incident as a fatal shooting during a traffic stop where Wright tried to flee arrest for an outstanding warrant.[4]

26.     At the same time in Minneapolis, only several miles away, the trial of former Minneapolis Police Officer Derek Chauvin for the murder of George Floyd was reaching its conclusion. In anticipation of public unrest in response to the verdict in Chauvin's case, Governor Tim Walz created "Operation Safety Net," ("OSN"), a multi-agency police force consisting of officers from, among others, the Minnesota State Patrol, Minneapolis Police

---

[4] Kyle Brown, *BCA investigating after Brooklyn Center officer shoots, kills driver during traffic stop,* KSTP (April 11, 2021, 4:46 PM), https://kstp.com/kstp-news/top-news/bca-investigating-after-brooklyn-center-officer-shoots-kills-driver-during-traffic-stop/.

Department, Hennepin County Sheriff's Office, Ramsey County's Sheriff's Office, Minnesota National Guard, and Conservation Officers from the Department of Natural Resources.[5] In addition to these agencies, OSN operated as part of a "mutual aid system" with "other agencies from around the metro and the state," and all agencies involved were part of a "coordinated response under unified command."[6]

27.    Although created to monitor civil unrest related to the Chauvin trial in Minneapolis, OSN forces were deployed to Brooklyn Center to assist the BCPD on April 12, 2021 and remained involved in operations there until at least April 16, 2021.[7]

28.    Also mobilized during the unrest in Brooklyn Center was the West Command Mobile Field Force, which is described in the Mobile Field Force Model Policy for Hennepin County Police Agencies as "a specially trained team of officers capable of

---

[5] This list is non-exhaustive but is taken from the Operation Safety Net website. While that website is no longer directly available, it is archived at: https://web.archive.org/web/20210413044756/https://safetynet.mn.gov/Pages/default.aspx. Since the protests surrounding the construction of the Enbridge Line 3 Pipeline, the DNR has become increasingly militarized. Emails and public records demonstrate that Conservation Officers have received riot control training from the MSP as well as a stockpile of crowd-control weapons and vehicles from various other agencies and the Minnesota National Guard. DNR's budget for its Enforcement Division has increased by nearly 30% from fiscal year 2020, in addition to a $6.3 million appropriation to be split between DNR and MSP. *See* Andrew Neef, *Multi-Agency Task Force Prepares "Rules of Engagement" for Line 3 Protests*, Unicorn Riot (Feb. 11, 2019) (https://unicornriot.ninja/2019/multi_agency_task_force_prepares_rules_of_engagement_for_line_3_protests/); Tommy Wiita, *House Passes, Senate Amends $7.8M in Funding for Police Response to Civil Unrest*, KSTP (Apr. 27, 2021) (https://kstp.com/minnesota-news/house-passes-senate-amend-funding-for-police-response-to-civil-unrest-/6088453/).

[6] Archived at https://web.archive.org/web/20210412051256/https://safetynet.mn.gov/Pages/frequently-asked-questions.aspx

[7] Archived at https://web.archive.org/web/20210413044756/https://safetynet.mn.gov/Pages/default.aspx

responding to incidents of member agencies in which large numbers of people require management for public safety reasons and to protect First Amendment rights and peaceful protesting." Defendant Husevold was a field commander of the WCMFF, described as the "[m]ember agency command staff level officer that specifically guides and directs the tactics and operations of the platoon leaders and their Mobile Filed [*sic*] Force members."[8] The WCMFF was deployed in Brooklyn Center every night from April 11 to 16, 2021.

29.    Upon information and belief, it was Defendants Gruenig, Hutchinson, and Husevold, among others, who were in charge of the tactical operations during all relevant periods of time, including the decisions on use of force against protesters. Specifically, in addition to commanding the officers in their agency (Gruenig commanded the BCPD officers, Hutchinson commanded the HCSO officers, and Husevold commanded the Hopkins Police Department officers), Gruenig, Hutchinson, and Husevold all participated in command of OSN and the WCMFF.

30.    The precise makeup and structure of the law enforcement response described herein is information that is in the sole custody of Defendants.

**2.    Sunday, April 11, 2021 evening – Monday, April 12, 2021 morning**

31.    In the hours after the shooting, protesters gathered at the scene, waving Black Lives Matter flags and yelling "Justice for Daunte." Some protesters came directly from an earlier rally in St. Paul organized by families with relatives who had been killed by

---

[8] *Mobile Field Force Model Policy – Hennepin County Police Agencies,* 1 (the version of these policies was provided to Plaintiff through a Data Records Request and is in the possession of Plaintiff's counsel).

police.[9] The number of protesters at and around the site of Wright's killing eventually grew to more than one hundred.

32.    Brooklyn Center Mayor Mike Elliott issued a curfew from 1:00 a.m. until 6:00 a.m. Monday morning for anyone in the city except for those traveling to work or emergency situations.[10]

33.    As the number of protesters grew, police reinforcements in tactical gear arrived in the residential area.[11] At approximately 7:15 p.m., police in riot gear formed a line in front of the protesters but backed away and exited the area.

34.    Around nightfall, protesters regrouped near the Brooklyn Center Police Department Headquarters where they had erected a makeshift memorial for Wright.

35.    At approximately 9:00 p.m., the crowd of protesters continued their demonstration near the Police Department Headquarters, where law enforcement had created a perimeter. The law enforcement presence was comprised of, among others, officers from the Brooklyn Center Police Department, Hennepin County Sheriff's Office, the Minnesota State Patrol, and officers responding as a part of OSN or the WCMFF, including officers from the Hopkins Police Department. Just after 9:30 p.m., Brooklyn

---

[9] Jared Goyette & Andrea Salcedo, *Police Fatally Shoot Man, 20, in Suburban Minneapolis, Sparking Protests*, The Wash. Post (Apr. 12, 2021, 3:42 AM), https://www.washingtonpost.com/nation/2021/04/11/daunte-wright-brooklyn-center-minnesota/.

[10] Kyle Brown, *Brooklyn Center Curfew Implemented Following Protests Over Fatal Police Shooting,* KSTP (April 11, 2021, 10:23 PM), https://kstp.com/kstp-news/top-news/brooklyn-center-curfew-implemented-following-protests-over-fatal-police-shooting/.

[11] *Id.*

Center Police Commander Tony Gruenig (later to be named interim Brooklyn Center Police Chief) declared the demonstration outside the police station an unlawful assembly and gave protesters an order to disperse within 10 minutes.

