## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sam Wolk, | Case No. 22-cv-01666 (JWB/DTS) |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW IN SUPPORT OF HENNEPIN COUNTY, HENNEPIN COUNTY SHERIFF DAVID HUTCHINSON, DEPUTY AARON HOESE, DEPUTY BRANDON KNIEFEL, DEPUTY UC H, AND DEPUTY JOSEPH ZIMMER'S MOTION TO DISMISS** |
| Hennepin County, et al., | |
| Defendants. | |

## <u>INTRODUCTION</u>

In their Third Amended Complaint ("TAC"), Plaintiff brings three new First Amendment claims against four Hennepin County Sheriff's Office ("HCSO") deputies, former Hennepin County Sheriff David Hutchinson, and Hennepin County. Plaintiff's amended allegations indicate Plaintiff believes that deputies Aaron Hoese, Brandon Kniefel, UC H[1], and Joseph Zimmer ("Defendant Deputies") retaliated against them on April 14, 2021, for protesting among an assembled group of protesters outside the Brooklyn Center Police Department ("BCPD") headquarters. Plaintiff alleges that they[2] were injured on April 14 when a rubber bullet struck their leg and that they were

---

[1] "UC H" is a pseudonym for an HCSO deputy who works undercover. (*See* Doc. 184.)
[2] Plaintiff uses they/them pronouns.

subjected to tear gas and pepper spray. Plaintiff also attended protests at the same location on the following two days without incident.

But Plaintiff's re-fashioned counts do not articulate the elements of a First Amendment retaliation claim. If Plaintiff intended to put forth First Amendment retaliation claims, they have failed to state a plausible claim for relief. Not only does Plaintiff remain focused on the reasonableness of the Defendant Deputies' conduct, which is the incorrect standard, but Plaintiff cannot articulate a retaliatory motive for the Defendant Deputies allegedly singling Plaintiff out because none exists. Instead, Plaintiff voluntarily associated themselves with a large group of protesters who pelted water bottles at deputies, repeatedly shined strobe lights, and ignored commands to back away from a fence separating protesters from police headquarters. Body worn camera footage, which is embraced by the TAC, plainly shows Defendant Deputies responding with crowd control munitions to the assembled group's violent actions and defiance of lawful orders. Plaintiff does not raise the possibility that the Defendant Deputies interacted with them individually or even knew Plaintiff was at the protest because they can't. Plaintiff also does not plead sufficient facts to allege Hutchinson's personal involvement in Plaintiff's alleged constitutional deprivations. Likewise, Plaintiff fails to allege facts sufficient to state a claim for municipal liability against Hennepin County. As such, Plaintiff's TAC should be dismissed in its entirety.

## ALLEGATIONS IN THE THIRD AMENDED COMPLAINT

A. *Death of Daunte Wright and protests April 11-12, 2021*

On Sunday, April 11, 2021, Daunte Wright was killed by BCPD Officer Kim Potter. (TAC (Doc. 162) ¶ 2.) That same day, people gathered to protest. (*Id.*) Protesters initially gathered at the scene of Wright's death, where the crowd grew to more than 100 persons. (*Id.* ¶ 27.)  Additional police arrived on the scene, but police eventually exited the area. (*Id.* ¶ 29.)

Around 9 p.m., protesters gathered near the BCPD headquarters, where law enforcement had created a perimeter. (*Id.* ¶ 31.) Plaintiff alleges that BCPD, HCSO, and the Minnesota State Patrol ("MSP") were among the law enforcement agencies present. (*Id.*) Plaintiff further alleges that, just after 9:30 p.m., a BCPD Commander declared the assembly unlawful and gave the crowd ten minutes to disperse. (*Id.*)

Nearly thirty minutes after this dispersal order, just before 10 p.m., officers began deploying crowd control munitions, allegedly striking and injuring crowd members. (*Id.* ¶¶ 32-33, 36.) The BCPD Commander issued more dispersal orders, and police detained several crowd members. (*Id.* ¶¶ 35-36.)

The next day, April 12, the Brooklyn Center City Council passed a resolution limiting the use of certain crowd control tactics. (*Id.* ¶ 39.) Governor Walz enacted a curfew for Hennepin, Ramsey, Anoka, and Dakota counties. (*Id.* ¶ 41.) National Guard troops joined law enforcement in Brooklyn Center. (*Id.* ¶ 42.) Plaintiff alleges "upon information and belief" that Hutchinson, among others, was "in charge of the tactical

operations during all relevant time periods, including the decisions on use of force against protesters." (*Id.* ¶ 25.)

When curfew went into effect that evening, a large group had again gathered outside of the BCPD headquarters. (*Id.* ¶ 43.) Plaintiff alleges that law enforcement again used crowd control munitions, and that "[a]mong those involved" were HSCO, BCPD, MSP, DNR, and the National Guard. (*Id.* ¶¶ 43-44.) Around 40 people were arrested. (*Id.* ¶ 49.)

B. *Plaintiff is allegedly "indirectly exposed" to tear gas and other crowd control munitions on April 13, 2021, but Plaintiff does not allege that they were physically injured or arrested.*

On Tuesday, April 13, a curfew was again put in place. (*Id.* ¶ 52.) Plaintiff alleges that this is the first night they attended the protests, and that they gathered with the crowds outside the BCPD headquarters at approximately 8:30 p.m. (*Id.* ¶¶ 9, 54-56.) Plaintiff alleges that they were "indirectly exposed" to tear gas deployed by unidentified officers and that, between 8:30 p.m. and 9 p.m., they were "subjected to tear gas, flashbang grenades and other such crowd-control munitions fired at and around them." (*Id.* ¶¶ 9, 54.) After 9 p.m., dispersal orders were given and tear gas was allegedly deployed. (*Id.* ¶ 54.) Plaintiff alleges that the law enforcement contingency included BCPD, HCSO, and officers responding as part of Operation Safety Net. (*Id.*) Plaintiff further alleges that law enforcement deployed additional crowd control munitions and arrested protesters. (*Id.* ¶¶ 55-57.) Plaintiff does not allege that they were physically injured or arrested on April 13.

C. *Plaintiff is allegedly struck and injured by a "rubber bullet" and subjected to tear gas and pepper spray on April 14, 2021.*

On Wednesday, April 14, 2022, Brooklyn Center Mayor Mike Elliott held a press conference in which he indicated that Hutchinson "oversaw the Operation Safety Net agents and their tactics." (*Id.* ¶ 59.) The City of Brooklyn Center again announced a curfew beginning at 10 p.m. (*Id.* ¶ 61.)