36.     Just before 10:00 p.m., officers began firing "less-lethal rounds and flash-bang grenades" to disperse protesters remaining in the area.[12] Images and video from social media show clouds of chemicals engulfing groups of protesters and drifting across the street towards residential buildings.

37.     Officers shot gas canisters indiscriminately into groups of protesters, and some protestors were struck directly by the projectiles. Officers appeared to target individuals who approached spent gas canisters to identify their make and model. Specifically, Defendant Husevold directed officers with the WCMFF to fire rubber bullets, pepper spray, and other less-lethal munitions into the crowd in front of the Brooklyn Center Police Department Headquarters. Officers from the HCSO, BCPD, and other law enforcement agencies, acting on commands from Gruenig and Hutchinson, also fired less-lethal munitions indiscriminately at protesters.

38.     At several points, officers shot less-lethal munitions and gas canisters at individuals with clearly identified press credentials. Several members of the press who were gathered on the property directly North of the police department with "press" prominently displayed on their clothing were fired at several times. There were no protesters in their vicinity.

---

[12] *Id.*

39.    Commander Gruenig, acting on behalf of the Brooklyn Center Police Department, continued declaring the gathering to be an unlawful assembly and ordering the crowd to disperse. Several times he included "this includes the media."

40.    Dozens of protesters suffered injuries from munitions fired by the police, and several demonstrators were detained by police.

### 3.    Monday, April 12, 2021

41.    On the Morning of April 12, 2021, then-chief Tim Gannon released Potter's bodycam footage and identified her as the officer who killed Wright. Gannon commented that Potter had mistaken the taser on the left side of her duty belt with the handgun holstered on the right side and had intended to tase Wright to subdue him. Kim Potter was a 26-year police veteran. In 2019, Potter became a local police union president, and was an instructor with the Brooklyn Center Police Department. She was training two junior officers when she stopped and killed Daunte Wright.

42.    Minnesota Department of Public Safety Commissioner John Harrington justified the April 11, 2021, use of force due to reports of break-ins at least 20 businesses at a "nearby" mall.[13] However, the mall in question, the Shingle Creek Mall, is over five miles away from the BCPD headquarters and on the other side of a six-lane freeway. Officers did not act to protect those businesses, but instead employed violent and excessive force on the protestors in front of the Brooklyn Center Police Station. Harrington added

---

[13] Griff Witte & Mark Berman, *Minnesota killing adds to the anger, and the stakes, as Chauvin trial nears its end,* The Washington Post (April 12, 2021, 7:21 PM), https://www.washingtonpost.com/national/daunte-wright-minneapolis-protests/2021/04/12/d6a9150c-9bd0-11eb-b7a8-014b14aeb9e4_story.html.

that more troops from the National Guard were going to be deployed in the Brooklyn Center area.[14]

43.    Following the actions of law enforcement officers the previous night, Mayor Elliott convened the Brooklyn Center City Council for an extraordinary session to introduce and debate Resolution No. 2021-58: A Resolution Limiting Police Crowd Control Tactics During Protests. After less than 30 minutes of discussion, the Resolution passed 4-0, banning from use by the BCPD the following crowd control tactics:[15]

  a.  The use of gas and other chemicals;

  b.  Violent crowd control and dispersion techniques such as the use of rubber bullets as a tool against protesters;

  c.  Kettling, the corralling of demonstrators into a confined space so they cannot leave and are then arrested slowly;

  d.  Violent tactics such as chokeholds;

  e.  Preventing protesters from taping law enforcement personnel; and

  f.  Law enforcement covering up badge numbers.

44.    The Brooklyn Center City Council also recommended then-chief Gannon and former Officer Potter both resign.

---

[14] Goyette & Salcedo, *supra* note 5.

[15] Cheryl Teh, *Brooklyn Center, Minnesota, city council prohibited the use of tear gas. The police broke the rule almost immediately.*, Insider (April 12, 2021, 9:51 PM), https://www.insider.com/brooklyn-center-police-prohibited-tear-gas-then-broke-own-rules-2021-4; *see also* Brooklyn Center City Council Resolution No. 2021-58, available at http://bc-img.ci.brooklyn-center.mn.us/WebLink/DocView.aspx?id=978650&dbid=0&repo=BrooklynCenter.

45.     Governor Tim Walz announced a 7:00 p.m. curfew for that evening for Hennepin, Ramsey, Anoka, and Dakota counties along with increased deployment of police and National Guard.

46.     By the evening of April 12, members of the Minnesota National Guard arrived in Brooklyn Center to join forces with officers responding as a part of OSN or the WCMFF, including officers from the Hopkins Police Department.

47.     By curfew, a large group of protesters had gathered at the Brooklyn Center Police Department Headquarters and were again fired upon indiscriminately by law enforcement with tear gas, flashbang grenades, and pepper spray.

48.     Among those involved were law enforcement officers from the HCSO, BCPD, Minnesota State Patrol ("MSP"), Minnesota Department of Natural Resources ("DNR"), the National Guard, and officers responding as a part of OSN or the WCMFF, including officers from the Hopkins Police Department. Again, Defendant Gruenig from the BCPD gave the unlawful assembly and dispersal orders throughout the night.

49.     Approximately one hour after curfew, Defendant Husevold directed the National Guard to deploy a large military-style Humvee in front of the police department. As the vehicle approached the perimeter, a protester who stood alone near the fence was shot with a less-lethal munition by an officer approximately six feet away inside the perimeter.

50.     When a protester affixed a small flag bearing the letters BLM ("Black Lives Matter") to the perimeter fence, law enforcement officers fired several shots of less-lethal

munitions at the flag—apparently using the symbol of a movement against police brutality as target practice.

51.     Defendant Husevold, acting as a field commander of the WCMFF, directed officers to use pepper spray and pepperball projectiles at protesters standing behind the fence. Starting at approximately 8:30, the officers launched a nearly continuous and indiscriminate barrage of less-lethals at the crowd.

52.     Then-Brooklyn Center Police Chief Gannon told Husevold to "do whatever you need to do, you have the order for gas." Subsequently, law enforcement, including officers from the HCSO, BCPD, and officers responding as a part of OSN or the WCMFF, including officers from the Hopkins Police Department, fired gas canisters indiscriminately at the assembled crowds and towards the surrounding buildings. One gas canister was fired into the front yard of the residential property adjacent to the police department where no protesters were gathered. That house, along with the apartment buildings across Humboldt Avenue from the police station, became engulfed in noxious smoke.

53.     Brooklyn Center Mayor Elliott was on the scene at the Brooklyn Center Police Headquarters and in communication with Gannon.