Crowds, which again included Plaintiff, gathered outside of BCPD headquarters. (*Id.* ¶ 62.) Plaintiff initially alleges that "the assembled group" was peacefully protesting but later concedes that some of the protesters were, in fact, not peaceful. (*Id.* ¶¶ 62, 65, 71.) Plaintiff alleges that, at approximately 8:30 p.m., a group of HCSO officers, including Kniefel, shouted "back up, back up" and Kniefel "fired his 40mm launcher at Plaintiff Wolk . . . striking them in their leg" before they could comply with orders to back up, which resulted in difficulty walking for weeks and chronic knee pain. (*Id.* ¶¶ 63-64, 66, 76.) Plaintiff also alleges that crowd members behind them prevented Plaintiff from retreating from the fence. (*Id.* ¶ 67.) Plaintiff does not allege that Plaintiff had previously identified themselves to or interacted with Kniefel or any of the defendants. Moments later, Plaintiff alleges, Defendants Hoese, Zimmer, and UC H "indiscriminately deployed pepper spray" at the assembled protesters, including Wolk. (*Id.* ¶ 64.)

Plaintiff alleges this large group of protesters posed no threat to law enforcement personnel or property and that "no HCSO officer would have reasonably believed that they or other law enforcement officers were in imminent danger." (*Id.* ¶¶ 62, 65.)

However, the Deputy Defendants' body worn camera footage,[3] which is embraced by the operative complaint, shows the Deputy Defendants reacting to ongoing violent protester conduct in the 30 minutes leading up to Plaintiff's alleged injury, including protesters repeatedly throwing objects, shining lights at HCSO deputies, and disregarding law enforcement direction to back away from the fence separating the protesters from the BCPD. (*See* Declaration of Devona Wells, BWC Footage of Hoese ("Hoese BWC"), Ex. 1; BWC Footage of Kniefel ("Kniefel BWC"), Ex. 2; BWC Footage of UC H ("UC H BWC"), Ex. 3; BWC Footage of Zimmer ("Zimmer BWC")), Ex. 4.)

In fact, shortly after 8 p.m., Kniefel notes that the sun was going down and, already, the crowd had thrown objects at law enforcement. (Wells Decl., Ex. 2, Kniefel BWC 8:01:32-40). Less than three minutes later, Kniefel notes that the crowd of protesters "is picking up intensity, and they are condensing along the fence." (*Id.* 8:04:08-16.) Not long after, Kniefel states that two bottles were thrown over the fence, and an unidentified object can be seen coming over the fence and landing near Kniefel. (*Id.* 8:05:39-52, 8:05:59-01.) A minute later, Kniefel approaches the fence, while other offices can be heard ordering protesters to "back up." (*Id.* 8:07:42-52.) Kniefel then deploys his crowd control munition in response to a protester with a green laser who was throwing objects over the fence. (*Id.* 8:08:49-9:03.)

---

[3] Pursuant to the Stipulated Protective Order (Doc. 131), the faces and names of undercover deputies have been redacted from this footage.

Between 8:20 and 8:24 p.m., video footage shows a strobe light being shone at HCSO deputies, multiple deputies telling protesters to back up, objects being thrown over the fence, and, in response, officers deploying pepper spray and Kniefel deploying his 40-millimeter crowd control launcher, after which he states that "there's lots of objects being thrown." (*Id.* 8:21:36-22:24, 8:23:34-46, Wells Decl., Ex. 1, Hoese BWC 8:21:46, 8:21:52-22:12; Ex. 3, UC H BWC 8:21:18-35). Then, a bright strobe light is shone at deputies while bottles come directly at deputies; Kniefel states, "We are taking lots of bottles." (Wells Decl., Ex. 1, Hoese BWC 8:26:11; Ex. 2, Kniefel BWC 8:26:02; Ex. 3, UC H BWC 8:25:52-26:23, Ex. 4, Zimmer BWC 20:26:00, 20:26:11). Just after 8:29, five bottles are thrown over the fence in just five seconds. (Wells Decl., Ex. 2, Kniefel BWC 8:29:22-27.) At 8:29:31, UC H orders "back up, back up",  and, two seconds later, Kniefel also orders, "back up, back up" followed by another order to "back up now" while Zimmer also orders "get back now" and officers deploy pepper spray. (Wells Decl., Ex. 3, UC H BWC 8:29:31; Ex. 2, Kniefel BWC 8:29:33-37; Ex. 4, Zimmer BWC 8:29:36; Ex. 1, Hoese BWC 8:29:38-41.) At 8:29:38, Kniefel deploys crowd control munitions while continuing to order "back up" and bottles continue to be thrown over the fence. (Ex. 2, Kniefel BWC 8:29:38-30:19.) At 8:30:26, UC H states that protesters are refusing to back up from the fence and officers are "taking multiple bottles." (Wells Decl., Ex. 3, UC H BWC 8:30:26-34).

Plaintiff alleges that none of the protesters "in their immediate vicinity" were engaged in dangerous behavior and so the Deputy Defendants should have distinguished "between the peaceful demonstrators and those acting dangerously." (TAC ¶ 65.)

Plaintiff further alleges that "[n]o reasonable officer" would have understood they were carrying out their law enforcement duties when Plaintiff was allegedly injured. (TAC ¶¶ 70-71.)

According to Plaintiff, Defendants Hoese, Kniefel, UC H, and Zimmer were both acting on direct orders from unidentified sergeants and also "were instructed to deploy pepper spray and rubber bullets by other named and John Doe Defendants and/or did so due to policy or practice, or the training they received (or failed to receive) from HCSO." (*Id.* ¶¶ 68, 69).

Plaintiff alleges that comments made earlier that day by an unidentified HCSO officer provide evidence of the Deputy Defendants' animus. (*Id.* ¶ 72). However, the officer's statements do not relate to retaliation or use of force prompted by First Amendment activity and, instead, are simply crude comments by a non-defendant about a potential need to respond with less lethal munitions, if protests become violent, and the exercise of restraint by the HCSO on April 13 and 14. (*Id.*)

At 9:23 p.m., the Hopkins Police Captain declared the gathering an unlawful assembly and dispersal orders were given. (*Id.* ¶ 73.) Unidentified law enforcement continued to deploy pepper spray and non-lethal munitions, and 24 protesters were arrested. (*Id.* ¶ 73-74.) Plaintiff does not allege that they were among those arrested.