54.     A large contingent of officers from the MSP, DNR, and officers responding as a part of OSN or the WCMFF, including officers from the Hopkins Police Department, formed a line across Humboldt. Avenue and advanced on protesters, driving them north towards a strip mall and gas station. Several protesters were pepper-sprayed, shot with rubber bullets, and/or thrown to the ground for arrest.

55.     As police advanced down Humboldt Avenue, officers surrounded several vehicles and ordered all occupants out of the car and onto the ground at gunpoint. At one point, a group of State Patrol and DNR officers surrounded a parked vehicle and aimed a grenade launcher at the driver through the driver-side window. When the man got out of the vehicle he was thrown to the ground and arrested.

56.     That night, a total of around 40 protesters were arrested according to an Operation Safety Net press conference.[16]

**4.    Tuesday, April 13, 2021**

57.     Potter submitted her resignation, although Mayor Mike Elliott did not accept the resignation that day, insisting on an internal process to ensure accountability.

58.     Elliott announced that Tim Gannon had resigned as BCPD police chief and Brooklyn Center City Manager Curt Boganey was fired. Tony Gruenig was named interim BCPD police chief.

59.     Brooklyn Park Mayor Mike Elliott announced a curfew beginning April 13 at 10:00 p.m. to 6:00 a.m. the following morning.

60.     Around 8:30 p.m., crowds began to gather at the Brooklyn Center Police Department headquarters, many holding umbrellas to shield them from exposure to the toxic tear gas.

61.     Plaintiff Wolk was present outside the Brooklyn Center Police headquarters starting at approximately 8:30 p.m. Between 8:30 and 9:00 p.m., they were subjected to

---

[16] MN Operation Safety Net, *News Conference: April 13, 2021 – Briefing Update #1 (12:30 a.m.,* YouTube (April 113, 2021), https://www.youtube.com/watch?v=JpP0cYouWJ0

tear gas, flashbang grenades, and other such crowd-control munitions fired at and around them. Just after 9:00 p.m., almost an hour before the curfew set by Governor Walz, law enforcement began commanding media and press to leave the area immediately. After several such dispersal warnings, officers marched on the protesters, again discharging canisters of tear gas into the crowd. The law enforcement contingency was again made up of, among others, the BCPD, HCSO, and officers responding as a part of OSN or the WCMFF, including officers from the Hopkins Police Department.

62.     Defendant Husevold again commanded a platoon of law enforcement officers as part of WCMFF. Specifically, Husevold ordered officers, including Hopkins Police Officer Harriman, to shoot protesters who were against the fence in front of the Brooklyn Center Police Department headquarters with less-lethal munitions, including pepper balls, irritant powder, and pepper spray.

63.     Officers in riot gear marched towards members of the press who were clearly identified and taking video of the incident. One officer raised his firearm and deliberately shot one such journalist, striking him in the leg with a rubber bullet.

64.     As law enforcement marched on the gathered crowd, they shot gas canisters, rubber bullets, and flash-bang grenades indiscriminately into the crowd. Again, the gas from these canisters drifted towards the apartment buildings on the east side of Humboldt Avenue. Several residents of that apartment complex came outside and pleaded with law enforcement to stop firing because there were children in the apartments.

65.     Following a fourth dispersal order, the advancing police broke into a run, charging at protesters and throwing them to the ground. Defendant Husevold, acting as

field commander of the WCMFF, personally ordered the arrest of one such protestor who was standing still and attempting to film the officers on his cell phone. A large force of unmarked police cars then approached the scene, to prevent cars from leaving and to transport arrested protesters.

**5.    Wednesday, April 14, 2021**

66.    Kim Potter was charged on April 14, 2021, with second-degree manslaughter. She was brought into custody that morning, posted bail, and was released.

67.    At a press conference following Potter's arrest, Brooklyn Center Mayor Elliott distanced himself from the law enforcement decisions made regarding protesters, indicating that Hennepin County Sheriff David Hutchinson oversaw the Operation Safety Net agents and their tactics.

68.    The City of Brooklyn Center announced a curfew beginning at 10:00 p.m. on April 14, 2021.

69.    Captain Husevold received a message from the Hennepin County Sheriff's Office requesting the WCMFF to assist in the law enforcement response in Brooklyn Center. Captain Husevold met with command staff from the National Guard, BCPD, and Hennepin County Sheriff's Office to develop the tactical plan for the night. It was decided that Husevold would command the Hopkins Police Department officers Miller, Harriman, Leyrer, and Niemackl, among others, and be deployed within the secure perimeter at the BCPD headquarters. The Hopkins Police Department officers were further assigned to act as part of the chemical agent reaction team (CART), and the officers were armed with 40mm less-lethal launchers and various kinds of ammunition, pepper spray, and other less-

lethal munitions. Sergeants from HCSO were also assigned to command officers within the perimeter, including officers from the BCPD and HCSO. Defendants arrived at BCPD headquarters at approximately 5:00 p.m.

70.    Plaintiff Wolk joined others gathering in front of the BCPD headquarters on April 14, 2021. Wolk and the assembled group were peacefully protesting against police brutality and racial violence by singing songs and chanting slogans such as "say his name" and "I can't breathe." Wolk and the assembled group were not violating any laws or posing any threat to individuals, law enforcement personnel, or property. No present law enforcement officer would have any cause to fear for his safety or the safety of public or private property.

71.    At approximately 8:30 p.m., prior to curfew, Wolk and others were standing in front of the perimeter fence outside of the BCPD headquarters. No dispersal order had been read and Wolk had not otherwise been told to disperse. At that time, Defendants were standing within the secured perimeter several feet back from the chain fence.

72.    Suddenly and without warning, the officers charged towards the fence shouting "back up, back up." As they rushed the fence, they indiscriminately sprayed pepper spray onto protesters, including Plaintiff Wolk. Simultaneously, officers fired a barrage of less-lethal munitions at the protesters at close range, one of which struck Plaintiff Wolk in the leg.

73.    The officers did not wait for any amount of time between ordering the crowd to back up and shooting them with pepper spray and less-lethal rounds. Accordingly,

21

Plaintiff Wolk did not have any meaningful time to comply with the officers' orders before being fired upon.

74.    Moreover, due to the assembled crowd standing closely behind them, including individuals who were incapacitated by the volley from the officers behind the fence, Wolk was functionally trapped against the barrier. Eventually, Wolk was able to escape from the fence and leave the area.