D. *Allegations regarding April 15-17, 2021*

Plaintiff alleges that they again attended protests near the BCPD headquarters on April 15 and April 16. (*Id.* ¶ 9.) Plaintiff does not allege that they were subjected to force or in any way mistreated by law enforcement on either day. (*Id.*)

8

On April 15, Brooklyn Center Mayor Elliott sent a letter to Hutchinson stating that Brooklyn Center remained in need of "mutual aid from its partner agencies" and expressing the Mayor's belief that HCSO had "taken command of the situation." (*Id.* ¶ 77.) The TAC does not allege wrongdoing by law enforcement on April 15.

On April 16, a temporary restraining was ordered in the civil action *Goyette, et al. v. City of Minneapolis, et al.*, Court File No. 20-cv-1302 (WMW/DTS). (*Id.* ¶ 80.) *Goyette* was a putative class action brought by journalists who claim they were mistreated by law enforcement at protests. (*Id.* ¶¶ 80-81.) The temporary restraining order enjoined state law enforcement, and their agents, from taking certain actions toward journalists covering protests. (*Id.* ¶ 82.) Notably, neither Hennepin County nor Hutchinson were parties to the *Goyette* action when the TRO was entered. (*See* Doc. 49, ¶ 4, Ex. 1.).) The *Goyette* plaintiffs did not join Hutchinson as a defendant, individually and in his official capacity, until five months later, in September 2021, and Hennepin County was never joined as a defendant. (*See id.*) The *Goyette* plaintiffs chose not to move for class certification against Hutchinson. (*See id.*, ¶ 5, Ex. 2.)

On the evening of April 16, after dispersal orders were given, 134 protesters were arrested outside of BCPD headquarters. (TAC ¶ 85.) Plaintiff alleges that journalists were mistreated by law enforcement on April 16, but does not allege that Plaintiff or other protesters were mistreated. (*Id.* ¶¶ 86-87.)

On April 17, no arrests occurred, and the TAC contains no allegations of misconduct by law enforcement occurring on or after that day. (*Id.* ¶¶ 89-90.) The TAC sets forth total numbers of different types of munitions deployed by HCSO during the

time period of April 11-April 20, 2021, and alleges that the BCPD and DNR deployed an unspecified number of chemical and direct impact munitions over the same time. (*Id.* ¶ 91.)

E.   *Municipal allegations*

In addition to allegations about events in Brooklyn Center, the TAC sets forth multiple HCSO policies. (*Id.* ¶¶ 4, 92-98.) Plaintiff claims that "Defendants" repeatedly ignored their own policies and were deliberately indifferent to the rights of Plaintiff and the public. (*Id.* ¶ 100.) Plaintiff further claims that "Defendants'" alleged failure to follow their policies resulted in the use of excessive force in Brooklyn Center, "demonstrating their retaliatory animus." (*Id.* ¶ 101.) Plaintiff alleges that, "[o]n information and belief," the authorization for use of force was given by on-scene incident commanders. (*Id.* ¶ 99.)

Plaintiff also cites three lawsuits arising out of the George Floyd protests in support of their claim that HCSO and the Minnesota Department of Public Safety have a history of misconduct preceding April 2021. (*Id.* ¶ 7 n.2.) In fact, two of the three lawsuits have no connection to Hennepin County or Hutchinson. (*See* Doc. 49, ¶ 6.) As discussed above, the third lawsuit, *Goyette*, had no connection to Hennepin County until Hutchinson was added as a defendant in September 2021, five months after the events at issue in the present action. (*See id.*, ¶ 4, Ex. 1.) Even after Hutchinson became a party in *Goyette*, the *Goyette* plaintiffs make no excessive force allegations against Hutchinson or anyone at HCSO stemming from the George Floyd protests. Plaintiff also cites statistics from the "Police Scorecard" regarding the number of civilian complaints sustained by HCSO in the years 2016-2018 and 2020. (TAC ¶ 103.)

On these limited alleged facts, Plaintiff claims that "Defendants" unofficial customs and culture, and failure to train, supervise, and discipline have led to a pattern and practice of violating protesters' First Amendment rights. (*Id.* ¶ 104.)

## F. Procedural history

On June 27, 2022, Plaintiff brought six Section 1983 claims against the City of Brooklyn Center, two Brooklyn Center police leaders, Hennepin County, Hutchinson, and several State Defendants: First Amendment—free speech and free assembly, Fourth Amendment—unlawful seizure and excessive force, First Amendment—retaliation, Fourteenth Amendment—due process, civil conspiracy, and failure to intervene. (Doc. 1.) The Complaint was amended on July 14, 2022. (Doc. 18.) All Defendants moved to dismiss the Amended Complaint. Prior to the district court hearing argument on the motions, the State Defendants settled and were dismissed from the action. (Doc. 79, 81.)

The district court granted in part and denied in part the remaining Defendants' motions to dismiss. (Doc. 89 at 2.) The Fourth Amendment due process claim was dismissed with all other claims allowed to proceed. (*Id.* at 24.) Hutchinson and Hennepin County appealed. (Doc. 92.) On July 12, 2024, the Eighth Circuit affirmed in part and reversed in part, finding that Plaintiff's Fourth Amendment excessive force, failure to intervene, and conspiracy claims were insufficient as a matter of law. *Wolk v. City of Brooklyn Center*, 107 F. 4th 854, 859-860 (8th Cir. 2024). The denial of qualified immunity on Plaintiff's First Amendment retaliation claim was affirmed with the Eighth Circuit stating that "[m]ore facts are necessary to determine whether law enforcement singled Wolk out due to retaliatory animus or was simply acting according to an

understanding of its responsibilities." *Id.* at 860. On January 8, 2025, Plaintiff filed a

Second Amended Complaint, adding the City of Hopkins and five Hopkins police offers

as defendants. (Doc. 143.) On May 29, 2025, the City of Brooklyn Center and Hopkins

Defendants were dismissed from this action. (Doc. 157.)

On June 2, 2025, Plaintiff filed a TAC, bringing three new Section 1983 claims:

First Amendment—free speech, free assembly against Defendants Hoese, Kniefel, UC H,

and Zimmer; First Amendment—free speech, free assembly—supervisory liability

against Hutchinson; First Amendment—free speech, free assembly—municipal liability.