75.    The officers were acting on direct orders from Captain Husevold and the Sergeants from HCSO, who were in close proximity and were in constant verbal and radio contact with these officers. It was Captain Husevold and the Sergeants from HCSO who directed the HPD Officers to use pepper spray and less-lethal munitions on the group of peaceful protesters on the other side of the fence, including Plaintiff Wolk.

76.    Upon information and belief and the facts recited above, it was Defendants Miller, Harriman, Leyrer, Niemackl, and John Doe officers who used the less-lethal munitions against Plaintiff Wolk. The John Doe Defendants were instructed to deploy pepper spray and rubber bullets by other named and John Doe Defendants and/or did so due to a policy or practice, or the training they received (or failed to receive) from the BCPD, HCSO, and/or HPD.

77.    Captain Husevold and the officers exhibited animus towards Plaintiff and the other protesters as evidenced by the fact that Plaintiff Wolk and the other protesters were demonstrating peacefully, were not breaking any laws, and that Captain Husevold and the officers were not in any danger. Moreover, Captain Husevold and the officers were aware that their actions did not give Plaintiff Wolk and the other protesters a meaningful

opportunity to comply with their orders and that their actions therefore would not serve a law enforcement purpose besides inflicting pain on Plaintiff and the other protesters. No reasonable officer would understand that these actions were taken in order to carry out their responsibilities.

78.    The first order of the night announcing unlawful assembly and directing the crowd to disperse was read by Hopkins Police Captain Craig Kreiling at approximately 9:23 p.m.

79.    As a result of their injuries, Wolk had difficulty walking without assistance for weeks. Wolk was later instructed by their doctor not to stand for more than twenty minutes for several weeks. Wolk subsequently began participating in physical therapy and experiences consistent pain in their knee. To-date, Wolk has continued to suffer chronic knee pain and has been referred to a chronic pain specialist for long-term care.

80.    Around 9:00, law enforcement announced that the protesters were an unlawful assembly and gave dispersal orders. Large, military-style armored vehicles arrived on the scene and flanked the protesters on either side of the road. Law enforcement continued to spray protesters with pepper spray through the fence and fire nonlethal ammunition at protesters in a constant volley.

81.    Minnesota DNR Conservation and Minnesota State Patrol officers approached the group from Humboldt Avenue. Several officers rushed forward to make sudden arrests of individuals that were standing idly by the road. Officers walked around the residential buildings located on Humboldt Avenue. shining strobing flashlights into the

windows of homes and confronting random bystanders. About ten officers surrounded a vehicle with weapons drawn, pulled out a lone occupant, and arrested him. A total of 24 protesters were arrested.[17]

82.     Officers then approached various members of the press—clearly identified by their press credentials and the professional recording equipment they carried—and broke their equipment, detained them, forced them to be photographed, and then released them. The clear intention of these actions was to harass, intimidate, and punish the members of the press who were documenting the rampant abuses committed by law enforcement.

### 6.     Thursday, April 15, 2021

83.     Brooklyn Center Mayor Mike Elliott wrote a letter to HCSO Sheriff David Hutchinson indicating that Brooklyn Center "remains in need of mutual aid from its partner agencies," and that Elliott believed the HCSO had taken command of the situation.[18] Further, Elliott responded to "concerns from law enforcement" regarding Brooklyn Center's April 12, 2021 resolution banning the use of tear gas and other dangerous crowd control devices, stating "my view is that as long as protesters are peaceful and not directly interacting with law enforcement, law enforcement should not engage with them."[19]

---

[17] Minnesota Operation Safety Net (@MinnesotaOSN), Twitter (April 15, 2021, 12:19 AM), https://twitter.com/MinnesotaOSN/status/1382564319502725121.

[18] Letter from Mike Elliot to David Hutchinson (April 15, 2021), *available at* https://www.documentcloud.org/documents/20691731-mike-elliot-letter.

[19] *More than 100 people arrested on sixth night of Brooklyn Center protests; journalists detained,* MPR News (April 17, 2021, 10:55 AM), https://www.mprnews.org/story/2021/04/17/law-enforcement-response-swift-on-sixth-night-of-protests.

84.    Minnesota State Patrol Col. Matt Langer held a press conference where he was asked about journalists being detained, photographed, and having their equipment broken. Langer dismissed the concerns as "semantics" and insisted that the behavior of the State Patrol towards journalists was their "refined way to process them."[20]

85.    Protesters again gathered at the Brooklyn Center Police Department headquarters. As the 10:00 p.m. curfew approached, most of those gathered left the area and no official dispersal orders were given.[21]

**7.    Friday, April 16, 2021**

86.    On the morning of April 16, 2021, District of Minnesota Judge Wilhelmina Wright issued a temporary restraining order ("TRO") barring state law enforcement from using force against journalists or ordering them to disperse while covering protests. The case, *Goyette v. City of Minneapolis*, originally involved similar brutal treatment of the press during the George Floyd protests in May 2020. The complaint was filed on June 2, 2020, but the TRO was denied at that time because by that date, the protests had abated and the court found that a restraining order would not redress the alleged injury. When the Daunte Wright protests began and law enforcement—many of the same agencies and,

---

[20] *4th night of protests, arrests following shooting of Daunte Wright,* KARE 11 (April 14, 2021 7:34 AM), https://www.kare11.com/article/news/local/daunte-wright/daunte-wright-shooting-kim-potter-arrest-manslaughter-charge/89-c1bc8647-f019-4d27-b3f2-2c2f76a9d013.

[21] *No dispersal orders given on 5th night of protests in Brooklyn Center,* KSTP (April 15, 2021, 11:41 PM), https://kstp.com/news/protesters-gather-for-5th-night-in-brooklyn-center-to-call-for-justice-in-daunte-wright-shooting/6076737/?cat=1.

likely, individual officers—continued to harass and assault members of the press, Goyette again petitioned the court for a TRO.

87.    The 22-page order contained findings of fact reciting a litany of egregious violations of reporters' rights by law enforcement, including that "members of the press have sustained severe injuries at the hands of law enforcement in recent days. These severe injuries include bruising and at least one injury requiring surgery." *Goyette*, 338 F.R.D. 109, 117 (D. Minn. 2021). Additionally, the court concluded that plaintiffs had a fair chance of prevailing on the merits of their First Amendment retaliation claim that law enforcement officers were motivated by plaintiffs' exercise of their First Amendment rights. The court found

> Plaintiffs' declarations reflect that a Star Tribune photojournalist, who had a camera and press credentials in clear view, was pepper sprayed in the eye while photographing a scene. According to another journalist, '[o]ne officer just shot our ground reporter in the leg with some kind of impact round – it appeared to be deliberate and not accidental.' These facts suggest that the State Defendants' actions were motivated at least in part by the press's engagement in constitutionally protected activity.