(Doc. 162.) The First Amendment—retaliation claim from the Amended Complaint was

not included in the TAC.

Hennepin County, Hutchinson, and the Deputy Defendants now move to dismiss

all claims under Federal Rule of Civil Procedure 12(b)(6).

## **ARGUMENT**

To survive a motion to dismiss, a pleading must contain "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (also holding that a

complaint must contain "sufficient factual matter" to survive dismissal). Determining

whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.* at

679.

A pleading "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). A court may properly set aside legal conclusions, bare recitations of the elements of a claim, and indeterminate factual allegations. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Whether a complaint states a claim is a matter of law. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). If a complaint does not allege enough facts to state a claim for relief that is plausible on its face rather than merely conceivable, the claim must be dismissed. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678-79.

In addition, a court may consider certain outside materials, such as matters appearing in the record of the case, matters of public record, materials that do not contradict the complaint, and materials that are necessarily embraced by the pleadings without converting a motion under Rule 12 into one for summary judgment. *See generally Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). At the motion to dismiss stage, courts routinely consider body-worn camera footage as material "necessarily embraced by the pleadings." *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 620-21 (8th Cir. 2023) ("Videos of an incident are necessarily embraced by the pleadings.") (citing *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021)); *see also Irish v. McNamara*, 108 F.4th 715, 717-18 (8th Cir. 2024) (considering deputy's body cam footage at motion to dismiss); *Ferguson v. Cnty. of Clearwater*, 725 F. Supp. 3d 954, 958 (D. Minn. 2024) (considering video of incident at issue at motion to dismiss); *Miller-Fields v. Londregan*, 755 F. Supp. 3d 1122, 1127 n.1 (D. Minn. 2024) (considering body

cam and squad car footage at motion to dismiss). A plaintiff's version of facts blatantly contradicted by video evidence will not be accepted. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019).

I.    **Plaintiff Fails to State a Plausible Claim for Relief Against Defendant Deputies.**

Plaintiff cannot sustain a First Amendment retaliation claim because it is improperly pled, they rely on the wrong standard, and they fail to plausibly allege retaliation. At a minimum, the individual defendants are entitled to qualified immunity.

A.  **Plaintiff has improperly pleaded a retaliation claim.**

To prevail on a First Amendment claim, Plaintiff must establish that: (1) they engaged in protected First Amendment activity, (2) law enforcement took an adverse action that would chill a person of ordinary firmness from continuing that protected activity, and (3) the First Amendment activity was the "but-for cause" of the Plaintiff's alleged injury." *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023) (citation omitted). The third element requires that a plaintiff show that the "defendant would not have taken the adverse action but for harboring 'retaliatory animus' against the plaintiff because of" the exercise of their First Amendment rights. *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

Plaintiff's TAC puts forth First Amendment—free speech, free assembly claims against the Deputy Defendants, Hutchinson, and Hennepin County. (TAC pp. 31-36.) Inexplicably, the operative complaint does not contain the First Amendment—retaliation claim that the Eighth Circuit retained in Plaintiff's Amended Complaint. Further, the

14

claims in the operative complaint plead the first and second elements of a First Amendment retaliation claim but not the third. *See id.* Instead, the First Amendment claims in the TAC plead that the force used against Wolk was excessive, without justification, and unreasonable. (*See id.*) The claims, as pled, make no mention of the requisite retaliatory causation element,[4] leaving the Hennepin County Defendants to wonder what First Amendment claim Plaintiff is making, which is improper. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 665 (8th Cir. 2012) (stating plaintiff's short and plain statement of the claim must provide defendant with fair notice of plaintiff's claim) (citation omitted). Because Plaintiff did not plead an essential element of a First Amendment retaliation claim, Plaintiff has failed to bring properly pled claims and so they should be dismissed in their entirety.

### B. Plaintiff's allegations of unreasonableness do not establish animus.

If Plaintiff intended to bring First Amendment retaliation claims, they articulate the wrong standard. When assessing a retaliation claim, courts look not to whether the use of force was reasonable, "but rather whether the use of force was retaliatory." *Aldridge v. City of St. Louis*, 75 F.4th 895, 900 n.4 (8th Cir. 2023). Additionally, the Eighth Circuit will not find liability for retaliatory use of force where law enforcement is mistaken about their understanding of their law enforcement duty, even in situations where an officer is so mistaken as to be "unreasonable." *Mitchell*, 28 F.4th at 897 (citing

---

[4] Though there are mentions of animus and retaliation in Plaintiff's factual allegations and Prayer for Relief, they are missing from the claims pled.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010)). Because Plaintiff's attempt to show a retaliatory motive centers on allegations of reasonableness, Plaintiff's First Amendment claim fails.

Plaintiff alleges that the Deputy Defendants' conduct evinced animus because (1) "[n]o reasonable officer" would have understood they were carrying out their law enforcement duties at 8:30 p.m. on April 14 and (2) discerning between plaintiff and other protestors who were not demonstrating peacefully during a dangerous, chaotic situation was both "feasible and reasonable." (TAC ¶¶ 70-71.) However, courts do not analyze the reasonableness of an officer's conduct to determine if a First Amendment retaliation claim exists. Instead, where a use of force underlies a retaliation claim, courts examine whether the allegations show that an officer's conduct was driven by animus. *See Aldridge*, 75 F.4th at 900-01 (determining that whether officer's actions were "reasonable under the circumstances" was immaterial to whether the officer's use of pepper spray was retaliatory). In fact, the Eighth Circuit principle that an officer may be so mistaken as to be "unreasonable" and, thus, not liable for a First Amendment violation illustrates that reasonableness has no place in a retaliation analysis. *See Mitchell*, 28 F.4th at 897.

Even so, the Eighth Circuit already dismissed Plaintiff's excessive force claim as "insufficient as a matter of law." *Wolk*, 107 F.4th at 859. Furthermore, even if the relevant inquiry was objective reasonableness (it is not), in light of the video evidence embraced by the pleadings, Plaintiff has wholly failed to plausibly allege that Defendant Deputies' actions were objectively unreasonable. Whether a law enforcement officer's

16

actions are objectively reasonable depends on the facts and circumstances confronting the officer, without regard to the officer's subjective intent or motivation. *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). Even if an officer's understanding is later shown to be wrong, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Id.* at 966 (citing *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993)). A plaintiff's subjective motive, "does not bear on how reasonable officers would have interpreted [plaintiff's] behavior." *Fischer v. Hoven*, 925 F.3d 986, 989 (8th Cir. 2019); *see Loch*, 689 F.3d at 966 ("[E]ven if [plaintiff's] motives were innocent, a reasonable officer on the scene could have interpreted [plaintiff's] actions as resistance. . . . . [A] reasonable officer could believe that [plaintiff's] failure to comply was a matter of choice rather than necessity.").