*Id.* at 118 (alterations in original) (internal citations omitted).

88.    The district court granted plaintiffs' motion for a temporary restraining order and enjoined DPS Commissioner John Harrington, MSP Colonel Matthew Langer, and their agents from

> g.    arresting, threatening to arrest, or using physical force – including through use of flash bang grenades, non-lethal projectiles, riot batons, or any other means – directed against any person whom they know or reasonably should know is a Journalist . . . *unless* the State Defendants have probable cause to believe that such individual has committed a crime;

h. using chemical agents directed against any person whom they know or reasonably should know is a Journalist, including but not limited to mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas . . . and other similar substances unless such Journalist presents an imminent threat of violence or bodily harm to persons or damage to property; and

i. seizing any photographic equipment, audio- or videorecording equipment, or press passes from any person whom the State Defendants know or reasonably should know is a Journalist, or ordering such person to stop photographing, recording, or observing a protest, unless the State Defendants are lawfully seizing that person consistent with this Order.

*Id* at 121-22.[22]

89.    The Minnesota State Patrol has since settled the *Goyette* lawsuit by agreeing to a permanent injunction that prohibits the Minnesota State Patrol from arresting or attacking journalists.[23]

90.    Demonstrating local governance discomfort with the tactics being employed by law enforcement, the Minneapolis City Council passed a resolution opposing the use of tear gas and other less-lethal munitions on protesters.[24]

91.    Friday night saw a large gathering of protesters outside the Brooklyn Center Police headquarters on Humboldt Avenue. After dispersal orders were given to the crowd,

---

[22] Major Kurtz of the HCSO clarified to HCSO agents in an internal memorandum that "[t]his TRO, while not issued directly against HCSO, is a declaration of Minnesota law, so HCSO and our Operation Safety Net partners *must* comply with it." However, this memorandum was not circulated until April 20, 2021, well after the protests had essentially ended.

[23] Alex Chhith, *Settlement prohibits Minnesota State Patrol from attacking or arresting journalists*, Star Tribune (Feb. 8, 2022, 8:40 PM), https://www.startribune.com/settlement-prohibits-minnesota-state-patrol-from-attacking-or-arresting-journalists/600144577/.

[24] Tommy Wiita, *In 11-1 vote, Minneapolis City Council opposes use of tear gas on protesters*, KSTP (April 16, 2021, 3:31 PM), https://kstp.com/minnesota-news/in-11-1-vote-minneapolis-city-council-opposes-use-of-tear-gas-on-protesters/6077655/?cat=1.

police busses arrived on the scene and law enforcement conducted a kettle and mass arrest of 134 protesters.[25]

92.    Dozens of members of the press who had their press credentials clearly visible were ordered at gunpoint to lay on the ground and were held in that position while their credentials were checked and their badges and faces pictured by the police.[26] One photojournalist stated that during the police rush and mass arrests, an officer punched him in the face, threw his press badge, and slammed the journalist's head on the ground before ordering him at gunpoint to lay on the ground.[27]

93.    One photo shows a law enforcement officer standing in front of a group of reporters—all of whom are clearly identified, holding or standing near large telecommunications gear, and located at least ten yards from the rest of the crowd—and spraying a heavy stream of pepper spray onto their faces from a distance of approximately 4 feet away.[28]

**8.    Saturday, April 17, 2021**

94.    Brooklyn Center Mayor Elliott issued a curfew for 11:00 p.m.

---

[25] Niko Georgiades, *Police Break Equipment, Shoot, Beat, and Detain Press,* Unicorn Riot (April 20, 2021), https://unicornriot.ninja/2021/police-break-equipment-shoot-beat-and-detain-press/.

[26] *Id.*

[27] *See* Declaration of Timothy Evans, *Goyette v. City of Minneapolis*, No. 0:20-cv-01302 (D. Minn.), available at https://www.documentcloud.org/documents/20618242-declaration-of-timothy-evans.

[28] Alex Kent (@AlexKentTN), Twitter (April 17, 2021, 12:25 AM), https://twitter.com/AlexKentTN/status/1383290508181590018.

95.    The protests were largely quiet, as national civil rights figures Jesse Jackson and Rep. Maxine Waters appeared in Brooklyn Center and spoke to the crowd.

96.    There were no dispersal orders given following curfew. There were no further arrests.

97.    From the period of April 11 to April 20, 2021, HCSO used hundreds of less-lethal munitions against unarmed protesters, including foam rounds (288), 40mm 50 Meter Arial Warning Signal (24), 40mm 100 Meter Arial Warning Signal (1), OC Blast Ball (37), and various other munitions which deploy chemical agents such as tear gas. During the same period, BCPD and DNR deployed chemical munitions and direct impact munitions, as well as generalized use of force. BCPD and DNR would not identify the type or quantity of munitions they deployed against the protesters.

**B.    Defendants Violated Their Own Policies Regarding Use of Force**

**a.    Hennepin County Sheriff's Office**

98.    HCSO Policy Manual ("HCSO Policy") defines "Force" as: "The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained." [29]

99.    According to the same HCSO Policy, "When de-escalation techniques are not effective or appropriate, a deputy may consider the use of other than deadly force to

---

[29]    Hennepin County Sheriff's Office, *Policy Manual* § 300.1.1 Definitions (the version of these policies was provided to Plaintiff through a Data Records Request and is in the possession of Plaintiff's counsel).

control a non-compliant or actively resistant individual. A deputy is authorized to use agency-approved other than deadly force techniques and issued equipment in the following circumstances (Minn. Stat. § 609.066 and Minn. Stat. § 609.33): (a) [i]n effectuating a lawful arrest; or (b) [i]n the execution of a legal process; or (c) [i]n enforcing an order of the court; or (d) [i]n executing any other duty imposed by law; or (e) [i]n defense of self or another." HCSO Policy § 300.3.5 Use of Other Than Deadly Force.

100.    Kinetic energy projectiles, including rubber bullets and 40-mm less-lethal foam rounds, are "not to be used to psychologically torment, elicit statements or punish any individual," but rather "can be used in an attempt to de-escalate a potentially *deadly* situation." HCSO Policy § 308.9.3 Kinetic Energy Projectile and Marking Rounds Guidelines, Special Deployment Considerations (emphasis added).