Here, as discussed above, the video embraced by the pleadings shows that Defendant Deputies were confronted with a crowd that threw multiple objects at officers. This crowd repeatedly approached the fence that separated them from law enforcement despite multiple directions to "back up." Even if, as Plaintiff alleges, crowd members behind them prevented Plaintiff from retreating from the fence, in light of the video showing the crowd's violent actions and repeated defiance of lawful orders, Plaintiff has failed to plausibly allege that Defendant Deputies' actions were objectively unreasonable.

### C. Plaintiff has not plausibly alleged a First Amendment retaliation claim.

Plaintiff has failed to allege facts that would support a plausible claim of First Amendment retaliation. Plaintiff's reliance on inconsistent facts that are contradicted by the Defendant Deputies' body cam footage is insufficient as a matter of law. Further,

Plaintiff's allegations raise the plausible inference that law enforcement was fulfilling its duties, not that Plaintiff was singled out for exercising their First Amendment rights.

### 1. Plaintiff's allegations are contradicted by body worn camera, internally inconsistent, and not plausible.

Key allegations made by Plaintiff are blatantly contradicted by video evidence embraced by the pleadings, including allegations that Deputy Defendants were not in danger, that protesters posed no threat to Deputy Defendants, and that Deputy Defendants waited no time to use crowd control munitions after ordering that protesters "back up." Courts do not accept allegations blatantly contradicted by video evidence. *Waters*, 921 F.3d at 734.

Plaintiff alleges that no law enforcement officer at the BCPD headquarters would "have any cause to fear for his safety or the safety of public or private property." (TAC ¶ 62.) Yet video evidence shows the opposite, as objects are thrown numerous times over the fence outside BCPD headquarters and toward law enforcement. (*See, e.g.*, Wells Decl., Ex. 2, Kniefel BWC 8:01:32-40, 8:05:39-52, 8:05:59-01; 8:29:22-27.) Additionally, strobe lights were shone multiple times at deputies and protesters repeatedly ignored orders to back up, which were intended to control the violent crowd. (*Id.* 8:21:36-22:24, 8:23:34-46, Wells Decl., Ex. 1, Hoese BWC 8:21:46, 8:21:52-22:12.)

Additionally, Plaintiff alleges that the assembled group of protesters they joined was peacefully protesting (TAC ¶ 62), which is plainly contradicted by the video evidence cited above. And the TAC itself further underscores this contradiction by alleging that protesters were, in fact, "acting dangerously" and not demonstrating

peacefully (*Id.* ¶¶ 65, 71). Such contradictory allegations are not well pled allegations. *Braden*, 588 F.3d at 594 ("[C]omplaint[s] should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.").

Plaintiff also alleges that Deputy Defendants used crowd control munitions that allegedly caused Plaintiff's injury after ordering protesters to "back up" but did not wait "any amount of time" for Plaintiff to respond. (TAC ¶¶ 64, 66.) In fact, body cam footage between 8:21:26 and 8:21:38 shows Defendants Hoese and Kniefel repeatedly ordering protesters to back away from the fence. (Wells Decl., Ex. 2, Kniefel BWC 8:21:38; Ex. 1, Hoese BWC 8:21:26; Ex. 3.) After that, multiple bottles are thrown over the fence and strobe lights are shone at deputies. (*Id.* 8:23:34-46, Wells Decl., Ex. 1, Hoese BWC 8:21:52-22:12.) At 8:29:22, five bottles come over the fence, followed by UC H at 8:29:31 again ordering protesters to back up; two seconds later, Kniefel also orders, "back up, back up" followed by another order to "back up now" while Zimmer also orders "get back now" and officers deploy pepper spray. (Wells Decl., Ex. 3, UC H BWC 8:29:31; Ex. 2, Kniefel BWC 8:29:22-27, 8:29:33-37; Ex. 4, Zimmer BWC 8:29:36; Ex. 1, Hoese BWC 8:29:38-41.) At 8:29:38, Kniefel deploys crowd control munitions while continuing to order "back up" and bottles continue to be thrown over the fence. (*Id.*, Ex. 2, Kniefel BWC 8:29:38-30:19). At 8:30:26, UC H states that protesters are refusing to back up from the fence and officers are "taking multiple bottles." (Wells Decl., Ex. 3, UC H BWC 8:30:26-34).

So not only were protesters repeatedly warned to back up before the use of crowd control munitions, they were ordered to back up numerous times over the course of

several minutes, which blatantly contradicts Plaintiff's allegations. *See Waters*, 921 F.3d at 734 (stating courts will not accept allegations blatantly contradicted by video evidence).

Plaintiff further alleges that Defendant Deputies "exhibited animus toward Plaintiff" at 8:30 p.m. on April 14 while also alleging that they "were acting on direct orders" to use crowd control munitions. (TAC ¶¶ 68, 70.) But deputies cannot be both acting on their own retaliatory motive and also acting on direct orders from their superiors. Such allegations fall far short of plausibility.

Finally, Plaintiff points to statements by an unidentified HCSO commanding officer as support for Defendant Deputies' retaliatory motive. (*Id.* ¶ 72.) But Plaintiff does not allege that the Defendant Deputies made, heard, or were even aware of these alleged statements. Further, the officer's statements do not relate to alleged retaliation or a use of force prompted by First Amendment activity and, instead, are crude comments made by a non-defendant about a potential need to respond with crowd control munitions, if protests become violent, as well as the exercise of restraint by the HCSO on April 13 and 14. (*Id.*) Therefore, these comments have no bearing on Plaintiff's claims.

### 2. Plaintiff was not singled out by HCSO deputies.

To establish but-for causation in a First Amendment retaliation claim, a plaintiff must show they were "singled out" because of their protected expression. *De Mian v. City of St. Louis*, 86 F.4th 1179, 1182 (8th Cir. 2023) (stating Eight Circuit has repeatedly held that plaintiffs must show they were "singled out" due to protected expression). Because Plaintiff's allegations, coupled with the video evidence embraced by the pleadings, do not

show that Plaintiff was singled out because they were exercising their First Amendment rights, Plaintiff's claims fail.