101.    HCSO Policy states that "[t]he need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death." *Id.* § 308.9.2 Kinetic Energy Projectile and Marking Rounds Guidelines, Deployment Considerations. The policy explicitly advises against targeting a person's head and neck unless "the suspect poses an imminent threat of serious bodily injury or death to the deputy or others." *Id.*

102.    Importantly, the HCSO Policy also mandates that a verbal warning be considered "unless it would otherwise endanger the safety of deputies or when it is not practicable due to the circumstances:" "The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other deputies and individuals that the device is being employed." *Id.*

103.    The HCSO Policy also encourages the use of de-escalation tactics "whenever possible and appropriate before resorting to force and to reduce the need for force." *Id.* § 300.3.4 Use of Force Procedure, De-Escalation. De-escalation tactics listed in the policy include "command presence, advisements, warnings, verbal persuasion, and tactical repositioning." *Id.* § 300.1.1. Use of Force, Purpose and Scope, Definitions.

104.    HCSO policy permits chemical munitions be used for "crowd control, crowd dispersal or against barricaded suspects based on the circumstances" and states only the "Watch Commander, Incident Commander or Emergency Services Unit Commander may authorize the delivery and use of chemical munitions, and only after evaluating all conditions known at the time and determining that such force reasonably appears justified and necessary." *Id.* § 308.6. Control Devices, Chemical Munition Guidelines.

105.    On information and belief, the authorization for use of force was given as a blanket authorization by the on-scene incident commander(s) and was not given on an incident-by-incident basis.

106.    Defendants' repeated decisions to ignore their own policies constitutes a custom and practice of failing to, and refusing to, follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other members of the public.

**b.    Brooklyn Center Police Department**

107.    The Brooklyn Center PD Policy Manual ("BCPD Policy") states that "it is imperative that law enforcement actions are measured and appropriate for the behaviors officers may encounter . . . [t]he purpose of a law enforcement presence at the scene of

31

public assemblies and demonstrations should be to preserve the peace, to protect life and prevent the destruction of property. § 437.3 First Amendment Assemblies – General Considerations.

108.    The BCPD Policy also unequivocally states that "[i]ndividuals refusing to comply with lawful orders (e.g., nonviolent refusal to disperse) should be given a clear verbal warning and a reasonable opportunity to comply. If an individual refuses to comply with lawful orders, the Incident Commander should, if reasonably able to do so, evaluate the type of resistance and adopt a reasonable response in order to accomplish the law enforcement mission (such as dispersal or arrest of those acting in violation of the law). *Id.* § 437.7 First Amendment Assemblies – Use of Force.

109.    As alleged herein, BCPD officers, acting under the supervision of Defendant Gruenig, violated this policy by firing on Plaintiff Wolk without any warning or time to comply. Moreover, the decision to fire upon Wolk and the other peaceful demonstrators without warning or justification was not a reasonable response in order to accomplish the law enforcement mission.

110.    BCPD Policy permits the use of "control devices" (such as rubber bullets and pepper spray) "only when the participants' conduct reasonably appears to present the potential to harm officers, themselves or others, or will result in substantial property loss or damage." *Id.* Further, BCPD policy requires that "Force or control devices, including) chemical restraint [*sic*] should be directed toward individuals not toward groups or crowds, unless specific individuals cannot reasonably be targeted due to extreme circumstances, such as a riotous crowd." *Id.*

32

111.    As alleged herein, BCPD officers, acting under the supervision of Defendant Gruenig, violated this policy by utilizing control devices despite the fact that Plaintiff and the others gathered were posing no danger to officers or property and no reasonable officer could have feared for their safety or the safety of others. Moreover, the BCPD officers used control devices indiscriminately, shooting rubber bullets, pepper spray, chemical gas, and other munitions into the crowd rather than targeting individuals, despite the fact that the crowd was peaceful and any disruptive individuals could be reasonably targeted.

112.    Defendants' repeated decisions to ignore their own policies constitutes a custom and practice of failing to, and refusing to, follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other members of the public.

### c.    Hopkins Police Department

113.    Defendants' actions, including the indiscriminate use of force on peaceful protesters without providing meaningful opportunity to comply with orders, in addition to violating Plaintiff Wolk's constitutional rights, also runs afoul of contemporaneous Hopkins Police Department policy, which, in 2020, stated:

> Individuals refusing to comply with lawful orders (e.g., nonviolent refusal to disperse) should be given a clear warning and a reasonable opportunity to comply . . . . Control devices and Electro-Muscular Disruption Technology (EMDT) devices should be considered only when the participants' conduct reasonably appears to present the potential to harm officers, themselves or others, or will result in substantial property loss or damage . . . . Force or control devices, including oleoresin capsaicin (OC), should be directed toward individuals and not toward groups or crowds, unless individuals

33

cannot be reasonably be targeted due to extreme circumstances, such as a riotous crowd."[30]

Here, Plaintiff Wolk was not given a clear warning and a reasonable opportunity to comply with Defendants' orders. Moreover, Plaintiff Wolk's and the other protesters' conduct did not reasonably appear to present the potential to harm officers, themselves or others, or present a risk of property damage because the protesters were demonstrating peacefully. In fact, it wasn't until nearly an hour later that the law enforcement response declared the assembly unlawful. Finally, Defendants directed their pepper spray and less-lethal munitions at the crowd indiscriminately despite the fact that the protesters were demonstrating peacefully and no extreme circumstances were present.

114.    Defendants' indiscriminate use of control devices—which includes batons, tear gas, Oleorsein Capsicum (OC) (referred to colloquially as "pepper spray"), pepperball projectile systems, and kinetic energy projectiles—on peaceful protesters without providing meaningful opportunity to comply with orders, in addition to violating Plaintiff Wolk's constitutional rights, also runs afoul of Hopkins Police Department policy, which states:

> "Control devices may be used when a decision has been made to control, restrain or arrest a subject who is violent or who demonstrates the intent to be violent, and the use of the device appears reasonable under the circumstances. When reasonable, a verbal warning and opportunity to comply should precede the use of these devices. When using control devices,

---

[30]    Hopkins Police Department Policy Manual § 432.7, archived at https://web.archive.org/web/20200714173626/https://www.hopkinsmn.com/DocumentCenter/View/595/Police-Department-Policy-PDF

officers should carefully consider potential impact areas in order to minimize injuries and unintentional targets."[31]

Plaintiff Wolk and the other protesters were not violent and did not demonstrate the intent to be violent. Defendants did not provide Plaintiff Wolk with a verbal warning preceding the use of the control devices, nor did they provide Wolk with an opportunity to comply with commands to step back from the fence.