First, Plaintiff alleges that they were part of an "assembled group" of protesters without any indication that Plaintiff distinguished themselves from the group or interacted with any of the Defendant Deputies or Hutchinson. (TAC ¶ 62.) Therefore, Plaintiff could not have been singled out by HCSO deputies. *See Aldridge*, 75 F.4th at 900 (concluding protesters not singled out when they had no interactions with officers, officers were not aware of plaintiffs, and plaintiffs did not differentiate themselves). Additionally, here, Plaintiff's allegations are unlike the scenarios courts have held establish a protester was singled out because, for instance, a use of force occurred separate from the protesting activity or after an altercation with law enforcement. As an example, in *Green v. City of St. Louis*,[5] the Eighth Circuit determined that a plaintiff had sufficiently alleged she was singled out by officers when they sprayed tear gas at her one hour after she left a protest and was walking to her car. 52 F.4th 734, 740 (8th Cir. 2022); *see also Brandy v. City of St. Louis*, 75 F.4th 908, 916 (8th Cir. 2023) (holding protester alleged they were singled out when pepper sprayed after verbal altercation with officer);

_____

[5] When the Eighth Circuit assessed the Plaintiff's First Amendment retaliation claim, as pled in the Amended Complaint (Doc. 18), it pointed to *Green v. City of St. Louis* in concluding that more facts were needed to determine if law enforcement singled out Wolk or was acting according to an understanding of its responsibilities. *Wolk*, 107 F.4th 854, 860 (8th Cir. 2024) (citing *Green*, 52 4th 734, 740 (8th Cir. 2022)). The TAC includes many more factual allegations related to April 14 than did the Amended Complaint, and the video footage embraced by the operative pleading provides helpful, additional context.

*Welch v. Dempsey*, 51 F.4th 809, 813 (8th Cir. 2022) (holding protester showed retaliatory motive when pepper sprayed in face when standing alone on a public sidewalk streaming a live video on her phone). Here, by contrast, the allegations and video evidence show that Plaintiff voluntarily associated themself with an assembled group of protesters, during which violent protester conduct and defiance of lawful orders elicited the use of crowd control munitions.

Second, Plaintiff alleges that Defendants Hoese, Zimmer, and UC H "indiscriminately deployed pepper spray at the protesters outside the fence, including Plaintiff Wolk." (TAC ¶ 64.) As the Eighth Circuit has held, "One cannot simultaneously single out [one protester] and 'indiscriminately' spray the crowd." *Aldridge*, 75 F.4th at 900. At most, Plaintiff has alleged that they were present at a protest and impacted by a law enforcement response directed at the assembled group of protesters. *See Brown v. City of St. Louis*, No. 4:18 CV 1676 JMB, 2022 WL 1501368, at *4 (E.D. Mo. May 12, 2022). Nothing in the TAC or video evidence indicates that the HCSO directed their law enforcement response at Plaintiff, which renders Plaintiff's First Amendment claims insufficient as a matter of law.

### 3. Deputies' ongoing efforts to maintain order provide an obvious alternate explanation to retaliation.

Video evidence embraced by the pleadings shows a law enforcement response to violent protester conduct and defiance of lawful orders, providing an obvious alternate explanation—crowd control—for the use of less-lethal munitions. Where an obvious alternative explanation exists for a use of force, causation is lacking. *Laney v. City of St.*

*Louis*, 56 F.4th 1153, 1158 (8th Cir. 2023) (noting that non-lethal force "is exactly how

we would expect an officer to diffuse what had become a volatile situation") (citation

omitted). In the thirty minutes leading up to the time when Plaintiff alleges they were

injured, the video evidence embraced by the pleadings shows Defendant Deputies

enduring an ongoing barrage of objects thrown over the fence from the assembled

protesters and strobe lights repeatedly shined at officers, as well as protesters repeatedly

told to "back up" from the BCPD headquarters fence.  As the video evidence shows, each

use of force during that time was in reaction to the danger posed to law enforcement. For

example, at 8:01:32-40, Kniefel notes objects are being thrown at law enforcement,

followed about four minutes later by two bottles and a third object thrown over the fence.

(Wells Decl., Ex. 2, Kniefel BWC 8:01:32-40, 8:05:39-52, 8:05:59-01.) A short time

later, officers direct protesters to back up and shortly after that Kniefel deploys his 40-

millimeter crowd control munition, stating that he attempted to deter an individual who

had been shining a green laser at law enforcement and who then threw an object over the

fence. (*Id.* 8:07:42-52, 8:08:49-9:03.) Additionally, in the moments before Plaintiff

alleges they were injured, multiple objects are thrown by protesters at HCSO deputies

and deputies again order protesters to back up from the fence, after which deputies

deploy crowd control munitions. (Wells Decl., Ex. 2, Kniefel BWC 8:29:22-27, 8:29:33-

37, 8:29:38-30:19; Ex. 4, Zimmer BWC 8:29:36; Ex. 1, Hoese BWC 8:29:38-41.) These

examples show repeated law enforcement efforts to maintain order. Therefore, the only

plausible inference to draw is that the Deputy Defendants' response was driven by their

understanding of their responsibility to maintain law and order. *See Mitchell*, 28 F.4th at

897 (declining to infer retaliatory animus at motion to dismiss where obvious alternative explanation was that officers were "simply trying to maintain law and order"); *Aldridge*, 75 F.4th at 899-900 (stating that wide arc of pepper spray supports "obvious alternative explanation" that spray was used as crowd control mechanism, not to retaliate against a particular protester); *Jones v. City of St. Louis*, 599 F. Supp. 3d 806, 819 (8th Cir. 2022) (stating that protesters pelting officers with objects "bolsters Defendants' non-retaliatory justification that any use of force was in an attempt to maintain order").

## II.    Plaintiff's Claims Against Hutchinson Fail to State a Plausible Claim for Relief.

"Because vicarious liability is inapplicable to . . . [Section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual* actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added).  "Section 1983 does not sanction tort by association." *Smith v. City of Minneapolis*, 754 F.3d 541, 547–48 (8th Cir. 2014) (internal quotations marks omitted).