115.    Defendants also violated Hopkins Police Department policy regarding the use of kinetic energy projectiles specifically, which states:

> "A verbal warning of the intended use of the device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other offices and individual that the device is being deployed."[32]

Plaintiff Wolk and the other protesters were not given a verbal warning prior to Defendants' use of kinetic energy projectiles—despite the fact that doing so would not have endangered the safety of officers and would have been practicable under the circumstances.

116.    Defendants likewise violated Hopkins Police Department policy regarding the use of pepper spray and pepper projectiles, which states "[p]epper projectiles and OC spray should not be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public."[33] Defendants

---

[31] *Id.* § 303.3.
[32] *Id.* § 303.9.2.
[33] *Id.* § 303.7.

indiscriminately deployed pepper spray and pepper projectiles at the group of peaceful protesters including Plaintiff Wolk without any giving them any opportunity to disperse even though there was no risk to the safety of officers or the public.

**C.    Defendants Have a Pattern and Practice of Using Excessive Force**

117.    Defendants did not follow their own official policies regarding the use of less-lethal force in the days following Daunte Wright's death, resulting in such uses of force being excessive and demonstrating their retaliatory animus. Worse yet, Defendants have shown a pattern and practice of using excessive force when engaging with the public.

118.    These shocking stories from peaceful protestors over the course of multiple days exemplifies Defendants' pattern and practice of using excessive and unreasonable force on people they are meant to serve and protect.

119.    According to Police Scorecard[34], a data project that publishes a public evaluation of policing the United States, in 2016-2018 and 2020[35], there were 106 civilian complaints filed against HCSO, 39 of which were sustained. During this same period, 15 use of force complaints were filed against HCSO, 2 of which were sustained.[36]

120.    Similarly, from 2016 to 2020, there were 95 complaints submitted by civilians against the Brooklyn Center Police Department, including 29 use of force

---

[34]    Police Scorecard, https://policescorecard.org/mn/sheriff/hennepin-county (last visited May 24, 2022).
[35]    HCSO has not provided 2019 data despite numerous requests for its release.
[36]    Police Scorecard, https://policescorecard.org/mn/sheriff/hennepin-county (last visited May 24, 2022) (data compiled from Minnesota Board of Peace Officer Standards and Training (POST)) https://docs.google.com/spreadsheets/d/1AJFk9ILwxg2oJEDP4xj0C9Qi9lZLJNnxKG5N NPO__GA/edit#gid=0).

complaints.[37] Of those complaints, only 23 complaints in total, and only 2 of the use of force complaints, were sustained or ruled in favor of civilians. Since 2013, there have been 4 police killings by the BCPD, which is more killings by police per arrest than 94% of police departments nationwide.[38]

121.    The Brooklyn Center Police Department had eight police misconduct payouts from 2007 to 2018, two of which were among the most expensive police payouts in the state.[39]

122.    Moreover, emblematic of the pattern and practice of use of excessive force against nonviolent citizens is the event that ignited the protests in Brooklyn Center: the killing of Daunte Wright by Kim Potter of the BCPD. Potter decided to pull over Wright for having expired tabs and an air freshener hanging from the rearview mirror.[40] With no reason to fear for her safety and no reasonable belief that Wright was armed or dangerous, Potter, a 26-year police veteran, reacted to Wright making a quick movement by pulling out her service handgun and shooting him dead.[41] Potter was on a team of BCPD officers

---

[37] Police Scorecard, https://policescorecard.org/mn/police-department/brooklyn-center (last visited July 24, 2024)
[38] *Id.* (collecting data from *Mapping Police Violence*).
[39] Kim Hyatt and Jeff Hargarten, *Daunte Wright Killings Brings Fresh Scrutiny to Brooklyn Center Police Department.* Star Trib. (Apr. 17, 2021), https://www.startribune.com/daunte-wright-killing-brings-fresh-scrutiny-to-brooklyn-center-police-department/600047240/ (citing data from the League of Minnesota Cities Insurance Trust).
[40] Becky Sullivan and Laurel Wamsley, *Kim Potter, the Ex-cop Convicted in Daunte Wright's Death, is Sentenced to 2 years,* NPR (Feb. 18, 2022), https://www.npr.org/2022/02/18/1081597518/kim-potter-daunte-wright-sentencing
[41] *Id.*

in charge of doing field trainings for new officers and on April 11th when she killed Wright, she was accompanied by a trainee officer.[42]

123.    From 2016 to 2021, there were 45 civilian complaints submitted by civilians against the Hopkins Police Department.[43] Of those complaints, only 20% were ruled in favor of the civilians.[44]

124.    HCSO's, BCPD's, and HPD's unofficial customs and culture, and their deliberately indifferent failure to train, supervise, and discipline have all led to a pattern and practice of violating the First Amendment Rights of peaceful protesters.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### First Amendment—Free Speech, Free Assembly – Direct Liability
### (Against Defendants Miller, Harriman, Niemackl, Leyrer, and John Does 1-100)

125.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

126.    Plaintiff engaged in constitutionally protected acts by engaging in public demonstrations. Plaintiff will continue to do so in the future.

---

[42] Amir Vera, et al., *Here's What we Know about Kim Potter, the Officer who Fatally Shot Daunte Wright*, CNN (Dec. 23, 2021), https://www.cnn.com/2021/12/08/us/kim-potter-trial-what-we-know/index.html
[43] Police Scorecard, https://policescorecard.org/mn/police-department/hopkins# (last accessed July 24, 2024).
[44] *Id.*

127.    Defendants Miller, Harriman, Niemackl, Leyrer, and John Does 1-100, acting under color of law, used excessive force to curb Plaintiff's exercise of their First Amendment rights.

128.    Plaintiff reasonably fears the continued deployment of tear gas and less-lethal projectiles without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

129.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff from continuing to engage in public demonstration.

130.    Defendants Miller, Harriman, Niemackl, Leyrer, and John Does 1-100, acting under the color of state law, violated Plaintiff's First Amendment Rights to freedom of speech and assembly when these Defendants used force greater than what was necessary, without justification, on Wolk who was engaged in lawful and peaceful protest activity protected under the First Amendment. Further, no reasonable officer would believe that the amount and character of force applied by these Defendants was required for the officer to carry out his duties.

131.    Plaintiff reasonably fears further violation of their First Amendment rights if they continue to engage in lawful protest activity.

132.    Plaintiff Wolk suffered physical injury as a direct and proximate result of the Defendants Miller's, Harriman's, Niemackl's, Leyrer's, and John Does 1-100's violations

of their constitutional rights and these Defendants are jointly and severally liable to Plaintiff for damages.