A supervisor may be individually liable under Section 1983 "if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). A plaintiff asserting a supervisory liability claim "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts[,]" which "requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* (citations omitted). Because Section 1983 liability "requires

24

a causal link to, and direct responsibility for, the deprivation of rights," Plaintiff "must allege specific facts" regarding Hutchinson's "personal involvement in, or direct responsibility for," the deprivation of their rights. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007). Hutchinson's role as supervising the law enforcement activities of the HCSO is an insufficient basis on which to rest Section 1983 individual liability. *See Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987) (noting that "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement" for purposes of an individual capacity Section 1983 claim).

As an initial matter, Plaintiff's supervisory claims against Hutchinson fail because, as discussed above, Plaintiff has failed to plausibly allege a constitutional violation by Defendant Deputies. *See Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017) (Section 1983 supervisory claims "automatically fail" if no underlying constitutional violation). But even if Plaintiff had sufficiently alleged an underlying constitutional violation, Plaintiff has failed to sufficiently allege personal involvement by Hutchinson. Plaintiff does not allege that Hutchinson took any action directly aimed at Plaintiff. Plaintiff does not allege that Hutchinson was present when Plaintiff was allegedly struck in the knee by a rubber bullet and subjected to tear gas and pepper spray on April 14. Plaintiff does not allege that Hutchinson personally trained or supervised any unnamed law enforcement officer Plaintiff alleged violated Plaintiff's rights.

The fact that Hutchinson is the head of the HCSO is an insufficient basis to sustain individual liability under Section 1983. *See Tilson v. Forrest City Police Dep't*, 28 F.3d

25

802, 808 (8th Cir. 1994) (Chief of Police's knowledge that inmate was in custody was insufficient basis to hold Chief liable for the inmate's false arrest by subordinate officers); *Clemmons*, 477 F.3d at 967 (holding that the warden's general supervisory duties and receipt of investigative memorandum were an insufficient basis to attach individual Section 1983 liability for wrongful conviction); *Armstrong v. City of Minneapolis*, 525 F. Supp. 3d 954, 966 (D. Minn. 2021) ("In essence, Plaintiffs' claim is that because Arradondo is the Chief of Police, he bears supervisory responsibility for all officers in the MPD, and may therefore be held individually liable for constitutional violations committed by any MPD officer. In the Court's view, this theory stretches § 1983 supervisory liability too far."); *Cole v. Does*, 571 F. Supp. 3d 1033, 1046 (D. Minn. 2021) (dismissing claims against State law enforcement supervisors on Rule 12 motion); *Marks v. Doe 1*, 528 F. Supp. 3d 1008, 1016 (D. Minn. 2021) (dismissing, pursuant to Rule 12, individual liability claims against Chief Arradondo for alleged unlawful acts by subordinate officers during protests); *Stevenson v. Doe*, No. 20-CV-02007 (SRN/TNL), 2021 WL 931186, at *6 (D. Minn. Mar. 11, 2021) (same).

Plaintiff's Section 1983 claims against Hutchinson must be dismissed.

## III.    At a Minimum, the Deputy Defendants and Hutchinson are Entitled to Qualified Immunity.

"'Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam)). Public officials are, therefore, "entitled to qualified

immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (internal quotation marks omitted). "[C]ourts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'" *Nord v. Walsh Cnty.*, 757 F.3d 734, 738–39 (8th Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality[.]" *McDaniel v. Neal*, 44 F.4th 1085, 1091 (8th Cir. 2022) (ellipsis and internal quotation marks omitted). "Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kisela*, 584 U.S. at 104 (quoting *White*, 580 U.S. at 79). Where the facts of a prior decision are "materially distinguishable" from the instant case, the prior decision is not "sufficiently similar" to defeat qualified immunity. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7-8 (2021) (per curiam).

The Supreme Court has not stated whether a right may be clearly established without a Supreme Court case specifically recognizing it. *Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022). Absent Supreme Court precedent, the Eighth Circuit has identified three additional ways by which a plaintiff can show the law is clearly established. First, "[a plaintiff] may identify existing circuit precedent involving sufficiently similar facts that squarely governs the situation." *L.G. through M.G. v.*

27

*Columbia Pub. Schs.*, 990 F.3d 1145, 1147 (8th Cir. 2021). Second, "a plaintiff may point to 'a robust consensus of cases of persuasive authority' establishing that the facts of [plaintiff's] case make out a violation of clearly established right." *Id.* at 1147-48. A consensus based on "the decision of a single circuit and a handful of lower courts" is not "robust." *Id.* at 1150. "Finally, a plaintiff may show, in rare instances, that a general constitutional rule applies with 'obvious clarity' to the facts at issue and carries the day for [plaintiff]." *Id.* at 1148. "The principle at the heart of these approaches is that state actors are liable only for transgressing bright lines, not for making bad guesses in gray areas." *Id.*

As discussed above, Plaintiff has not sufficiently pled a plausible claim of a constitutional violation against the Deputy Defendants or Hutchinson. In addition, the Deputy Defendants and Hutchinson are entitled to qualified immunity, because, even if their conduct was unlawful (it was not), such unlawfulness was not clearly established on April 14, 2021.

## IV.  Plaintiff's Claims Against Hennepin County Also Fail Under Rule 12.

There is no *respondeat superior* liability under Section 1983, and a municipality like Hennepin County may not be held liable for a constitutional violation unless "the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019) (internal quotation marks omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

28

As a threshold matter, Hennepin County is entitled to dismissal of Plaintiff's claims because, as discussed above, Plaintiff has failed to plausibly allege an underlying constitutional violation against the individual defendants. *See Mendoza*, 849 F.3d at 420. Even assuming, *arguendo*, that Plaintiff had otherwise stated a constitutional violation in this action, which they have not, Plaintiff does not plausibly allege facts sufficient to support a claim for municipal liability against Hennepin County under Section 1983.

### A.    Plaintiff fails to plead facts sufficient to plausibly allege that their alleged injuries were caused by the application of a specific Hennepin County policy, custom, or practice.

Under *Monell*, a plaintiff must plausibly allege specific facts that support the conclusion that Hennepin County had an unconstitutional policy or custom that caused the injury alleged. "A 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (citations omitted). A governmental custom may also be the basis for liability, but a plaintiff must ultimately prove: (1) the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees"; (2) "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct"; and (3) that plaintiff was injured "by acts pursuant to the governmental entity's custom", *i.e.*, proof "that the custom was the moving force behind the constitutional violation." *Id.* To prove an unconstitutional custom, a plaintiff must show that "officials had notice of prior

29

incidents of . . . misconduct and had deliberately failed to act on this knowledge." *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987).