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### First Amendment—Free Speech, Free Assembly – Supervisory Liability
### (Against Defendants Gruenig, Hutchinson, and Husevold)

133.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

134.    Plaintiff engaged in constitutionally protected acts by engaging in public demonstrations. Plaintiff will continue to do so in the future.

135.    Defendants Gruenig, Hutchinson, and Husevold, acting under color of law, directly ordered, authorized, directed, and commanded the actions of officers to use excessive force to curb Plaintiff's exercise of their First Amendment rights.

136.    Plaintiff reasonably fears the continued deployment of tear gas and less-lethal projectiles without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

137.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff from continuing to engage in public demonstration.

138.    Defendants Gruenig, Hutchinson, and Husevold, acting under the color of state law, violated Plaintiff's First Amendment Rights by directly ordering, authorizing, directing, and commanding law enforcement officers to indiscriminately use pepper spray

and less-lethal munitions on Plaintiff and the assembled protesters who were exercising their constitutional rights under the First Amendment and who had not broken any laws and were not posing a threat to officers, others, or property, without warning or an opportunity to comply. Further, these Defendants ordered law enforcement to take these actions despite the fact that no reasonable officer would believe that they were necessary to carry out their duties.

139.    Plaintiff reasonably fears further violation of their First Amendment rights if they continue to engage in lawful protest activity.

140.    Plaintiff Wolk suffered physical injury as a direct and proximate result of the Defendants Gruenig's, Hutchinson's, and Husevold's violations of their constitutional rights and these Defendants are jointly and severally liable with Defendants Miller, Harriman, Niemackl, Leyrer, and John Does 1-100 to Plaintiff for damages.

**THIRD CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**First Amendment—Free Speech, Free Assembly – State and Municipal Liability**
**(Against Defendants City of Brooklyn Center, Hennepin County, and City of Hopkins)**

141.    Plaintiff realleges each paragraph of this complaint as if they were fully set forth herein.

142.    Plaintiff engaged in constitutionally protected acts engaging in public demonstrations. Plaintiff will continue to do so in the future.

143.    Defendants Brooklyn Center, Hennepin County Sheriff's Office, and the City of Hopkins, acting under color of law, used excessive force to curb Plaintiff's exercise of their First Amendment rights.

144.    Plaintiff reasonably fears the continued deployment of chemical agents without warning, unlawful seizure, and excessive force through the firing of flash bang grenades, less-lethal projectiles, riot batons, and other means if they continue to engage in constitutionally protected activity.

145.    These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff from continuing to engage in public demonstration.

146.    It was Defendants Brooklyn Center's, Hennepin County Sheriff's Office's, and the City of Hopkins' custom and policy, as well as their failure to train and supervise their officers, and issue corrective instructions after violations were brought to light, that caused Defendants to violate Plaintiff's First Amendment rights.

147.    The Defendants Brooklyn Center's, Hennepin County Sheriff's Office's, and the City of Hopkins' failure to supervise and train their employees and agents with respect to Plaintiff's First Amendment rights, including a failure to investigate and discipline officers for First Amendment violations, amounts to reckless and deliberate indifference to Plaintiff's rights.

148.    The pattern of similar constitutional violations against Plaintiff and others that occurred during the protests of April 11 to April 17, 2021, demonstrates the reckless

and deliberate indifference of the Defendants Brooklyn Center, Hennepin County Sheriff's Office, and the City of Hopkins to Plaintiff's rights.

149.    Given the multiple constitutional violations documented above, Defendants Brooklyn Center's, Hennepin County Sheriff's Office's, and the City of Hopkins' lengthy pattern and practice of such violations, and the multiple past federal lawsuits arising out of such violations, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Brooklyn Center, Hennepin County Sheriff's Office, and the City of Hopkins demonstrated their reckless and deliberate indifference to the need for such training and supervision.

150.    Further, the excessive and unlawful use of force, and the rampant constitutional violations, were so widespread, well-known, and obvious to Defendants Brooklyn Center, Hennepin County Sheriff's Office, and the City of Hopkins, that Defendants' continued use of excessive force against Plaintiff, and continued violation of constitutional rights, was willful and recklessly indifferent to Plaintiff's rights.

151.    Plaintiff Wolk's First Amendment rights were violated when they were deliberately targeted and shot with less-lethal projectiles without warning or meaningful opportunity to comply while engaging in lawful protest activity.

152.    Plaintiff Wolk suffered physical injury as a direct and proximate result of Defendants' violations of their constitutional rights and Defendants, are jointly and severally liable to Plaintiff for damages.

153.    Plaintiff reasonably fears further violation of their First Amendment rights if they continue to engage in lawful protest activity and is entitled to injunctive relief against Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

A.    Enter judgment in favor of Plaintiff and against the Defendants;

B.    Declare that Defendants have infringed on the First Amendment rights of Plaintiff;

C.    Declare that Defendants have retaliated against Plaintiff for exercising their First Amendment rights;

D.    Declare that Defendants used excessive force on Plaintiff;

E.    Declare that Defendants have a pattern and practice of using excessive force against protesters such as Plaintiff;

F.    Enjoin and prohibit Defendants from continuing their use of excessive force;

G.    Award Plaintiff monetary damages in an amount that is fair and reasonable to compensate them for the damages they have suffered;

H.    Award Plaintiff punitive damages assessed against the Defendants Gruenig, Hutchinson, Miller, Harriman, Niemackl, Leyrer, Husevold, Hennepin County, the City of Brooklyn Center, and the City of Hopkins;

I.    Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

J.    Allow such other and further relief as the Court deems just and proper.

44

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial as to all issues triable by a jury.


Dated:  January 8, 2025                    Respectfully submitted,


                                            /s/Daniel J. Nordin
                                           Daniel E. Gustafson (#202241)
                                           Daniel J. Nordin (#392393)
                                           Anthony Stauber (#401093)
                                           Frances Mahoney-Mosedale (#0402741)
                                           **GUSTAFSON GLUEK PLLC**
                                           Canadian Pacific Plaza
                                           120 South 6th Street, Suite 2600
                                           Minneapolis, MN 55402
                                           Telephone: (612) 333-8844
                                           Facsimile: (612) 339-6622
                                           dgustafson@gustafsongluek.com
                                           dnordin@gustafsongluek.com
                                           tstauber@gustafsongluek.com
                                           fmahoneymosedale@gustafsongluek.com

                                           ***Attorneys for Plaintiff***