Here, Plaintiff does not allege that Hennepin County had an unconstitutional policy that led to a deprivation of their constitutional rights. Instead, Plaintiff quotes extensively from HCSO policies, and then alleges that these policies were disregarded during the response to the Brooklyn Center protests, which resulted in the use of excessive force and retaliatory animus. (TAC ¶¶ 92-98, 101.)

Plaintiff fails to sufficiently allege the existence of an unconstitutional custom within Hennepin County of retaliating against protesters for exercising their First amendment rights. Instead, Plaintiff makes a generalized allegation that "Defendants" have "a pattern and practice of using excessive force when engaging with the public." (*Id.* ¶¶ 101-02.) As laid out above, Plaintiff has failed to plausibly allege that HCSO employees retaliated against Plaintiff. And Plaintiff fails to allege retaliation against any other protesters by HCSO employees. In fact, the allegations related to the Deputy Defendants are brought solely in relation to one day—April 14, 2021. (*See id.* ¶¶ 12-15.) Plaintiff also repeatedly alleges that HCSO was among the law enforcement agencies that responded to and deployed crowd control munitions at the protests in Brooklyn Center. HCSO's presence and deployment of crowd control munitions at protests are not sufficient to allege an unconstitutional custom. It is also insufficient to put Hennepin County policymakers on notice of the alleged wrongdoing, especially considering the undisputed existence of Sheriff's Office polices authorizing the lawful use of crowd control munitions.

Plaintiff cites the *Armstrong*, *Samaha,* and *Goyette* lawsuits, claiming that these civil actions put Hennepin County policymakers on notice of a pattern of misconduct that they failed to correct prior to April 2021. (*Id.* ¶ 7 n.2.) In fact, as discussed above, Hennepin County, HCSO, and Hutchinson are not parties to *Armstrong* or *Samaha*. (*See* Doc. 49, ¶ 6.)  In April 2021, Hennepin County, HCSO, and Hutchinson were similarly not parties in *Goyette*. (*See* Doc. 49 ¶ 4, Ex. 1.) Hutchinson, the only Hennepin County defendant in *Goyette*, was not joined as a defendant in *Goyette* until September 2021, five months after the protests at issue here. (*See id*.) Therefore, even if the allegations in *Goyette* were sufficient to put Hennepin County policymakers on notice of a pattern of misconduct, which they are not, no such allegations were levied until well after Plaintiff's injuries here. Post-incident events cannot be the "moving force" behind a prior deprivation of constitutional rights and cannot support an unconstitutional custom claim. *Mettler*, 165 F.3d at 1205.

Plaintiff also alleges that data from an online "Police Scorecard" showing the percentage of civilian complaints sustained by HCSO supports their Section 1983 municipal liability claim against Hennepin County. (TAC ¶ 103.) Plaintiff alleges that HCSO received fifteen use of force complaints in 2016-2018 and 2020, and two of these complaints were sustained. (*Id.*) Further, unsustained complaints cannot form the basis for municipal liability. *See Mettler,* 165 F.3d at 1204-05; *Fancher v. Klann*, No. CIV. 13-435 DSD/JJK, 2014 WL 4294960, at *4 (D. Minn. Aug. 28, 2014). In addition, fifteen complaints against two individual officers have been found insufficient to establish *Monell* liability. *See Mettler*, 165 F.3d at 1205. Considering this precedent, fifteen total

31

use of force complaints against a county-wide agency over the period of four years

cannot plausibly allege an unconstitutional custom of excessive force.

In addition to failing to plausibly allege the existence of an unconstitutional

custom of excessive force within Hennepin County, Plaintiff has failed to plausibly allege

that any such custom was the "moving force" behind their alleged constitutional

deprivations. Therefore, Plaintiff cannot plausibly allege that a Hennepin County custom

was the moving force behind their injuries.

**B.    Plaintiff fails to plead facts sufficient to plausibly allege that their alleged injuries were caused by any failure by Hennepin County to supervise or train its employees.**

Likewise, the TAC fails to state a failure-to-train-and-supervise claim against

Hennepin County under Section 1983 and *City of Canton*. In some "limited"

circumstances, a municipality's "decision not to train employees about their legal duty to

avoid violating citizens' rights may rise to the level of an official government policy for

purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But to state a claim

based on a failure to train and supervise, a plaintiff must allege: (1) the municipality's

training practices were inadequate; (2) the municipality was deliberately indifferent to the

rights of others in adopting those training practices "such that the failure to train reflects a

deliberate or conscious choice" by the municipality; and (3) the inadequate training

caused a constitutional deprivation. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010)

(quoting *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) and *City of Canton*, 489

U.S. at 388-89).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks and citation omitted); *see also Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013) (affirming dismissal of claim where plaintiff alleged inadequate supervision and training practices but supported his claim with only his own arrest and detention). However, the Supreme Court has left open the possibility, "however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

Plaintiff alleges no facts that support any allegation that Hennepin County violated the Constitution by failing to train and supervise its employees. The TAC identifies no training or supervision practices that Hennepin County employed or failed to employ, no pattern of similar constitutional violations by untrained or unsupervised employees, and no facts suggesting a patently obvious constitutional violation that was caused by a failure to train or supervise employees. So, to the extent that Plaintiff brings any of their Section 1983 claims against Hennepin County under *City of Canton*, they are insufficient and should be dismissed.

## **CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss.

MARY F. MORIARTY
Hennepin County Attorney

Dated: August 1, 2025          By: _/s/ Devona L. Wells_____
                              DEVONA L. WELLS (#0392052)
                              SARAH McLAREN (#0345878)
                              LEAF McGREGOR (#0389140)
                              JAMIL M.F. MASROUJEH (#0400895)
                              Assistant County Attorneys
                              1300A Government Center, MC137
                              300 South Sixth Street
                              Minneapolis, MN 55487
                              Telephone: (612) 348-5532
                              FAX No: (612) 348-8299
                              Devona.Wells@hennepin.us
                              Sarah.McLaren@hennepin.us
                              Leaf.McGregor @hennepin.us
                              Jamil.Masroujeh@hennepin.us

                              *Attorneys for Defendants Hennepin County,*
                              *Hennepin County Sheriff David Hutchinson,*
                              *Deputy Aaron Hoese, Deputy Brandon Kniefel,*
                              *Deputy UC H, and Deputy Joseph Zimmer*